## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

RITU BHAMBHANI, M.D., *on behalf of herself and on behalf of all others similarly situated*,

Plaintiff,

- v. -

INNOVATIVE HEALTH SOLUTIONS, INC., and ACCLIVITY MEDICAL, LLC,

Defendants.

Civil Action No.: 19-CV-355

**CLASS ACTION COMPLAINT**

*Jury Trial Demanded*

Plaintiff Ritu Bhambhani M.D. ("Dr. Bhambhani"), on behalf of herself and on behalf of all others similarly situated, by and through her undersigned attorneys, based upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief formed after an inquiry reasonable under the circumstances, for her Class Action Complaint against Defendants Innovative Health Solutions, Inc. ("IHS"), and Acclivity Medical, LLC ("Acclivity") (collectively, "Defendants") hereby allege as follows:

### INTRODUCTION

1. Dr. Bhambhani is but one among many healthcare providers who were sold a medical device known as the Neuro-Stim System ("NSS") and given advice concerning how to bill and collect health insurance reimbursements (including Medicare) for the cost of the device and the services associated with the device's implantation by the Defendants.

2. The NSS is a medical device purportedly designed to provide field stimulation to peripheral and cranial nerves in the auricle over a five-day period. It is recommended for pre-operative, intra-operative, and post-operative pain therapy as well as for the treatment of chronic

1

pain. It is placed behind the patient's ear and connected to stimulation electrode arrays placed percutaneously in the auricle. However, the NSS was cleared by the Food and Drug Administration ("FDA") in 2014 merely for use in acupuncture, and in the 501(k)-premarket clearance application submitted to the FDA, IHS explicitly described the device as an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states. *See* FDA 510(k) Clearance Letter K140530 at Exhibit 1.

3.    The device was sold and marketed throughout the United States by IHS and other distributors, including but not limited to Acclivity; and IHS invested substantial sums in advertising and marketing the NSS throughout the United States, including on its website, at trade shows, in brochures, in newsletters, in videos and in on-site presentations at physician offices and surgery centers. In a slide show utilized by IHS in promoting the device to Dr. Bhambhani and other medical providers and facilities, IHS explicitly referred to the NSS as being "FDA-approved," and claimed that "NSS is the first and only FDA approved electro-auricular, peripheral nerve stimulator currently on the market to treat acute and chronic pain." *See* IHS Physician Power Point Slide Show at Exhibit 2, 3, 12. Notably, while the IHS Physician Power Point Slide Show cited to FDA 510(k) Clearance Letter K140530, no reference to acupuncture or electro-acupuncture is made anywhere within the IHS Physician Power Point Slide Show.

4.    As a means of enticing Dr. Bhambhani and other medical providers and facilities to purchase the NSS to implement it into their clinical practices, the Defendants conceived of promoting the NSS as billable under a set of medical billing codes known as Current Procedural Terminology ("CPT"). CPT codes are the national standard for how medical professionals document and report medical, surgical, radiology, laboratory, anesthesiology, and evaluation and management services. All healthcare providers, payers, and facilities use CPT codes. These codes

are used by insurers to help determine the amount of reimbursement that a practitioner will receive for services provided. CPT codes are developed, maintained, and copyrighted by the American Medical Association, and are mandatory under the transaction standards promulgated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") for reporting the performance of medical procedures when submitting electronic billing. In short, CPT is the uniform language of medical procedures utilized by all providers and payers.

5.     To entice medical providers and facilities to purchase their NSS devices, the Defendants promoted the billing of the NSS using a particular set of medical billing codes, including CPT 64555, Percutaneous Implantation of Neurostimulator Electrodes at a Peripheral Nerve. This code and the ancillary codes billed with it covering both professional and facility charges provided for between $4,800.00 and $11,400.00 *per patient* in reimbursement from health insurers for a procedure with little associated cost, taking ten minutes to perform. As a result of their reimbursement-driven marketing efforts, Defendants sold tens of thousands of NSS devices throughout the United States and touted itself as the market leader of the industry.

6.     Defendants either deliberately or negligently made misrepresentations concerning the correct billing, coding, and reimbursement for the NSS intending or having reason to expect that the substance of these misrepresentations would be communicated and repeated to Dr. Bhambhani and other medical professionals and facilities (collectively, "medical providers") through sales and marketing representatives and that it would induce Dr. Bhambhani and other medical providers and facilities to rely upon the misrepresentations and upon which Dr. Bhambhani and other medical providers did, indeed, justifiably rely to their detriment.

7.     Dr. Bhambhani brings this action on behalf of all medical providers who suffered harm based upon their reliance upon Defendants deliberate or negligent misrepresentations

concerning the correct billing, coding, and reimbursement for the NSS.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A).

9.      This Court also has personal jurisdiction over Defendants because they are authorized to do business and in fact do business in this state and District and Defendants have sufficient minimum contacts with this state and District, and/or otherwise intentionally avails itself of the markets in this state and District through the promotion, marketing, and sale of the NSS in this state, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under 28 U.S.C. § 1391. Defendant does substantial business in this state and within this District, advertises in this this state and within this District, receives substantial compensation and profits from the sale of the NSS in this state and within this District, and has engaged in deliberately or negligently misleading representations concerning the correct billing, coding, and reimbursement for the NSS in this state and within this District to subject it to *in personam* jurisdiction in this District. Furthermore, the transactions between Defendants and the named Plaintiff, Dr. Bhambhani, occurred in this state and within this District.

## THE PARTIES

11.     Dr. Bhambhani is a medical doctor practicing in Abingdon, MD. She is board-certified in both Anesthesiology and Pain Medicine and is affiliated with multiple hospitals in the

area, including MedStar Franklin Square Medical Center and University of Maryland Harford Memorial Hospital. She received her medical degree from Maulana Azad Medical College, completed both a residency and fellowship at the prestigious Cleveland Clinic Foundation in Ohio, and has been in private practice for more than 20 years. She is the managing member of both Ritu Bhambhani LLC d/b/a Complete Care of Maryland, through which she conducts her private medical practice, and Box Hill Surgery Center LLC, a state-of-the art ambulatory surgery center where Dr. Bhambhani performs many of her more invasive pain management procedures.

12.    Upon information and belief, Innovative Health Solutions, Inc. is an Indiana corporation which at all relevant times herein, was and is engaged in the business of marketing, selling, and distributing the NSS, as more fully described herein, throughout Maryland and the United States, with a registered office at 829 S. Adams St., Versailles, IN 47042.

13.    Upon information and belief, Acclivity Medical LLC is a Kentucky corporation which at all relevant times herein, was and is engaged in the business of marketing, selling, and distributing the NSS, as more fully described herein, throughout Maryland and the United States, with a registered office at 456 Glengarry Way, Fort Wright, KY 41011.

## FACTUAL BACKGROUND

14.    Dr. Bhambhani was originally contacted by IHS on August 17, 2015. She received an email from Robert A. Smith ("Smith"), the Vice President of Sales and Marketing for IHS, which introduced the NSS device, and enclosed the IHS Physician Power Point Slide Show. This email stated:

> Dr Bhambhani, My company has the exclusive rights to a recently FDA and VA approved device for acute and chronic pain. I live in Maryland and am selecting key practices now. We have launched with prominent Physicians and larger surgery groups throughout the U.S. I have attached the Slideshow above along with a short Science Video https://vimeo.com/user17291718/review/108118730/56e5ec2571. They feature the technology along with the ***extraordinary reimbursement*** for this

treatment. Select practices can participate in our Full Service Program outlined on the attached PowerPoint.

*See* August 17, 2015, Email from Robert A. Smith, <u>Exhibit 3</u>.

15.     So, from the start, the promise of extraordinary reimbursement and the IHS Physician Power Point Slide Show were the foundation of IHS's marketing, promotion, and sales of the NSS device to Dr. Bhambhani. Among the representations made in the IHS Physician Power Point Slide Show were the following:

    a.     NSS is a patented, FDA approved peripheral nerve stimulator designed to provide field stimulation to peripheral and cranial nerves in the auricle over a 5-day period.

    b.     It is FDA approved for chronic and acute pain.

    c.     NSS is the first and only FDA approved electro-auricular, peripheral nerve simulator currently on the market to treat acute and chronic pain.

    d.     NSS is reimbursed by Medicare when performed at an ASC.

    e.     The following Insurers pay for in office and ASC: Major health insurers; workers compensation insurers; and personal injury insurers.

*See* <u>Exhibit 2</u>, 3, 12, 14.

16.     The IHS Physician Power Point Slide Show promised guaranteed profits through a "turn-key program" with "no upfront cost":



*See* <u>Exhibit 2</u>, 15.

17.    As to the guarantee of profits, IHS offered distinctly different programs: the "Full Service Program" and the "Direct Purchase Program." The difference between the two programs was relatively straightforward. With the Full Service Program, IHS (or its affiliates, including Acclivity) would provide "full-service" billing and collections services:



*See* <u>Exhibit 2</u>, 18.

18.    Even without these so-called full-service billing services, the Direct Purchase Program still provided billing/collections protocols from IHS and/or its affiliates, including Acclivity:



*See* <u>Exhibit 2</u>, 21.

19.    These billing protocols, in no uncertain terms, included specific coding advice whereby the NSS device was to be billed under CPT 64555, Percutaneous Implantation of Neurostimulator Electrodes at a Peripheral Nerve:



*See* <u>Exhibit 2</u>, 22.

20.    Regardless of program, however, the touchstone of IHS's sales pitch was profit:



*See* Exhibit 2, 26.

21.      Nowhere in the IHS Physician Power Point Slide Show, or any other information

or document provided to Dr. Bhambhani, was it disclosed that the NSS was in fact cleared by the

FDA as merely an electro acupuncture device for use in the practice of acupuncture by qualified

practitioners of acupuncture.

22.      On September 8, 2015, Kristen Brannon ("Brannon"), Vice President of Operations

for IHS sent an email to Dr. Bhambhani attaching certain NSS "billing information," including a

Precertification and Billing Overview, a NSS Precertification Form, and a NSS Procedure Note

Template. *See* September 8, 2015, Email from Brannon, Exhibit 4. Notably, the NSS Procedure

Note Template referred to the NSS service by the CPT descriptor only, and again contained no

reference to electro acupuncture.

23.      On September 9, 2015, Smith sent Dr. Bhambhani two more email solicitations.

*See* September 9, 2015, Emails from Smith, Exhibit 5. The first contained certain clinical studies

purporting to extol the efficacy of the NSS device, on which Brian Carrico ("Carrico"), "one of

the owners and pioneers of this technology," was copied. The second included links to training videos and an extensive list of applications for the device.

24.    In reliance upon IHS's statements concerning the efficacy of the NSS device, as well as the corresponding reimbursement figures, Dr. Bhambhani decided to purchase and did, in fact, enroll in the IHS Full Service Program, at a cost of $900 per NSS device; and to make orders that were fulfilled through Acclivity on September 14, 2015 and October 6, 2015.

25.    On September 28 and 29, 2015, Brannon sent emails providing additional coding advice to Dr. Bhambhani vis-a-vis the NSS device. *See* September 28 and 29, 2015, Emails from Brannon, Exhibit 6. Specifically, Brannon stated that a modifier is no longer necessary to bill CPT code 64555 for the NSS service. She further guided Plaintiff on what to do when a Medicare claim is rejected and how to successfully "rebill" such a claim.

26.    Again, on December 8, 2015, Brannon provided coding advice by stating the codes to use for workers compensation claims, and confirmed the propriety of the same code sequence set forth on the IHS Physician Power Point Slide Show. *See* December 8, 2015, Email from Brannon, Exhibit 7.

27.    Unbeknownst to Dr. Bhambhani, but known to the Defendants, in 2011 NSS had already been deemed to not satisfy the coding sequence set forth in the IHS Physician Power Point Slide Show and other promotion materials and information statements provided by the Defendants. Indeed, in April 2011, the Centers for Medicare and Medicaid Services ("CMS") created Healthcare Common Procedure Coding System ("HCPCS") code S8930, Electrical stimulation of auricular acupuncture points, each 15 minutes of personal one-on-one contact with the patient. And electro acupuncture services reported to CMS under that code were excluded from coverage by most Medicare Administrative Contractors ("MACs") starting immediately.

28.    Despite knowing that the coding instructions they were giving were incorrect, the Defendants concealed this fact and falsely stated their coding, billing, and reimbursement instructions were appropriate. They did so because the high reimbursement under the codes promoted by them encouraged healthcare providers like Dr. Bhambhani to purchase NSS devices at an excessively high price. Dr. Bhambhani reasonably relied on the expertise of the Defendants with respect to the NSS and its billing, coding, and reimbursement.

29.    In all, between September 2015 and June 2016, Dr. Bhambhani purchased 420 NSS devices, to the tune of $264,000, all paid to Acclivity, who served as distributor and an agent-in-fact on behalf of IHS at all times during Dr. Bhambhani's relationship with IHS.

30.    On or about October 8, 2016, however, Dr. Bhambhani's reporting of the code sequences explicitly recommended by Defendants prompted Novitas, the MAC responsible for administration of the Medicare program in Maryland, to initiate both post-payment and prepayment audits of both Dr. Bhambhani's private practice and her ambulatory surgical center.

31.    Upon learning that the audits were initiated due to the suspicion that Dr. Bhambhani and her entities were improperly submitting bills for electro acupuncture to the Medicare program, she attempted to return her remaining inventory of NSS devices to IHS.

32.    On or about September 1, 2016, Carrico, "one of the owners and pioneers of this technology" responded to Dr. Bhambhani's return request with a bold-faced lie, telling her that "IHS has not and does not get involved in billing and coding in any way." *See* September 1, 2016, Email from Carrico, Exhibit 8. He went on to suggest, rather, that IHS could not accept the device returns, but would be happy to assist her in billing them to commercial insurance companies, and recommended a third-party billing services that would "do a tremendous job of pre authorizing and billing for the NSS which will allow you to have 0 headaches, help patients, be very profitable,

and be protected."

33.    In August 2016, Novitas published Local Coverage Advisory A55240, which specifically: (i) identified the NSS device as electro acupuncture; and (ii) noted that the NSS device was not a covered by the Medicare program.

34.    In November and December of 2016, Dr. Bhambhani's practice and surgery center were hit with a series of refund demands from Novitas on behalf of the Medicare program, with the total amount of refunds exceeding $1,000,000.00. While those refunds were appealed and remain pending before the Office of Administrative Law, a substantial portion of the disputed refund amount has already been offset from other claims payable to Dr. Bhambhani's practice and surgery center, and Dr. Bhambhani has already spent tens of thousands of dollars in legal fees and other related expenses relative to defending the Medicare audits—all on account of the deliberate or negligent misrepresentation of the Defendants relative to the NSS device.

## CLASS ALLEGATIONS

35.    Plaintiff hereby repleads and incorporates by reference each and every allegation set forth above, and further states as follows:

36.    Plaintiff brings this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class (the "Proposed Class"). The Proposed Class consists of:

> All healthcare providers located within the United States who purchased one or more NSS devices from the Defendants from within the longest period allowed by statute before filing of this action up through and including the date of judgment in this case. Excluded from this class are any healthcare providers, if any, who have previously settled or compromised claims(s) as identified herein for the class.

37.    The members of the Proposed Class are so numerous that joinder of all members is impracticable. While the precise number of members of the Proposed Class is known only to the

Defendants, the number of healthcare providers who purchased one or more NSS devices from the Defendants from within the longest period of time allowed by statute before the filing of this action is certainly in excess of 100 persons.

38.    Common questions of law and fact that can be resolved with common answers exist as to all class members. Such common questions include whether:

a.    Defendants either deliberately or negligently made misrepresentations concerning the correct billing, coding, and reimbursement for the NSS;

b.    Defendants had reason to expect that the substance of these misrepresentations would be communicated and repeated to Dr. Bhambhani and other medical providers through sales and marketing representatives;

c.    Defendants had reason to expect that the substance of these misrepresentations would induce Dr. Bhambhani and other medical providers and facilities to rely upon the misrepresentations and upon which Dr. Bhambhani and other medical providers did, indeed, justifiably rely to their detriment;

d.    Class members are entitled to recover compensatory damages, including but not limited to all amounts paid to Defendants for the NSS devices they purchased under false pretenses;

e.    Class members are entitled to recover interest on such compensatory damages, including but not limited to interest on all amounts paid to Defendants for the NSS devices they purchased under false pretenses;

f.    Class members are entitled to punitive damages based on Defendants' acts or omissions, because such acts or omissions were actuated by actual malice

or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions; and

g.     Class members are entitled to other equitable relief as sought herein.

39.     Plaintiff's claims are typical of the claims of the Proposed Class.

40.     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests do not conflict with the interests of the Class members. Furthermore, Plaintiff has retained competent counsel experienced in class action litigation. Plaintiff's counsel will fairly and adequately protect and represent the interests of the Class.

41.     The prosecution of separate actions by individual members of the Proposed Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Defendant.

42.     By routinely misrepresenting the correct billing, coding, and reimbursement for the NSS device, Defendants have acted or refused to act on grounds that apply generally to the Proposed Class.

43.     Common questions of law or fact common to the class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because joinder of all members of the Proposed Class is impracticable.

44.     Defendants maintain sales records that record who purchased the NSS devices, in what amounts, and for how much, thus the members of the Proposed Class can be readily and objectively ascertained through the use of records maintained by Defendants.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**FRAUDULENT MISREPRESENTATION**
**(Against all Defendants)**

45.     Plaintiff, individually and on behalf of all others similarly situated, repeats, realleges, and incorporates by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

46.     Defendants made material misrepresentations to Plaintiff and members of the Proposed Class by means of oral representations, labeling, advertisements, promotions/or marketing, that Defendants' NSS device could be billed to third party payors and health insurers with a particular resulting reimbursement, as alleged more fully herein above. Although the Defendants may have included disclaimers or caveats with their misrepresentations, those disclaimers or caveats were ambiguous and, in the context of the balance of the communications by the Defendants, misleading. Moreover, the Defendants conduct was inconsistent with the disclaimers and caveats, rendering the latter ineffective. The general disclaimers made by the Defendants were contradicted by their specific representations that the billing advice they gave in connection with their marketing was correct.

47.     Defendants' representations were untrue, or at the least, made with reckless disregard for its truth.

48.     Defendants made the representations herein alleged with the intention of inducing Plaintiff and members of the Proposed Class to purchase NSS devices from Defendants.

49.     At the time Defendants made the representations herein alleged, Defendants knew that the representations were false.

50.     Plaintiff and members of the Proposed Class justifiably relied upon Defendants'

fraudulent and intentional misrepresentations and, in reliance on those representations, were induced to purchase NSS devices from Defendants.

51.     As a direct and proximate result of Defendants' intentional misrepresentations, Plaintiff and members of the Proposed Class were harmed in an amount to be determined at trial.

**COUNT TWO**
**INTENTIONAL MISREPRESENTATION BY CONCEALMENT**
**OR NON-DISCLOSURE**
**(Against all Defendants)**

52.     Plaintiff, individually and on behalf of all others similarly situated, repeats, realleges, and incorporates by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

53.     Defendants failed to disclose material facts regarding the reimbursement, billing and collections rules and characteristics in connection with the NSS device purchased by Plaintiff and members of the Proposed Class, and the exposure the Plaintiff and members of the Proposed Class would have to Medicare and third-party payors if they followed Defendants billing advice.

54.     Defendants had to a duty to disclose, failed to disclose, and purposefully failed to disclose accurate facts about the billing and collections rules and characteristics about the NSS services.

55.     Specifically, the Defendants intended to deceive the Plaintiff and members of the Proposed Class of the fact that the NSS device did not have the attribute of being billable and reimbursable in the way asserted by the Defendants, and knew that the Plaintiff and members of the Proposed Class would have not purchased the NSS device or NSS services, or paid a lower price for the NSS device or NSS services had Plaintiffs and members of the Proposed Class knew of the undisclosed material facts.

56.     This failure to disclose induced the Plaintiff and members of the Proposed Class to

act.

57.    As a direct and proximate result of Defendants' concealment of material facts, Plaintiff and members of the Proposed Class were damaged in a way to be determined at trial.

## COUNT THREE
## NEGLIGENT MISREPRESENTATION
### (Against all Defendants)

58.    Plaintiff, individually and on behalf of all others similarly situated, repeats, realleges, and incorporates by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

59.    Defendants owed Plaintiff and members of the Proposed Class a duty to take reasonable care that the verbal and written information being provided by Defendants to Plaintiff and members of the Proposed Class was true and correct.

60.    Defendants made material misrepresentations to Plaintiff and members of the Proposed Class by means of oral representations, labeling, advertising, promotions and/or marketing that the Defendants' NSS device could be billed to third party payors and health insurers with resulting reimbursement in a particular way. Defendants undertook to provide Plaintiff and members of the Proposed Class with billing advice. That billing advice was incorrect.

61.    Defendants representations were untrue as set forth above.

62.    Defendants made the representations herein alleged with the intent of inducing Plaintiff and members of the Proposed Class to continue to purchase Defendants' NSS device.

63.    Defendants knew that the Plaintiff and members of the Proposed Class would probably rely on the Defendants representations.

64.    Plaintiff and members of the Proposed Class justifiably relied upon Defendants' oral representations, labeling, and advertising and, in reliance thereon, were induced to purchase

NSS device from the Defendants and to bill and collect for NSS services as instructed by the Defendants.

65.    At the time the Defendants made the misrepresentations herein alleged, Defendants had no reasonable grounds to believe the representations they were making to be true, thereby breaching their duty owed to Plaintiff and members of the Proposed Class.

66.    As a proximate result of Defendants' misrepresentations, Plaintiff and members of the Proposed Class were harmed.

**COUNT FOUR**
**NEGLIGENCE**
**(Against all Defendants)**

67.    Plaintiff, individually and on behalf of all others similarly situated, repeats, realleges, and incorporates by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

68.    Defendants owed Plaintiff and members of the Proposed Class a duty to take reasonable care that the verbal and written information being provided by Defendants to Plaintiff and members of the Proposed Class was true and correct.

69.    Defendants made material misrepresentations to Plaintiff and members of the Proposed Class by means of oral representations, labeling, advertising, promotions and/or marketing that the Defendants' NSS device could be billed to third party payors and health insurers with resulting reimbursement in a particular way. Defendants undertook to provide Plaintiff and members of the Proposed Class with billing advice. That billing advice was incorrect.

70.    Defendants representations were untrue as set forth above.

71.    Defendants made the representations herein alleged with the intent of inducing Plaintiff and members of the Proposed Class to continue to purchase Defendants' NSS device.

72.     At the time the Defendants made the misrepresentations herein alleged, Defendants had no reasonable grounds to believe the representations they were making to be true, thereby breaching their duty owed to Plaintiff and members of the Proposed Class. The Defendants reasonably should have known that the information and instructions they were giving concerning the billing and collection of NSS services was incorrect and that the Plaintiff and members of the Proposed Class foreseeably would rely upon the information and instructions to their detriment.

73.     Plaintiff and members of the Proposed Class justifiably relied upon Defendants' oral representations, labeling, and advertising and, in reliance thereon, were induced to purchase NSS device from the Defendants and to bill and collect for NSS services as instructed by the Defendants.

74.     As a proximate result of Defendants' misrepresentations, Plaintiff and members of the Proposed Class were actually harmed.

## COUNT FIVE
## DECLARATORY JUDGMENT PURSUANT TO
## 28 U.S.C. § 2201(a)
## (Against all Defendants)

75.     Plaintiff, individually and on behalf of all others similarly situated, repeats, realleges, and incorporates by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

76.     Defendants had actual knowledge or reasonably should have known that the information and instructions they were giving concerning the billing and collection of NSS services was incorrect and misrepresented both the manner in which the NSS device could be billed to third party payors and health insurers and the expected reimbursement to be generated per patient by the NSS services to Plaintiff and members of the Proposed Class.

77.     An actual and justiciable controversy exists between Defendant and Plaintiff

concerning the parties' respective rights and obligations as it relates to the NSS device.

78.    Plaintiff and members of the Proposed Class have tangible legal interests in the instant controversy, including but not limited to:

> a.    Their interest in a declaration from this Court that the NSS device is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture and not properly billable to health insurers and other third-party payers under CPT 64555, Percutaneous implantation of neurostimulator electrode array;
>
> b.    Their interest in obtaining injunctive relief so that Defendant does not in the future employ unfair and/or deceptive practices in its business dealings with consumers; and
>
> c.    Their interest in a declaration from this Court that Defendant is unfairly misrepresenting both the manner in which the NSS device could be billed to third party payors and health insurers and the expected reimbursement to be generated per patient by the NSS services; thereby violating Maryland public policy and the public policy of various states.

79.    Plaintiff and members of the Proposed Class are therefore entitled to a declaration of rights from this Court pursuant to § 2201(a) of the United States Code, for the purpose of determining the rights between the parties and terminating uncertainty and controversy giving rise to this proceeding.

80.    A declaratory judgment by this Court of the following facts will terminate this controversy: (i) the NSS device is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture and not properly billable to health insurers

and other third-party payers under CPT 64555, Percutaneous implantation of neurostimulator electrode array; and (ii) that Defendant is unfairly misrepresenting both the manner in which the NSS device could be billed to third party payors and health insurers and the expected reimbursement to be generated per patient by the NSS services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands relief in her favor and against the Defendants as follows:

1.     That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that the Plaintiff is a proper class representative, and her counsel is adequate class counsel.

2.     That the Court certify the class identified above;

3.     That Declaratory Judgment be entered against Defendants finding that Defendants' conduct is in violation of the law;

4.     That the Court issue a permanent injunction requiring Defendants to cease all such fraudulent misrepresentation, intentional misrepresentation by concealment or non-disclosure, negligent misrepresentation, and negligence;

5.     That the Court issue a permanent injunction requiring Defendants disclose, in its written and oral marketing representations, that the Defendants' NSS device cannot be billed to third party payors and health insurers under CPT 64555;

6.     That the Court issue a permanent injunction requiring Defendants disclose, in its written and oral marketing representations, that the Defendants NSS device is electro acupuncture for purposes of medical coding and billing and should be billed under S8930;

7.     That judgment be entered against Defendant and in favor of Plaintiff and the Proposed Class on the Causes of Action in this Class Action Complaint, for injunctive and

equitable relief as requested above, and for actual, compensatory, and punitive damages, in an amount to be determined at trial;

8.    That the Court award attorneys' fees and litigation costs against Defendant;

9.    That judgment be entered imposing interest on damages, attorneys' fees, and litigation costs against Defendant; and

10.    That the Court award against Defendant and for Plaintiff and the Class for all other and further relief, both at law and in equity, to which they may show themselves justly entitled.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff and the Proposed Class demand a jury trial on all issues so triable.

Dated: February 6, 2019                Respectfully submitted,

/s/ Elizabeth A. Rice

Elizabeth A. Rice
earice@buttacilaw.com
John W. Leardi (*pro hac vice* application forthcoming)
jwleardi@buttacilaw.com
Nicole P. Allocca (*pro hac vice* application forthcoming)
npallocca@buttacilaw.com
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
(609) 799-5150
(609) 799-5180
*Attorneys for Plaintiff*
*Ritu Bhambhani M.D.*
*and the Proposed Class*

# Exhibit 1



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                                    Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center    WO66 G609
Silver Spring, MD  20993 0002

October 2, 2014

Navigant Consulting, Inc.
Colleen Hittle
Managing Director
30 S. Wacker Drive, Suite 3100
Chicago, Illinois 60606

Re: K140530
    Trade/Device Name: Electro Auricular Device
    Regulation Name: Electro Acupuncture Stimulator
    Regulatory Class: Unclassified
    Product Code: BWK
    Dated:  August 29, 2014
    Received:  September 2, 2014

Dear Ms. Colleen Hittle:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA).
You may, therefore, market the device, subject to the general controls provisions of the Act.
The general controls provisions of the Act include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration.  Please note:  CDRH does not evaluate information related to contract liability
warranties.  We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA),
it may be subject to additional controls.  Existing major regulations affecting your device can be
found in the Code of Federal Regulations, Title 21, Parts 800 to 898.  In addition, FDA may
publish further announcements concerning your device in the <u>Federal Register.</u>

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act
or any Federal statutes and regulations administered by other Federal agencies.  You must
comply with all the Act's requirements, including, but not limited to: registration and listing (21
CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical
device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set

Page 2    Ms. Colleen Hittle

forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.  Also, please note the regulation entitled, ″Misbranding by reference to premarket notification″ (21CFR Part 807.97).  For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Felipe Aguel -S

for    Carlos L. Peña, PhD, MS
Director
Division of Neurological and
    Physical Medicine Devices
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Food and Drug Administration

## Indications for Use

Form Approved: OMB No. 0910-0120
Expiration Date: January 31, 2017
*See PRA Statement below.*

510(k) Number *(if known)*
K140530

Device Name
EAD (electro auricular device)

Indications for Use *(Describe)*
The EAD is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states.

Type of Use *(Select one or both, as applicable)*

☒ Prescription Use (Part 21 CFR 801 Subpart D)          ☐ Over-The-Counter Use (21 CFR 801 Subpart C)

### PLEASE DO NOT WRITE BELOW THIS LINE – CONTINUE ON A SEPARATE PAGE IF NEEDED.

### FOR FDA USE ONLY

Concurrence of Center for Devices and Radiological Health (CDRH) *(Signature)*

Felipe Aguel  Date: 2014.10.02
-S                20:47:21 -04'00'

This section applies only to requirements of the Paperwork Reduction Act of 1995.

### *DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.*

The burden time for this collection of information is estimated to average 79 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

Department of Health and Human Services
Food and Drug Administration
Office of Chief Information Officer
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

# 510(k) Summary

**Submitter & Contact Information**

Colleen Hittle, RAC
Managing Director
Navigant Consulting, Inc.
30 S. Wacker Drive
Suite 3100
Chicago IL 60606
Phone: (317) 228-8730
Fax: (317) 228-8701
colleen.hittle@navigant.com

**Date:**  June 23, 2014

**Manufacturer:**        Key Electronics
                         2533 Centennial Blvd
                         Jeffersonville, IN  47130

**Trade Name:** EAD (electro auricular device)

**Common Name:**        electro acupuncture device

**Classification Name(s):**  BWK – stimulator, electro-acupuncture

**Classification Number:**        Unclassified

**Predicate Device(s)**

|  | 510(k) Number | Device Name | Submitter Name |
|---|---|---|---|
| Primary Predicate | K050123 | P.Stim System | Neuroscience Therapy Corporation |
| Reference Device | K091875 | E-Pulse | Medevice Corporation |

# Device Description

The EAD system is a battery-operated, single-use device that has a preprogrammed frequency, pulse and duration for the stimulation of auricular point nerve stimulation for pain. The device power supply connects via four (4) stainless steel wires, sheathed in a plastic over-molding, to three (3) needle arrays comprised of four (4) needles each and one (1) needle array comprised of only 1 needle.

The device is powered by one 3 Volt lithium ion battery.

The device modulates a duty cycle between 2 hours on and 2 hours at rest. The maximum performance time frame is 5 days or 120 hours (5 days X 24 hours). Weight is 4 grams including batteries. The power supply dimensions are 36 mm x 17 mm x 7 mm. The needle dimensions are 0.5 mm width x 2 mm length.

# Intended Use(s)

The EAD is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states.

# Technological Characteristics

**Appliance:** Electro-acupuncture Device
**Type description:** EAD
**Power supply:** 1 x 3V battery (Type CR1220 Lithium)
**Output:** (Load impedance range 1k-10kQ) max. 3.2V, Impulse interval 1000ms, impulse width 1ms, 'ims *I* bipolar), max possible total duration of treatment 5x 24 hours
**Protection level:** IP20 Type: B
**Duty type:** approx. 2h duty *I* 2h at rest (periodic duty)
**Weight incl. battery:** 4g  Dimensions:  36 x 16 x 7 mm
**Needle Dimensions:** 0.5 mm width x 2 mm length

2

510(k) Summary
EAD (Electro Auricular Device)

## Comparison Table: Applicant Device vs. Predicate Devices

| Device Name | EAD | E-Pulse (Reference Device) | P.Stim System (Primary Predicate) |
|---|---|---|---|
| 501(k) Number | This Submission | K091875 | K050123 |
| Indication for Use | The EAD is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states. | The E-Pulse is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states. | The P-Stim is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states. |
| Device Description | Battery powered device generates low frequency and continual electrical pulse which are transmitted to new endings of the ear. It allows continued therapy over several days. The device is controlled by a micro processor. | Battery powered unit designed to administer auricular point nerve stimulation treatment for pain therapy over a 96-hour period via electrical pulsing. The device is on for 3 hours and then off for 3 hours. The device is controlled by a micro processor. | A micro stimulation appliance for pain therapy. The device generates low frequency and continual electrical pulse which are transmitted to new endings of the ear. It allows continued therapy over several days. The device is controlled by a micro processor. |
| Target Population | Patients with acute and chronic pain | Patients with acute and chronic pain | Patients with acute and chronic pain |
| Human Factors | To be applied by a qualified practitioner of acupuncture | To be applied by a qualified practitioner of acupuncture | To be applied by a qualified practitioner of acupuncture |
| Where Used | At the clinic and at home | At the clinic and at home | At the clinic and at home |
| Software Based | Yes | Yes | Yes |
| Performance | 2 hours on/2 hours off; pulses with modulating frequency (1 to 10 Hz) | 3 hours on/3 hours off; pulse monophasic at 1 Hz | 3 hours on/3 hours off; pulse monophasic at 1 Hz |
| Power Source | Lithium ion battery | Zinc air battery | Zinc air battery |
| Duration | Up to 120 hours | 96 hours | 96 hours |

3

510(k) Summary
EAD (Electro Auricular Device)

| Generator | Attached behind patient ear | Attached behind patient ear | Attached behind patient ear |
|---|---|---|---|
| Leads | Four electrode needle leads | Three leads that can attach to needles | Three leads that can attach to needles |
| Needles | Titanium straight shaft | Titanium hook shaft | Titanium straight shaft |
| Shape | Elliptical | Round | Elliptical |

## Non-Clinical Performance Data

**Biocompatibility Testing**
The biocompatibility evaluation for the adhesive for the EAD device was conducted in accordance with the FDA Blue Book Memorandum #G95-1 "Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing,'" May 1, 1995, and International Standard ISO 10993-1 "Biological Evaluation of Medical Devices − Part 1: Evaluation and Testing Within a Risk Management Process," as recognized by FDA. The battery of testing included the following tests:
- Cytotoxicity
- Sensitization
- Irritation

The EAD adhesive is considered tissue contacting for a duration of less than 30 days. The other patient contacting materials contained in the subject device are unchanged from the P-Stim predicate device.

**Electrical Safety and Electromagnetic Compatibility (EMC)**
Electrical safety and EMC testing were conducted on the EAD device. The system complies with the IEC 60601-1 and IEC 60601-2-10 standards for safety and the IEC 60601-1-2 standard for EMC.

**Software Verification and Validation Testing**
Software verification and validation testing were conducted and documentation was provided as recommended by FDA's Guidance for Industry and FDA Staff, "Guidance for the Content of Premarket Submissions for Software Contained in Medical Devices." The software for this device was considered as a "minor" level of concern, since a failure or latent flaw in the software could not directly result in serious injury or death to the patient or operator.

**Sterility/Shelf Life**
Sterilization Validation was conducted on the EAD device needles and wiring harness using the VDMAX25 method according to ISO 11137-2 and ISO 11737-2. Performance and stability of the EAD packaging was validated in accordance with ISO 11607-1 and Accelerated aging of the EAD was performed in accordance with ASTM F1980-07. Packaging qualifications are according to ISO 11607-1 and machine qualifications for the sealing process are according to ISO 11607-2.

510(k) Summary
EAD (Electro Auricular Device)

## Conclusion

The non-clinical data support the safety of the device and the hardware and software verification and validation demonstrate that the EAD device should perform as well as the predicate device in the specified use conditions.

# Exhibit 2

INNOVATIVE HEALTHCARE SOLUTIONS

**THE NEURO-STIM SYSTEM (NSS)**

**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# TESTIMONIAL



"I have been using the NSS Neuro-Stim system for some time now. It has proved to be highly effective in the treatment of acute and chronic pain for my patients"

Dr. Peter S. Baek. MD

Johns Hopkins University

Duke University School of Medicine

INNOVATIVE HEALTHCARE SOLUTIONS

## THE NEURO-STIM SYSTEM

- NSS is a patented, FDA approved peripheral nerve stimulator designed to provide field stimulation to peripheral and cranial nerves in the auricle over a 5 day period.

- It is FDA approved for chronic and acute pain



# WHEN IS NSS USED?





Peripheral nerve stimulation by NSS is mainly used to treat *pain* . Use of the device is recommended for *pre-operative, intra-operative and post-operative pain therapy* as well as for the treatment of *chronic pain*.



**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# HOW NSS WORKS

**NSS** is placed behind the patient's ear and connected to stimulation electrode arrays placed percutaneously in the auricle. The advantage of using the ear for such treatment is that it offers easy access to many nerve bundles allowing for a very minimally invasive procedure.



**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# HOW NSS WORKS

- The device transmits low-frequency electrical impulses to exposed nerve bundles, which trigger the release of endorphins.

- **NSS** not only relieves pain, but also reduces sympathetic nervous system activity resulting in decreased inflammation and increased arterial perfusion/oxygenation.



**IHCS**

**INNOVATIVE HEALTHCARE SOLUTIONS**

# HOW NSS WORKS

✦ The built-in microchip creates periods of stimulation and rest, each lasting 2 hours over a 5 day period. It is pre-programmed to neuromodulate from 1 Hz-10Hz and back each second.

✦ Patients will feel a mild tapping upon placement. This typically goes away quickly allowing for normal daily activities to be resumed.





**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# BENEFITS OF NSS

The NSS is  minimally invasive and is applied in an economical time frame.

The device is removed and disposed of by the patient after five days.

It is light weight, allowing a patient to enjoy normal daily act ivies without restrictions.



**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# BENEFITS OF NSS

+ **NSS** is a non-narcotic alternative to treat pain. An advantage over drug therapy is that the patient no longer suffers any of the possible side-effects of pain-killers such as impaired reactions.

+ In most cases, the patient claims an improvement in overall clarity and quality of life.





**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# TYPICAL TREATMENT – CHRONIC PAIN
# 6 TREATMENTS ON AVERAGE

- Patient fitted with 3 devices with each new device being placed every 7 days.

- Patient then given 7 days off.

- If pain increases over off period, patient receives 3 more devices placed every 7 days.

- Generally, after 6 devices have been placed, patient will have achieved maximum therapeutic benefit.

*This Protocol allows time for the central nervous system to balance itself*



**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

## TYPICAL TREATMENT – ACUTE PAIN
## 3 TREATMENTS

- Patient fitted with device up to 5 days prior to procedure

- Patient wears device through procedure and then is fitted with new device immediately after procedure

- Patient will often benefit from one additional device 5 days post-procedure



**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS IS FDA APPROVED

**NSS** is the first and only FDA approved electro-auricular, peripheral nerve simulator currently on the market to treat acute and chronic pain.

FDA 510(K) # K140530





**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS STUDIES

## Walter Reed Military Hospital (DOD):

- Reduced pain scores
- Reduced narcotic consumption
- Improved sleep



Multiple private institutions are in the protocol discovery stage.



# NSS IS REIMBURSED BY MAJOR PRIVATE AND PUBLIC PAYORS

**NSS is reimbursed by..**
➢ Medicare when performed at an ASC

**The following Insurers pay for in office and ASC**
➢ Major health insurers

➢ Workers compensation insurers

➢ Personal injury insurers





# NSS IS GOOD MEDICINE
# AND GOOD BUSINESS

**Turn-Key Program:** physician & staff training, prior authorizations, billing & collections

No upfront cost to Practice.

90 Day Terms

90 Full Return Policy

Guaranteed Profits



IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR CHRONIC PAIN – FULL SERVICE PROGRAM IN OFFICE

Average procedures for chronic pain:

6

Physician profit per device:

$700

Physician profit per patient:

$4,200

**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR ACUTE PAIN /
# PROCEDURE FULL SERVICE PROGRAM
# IN OFFICE

| Average devices per procedure: | Physician profit per device: | Physician profit per patient: |
|:---:|:---:|:---:|
| 3 | $700 | $2,100 |



# FULL-SERVICE PROGRAM





# NSS FOR CHRONIC PAIN DIRECT PURCHASE IN OFFICE

Average procedures for chronic pain:

6

Physician profit per device:

$1,000

Physician profit per patient:

$6,000



# NSS FOR ACUTE PAIN PROCEDURE DIRECT PURCHASE IN OFFICE

Average devices per procedure:
3

Physician profit per device:
$1,000

Physician profit per patient:
$3,000

**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# DIRECT PURCHASE PROGRAM



# IN OFFICE BILLING PROCEDURE

Check your major commercial payer contracts/policies for exact Reimbursement amounts.

64555:   Percutaneous implantation of electrodes

L8680 x3:   Neurostimulator electrodes (each)



L8699 x3:  Neurostimulator electrodes (each)



# NSS FOR CHRONIC PAIN – FULL SERVICE PROGRAM
## AT ASC

Average procedures for chronic pain:

6

Physician profit per device:

$1,600

Physician profit per patient:

$9,600



# NSS FOR ACUTE PAIN /
# PROCEDURE FULL SERVICE PROGRAM
## AT ASC



Average devices per procedure: 3

Physician profit per device: $1,600

Physician profit per patient: $4,800

**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# FULL-SERVICE PROGRAM





# NSS FOR CHRONIC PAIN DIRECT PURCHASE
## AT ASC

| Average procedures for chronic pain: | Physician profit per device: | Physician profit per patient: |
|---|---|---|
| 6 | $1,900 | $11,400 |





# DIRECT PURCHASE PROGRAM

$600 per device

Prior Authorizations Billing/ Collections Protocols

60 DAY INVENTORY IS RETURNABLE

Physician Training

Clinical & Office Staff Training

**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR ACUTE PAIN PROCEDURE DIRECT PURCHASE
## AT ASC

# ASC BILLING PROCEDURE

Check your major commercial payer contracts/policies for exact Reimbursement amounts.

64555:   Percutaneous implantation of electrodes

*Modifier 58 <u>must be used </u>after initial procedure*



L8680 x3:   Neurostimulator electrodes (each)

L8699 x3:  Neurostimulator electrodes (each)



**IHCS**

INNOVATIVE HEALTHCARE SOLUTIONS

Date: 3/26/2015

# compmanagement health systems

P.O. Box 1040
Dublin, OH 43017

Pay to Provider:
Pay To NPI:
Pay To Taxonomy:

Service Provider:       *******
Service NPI:
Service Taxonomy:

If you have any questions regarding this summary, please call or send a copy of your statement and copy of this summary to:

**CompManagement Health Systems, Inc.**
**Attn: Bill Review Department Toll Free**
**Phone: 888-247-7799 Option #2 Toll Free**
**Fax: 800-334-4229**

*Note: Charges were reduced according to the Ohio Bureau of Workers' Compensation Fee Schedule, unless otherwise noted. See end of statement for description of EOB codes.

**For Electronic Billing: Call Emdeon at 877-363-3666.**

An EOB of 714 indicates that the line item was priced according to the Ohio Comp Network Health Group's pricing policies and fee schedules.

The Ohio Bureau of Workers' Compensation prohibits a provider from billing an injured worker for any difference between the provider's charge and the amount paid.

| BWC Claim: | Check/Voucher #: | Bill Doc #: | DRG Pricing: |
|---|---|---|---|
| Patient: | Patient Acct #: | CARE Invoice #: | |

| Line # | DOS | Rev Code | CPT Code | Modifier | Diagnosis Code | Place of Svc | Units | Charge | MCO Price | Interest | Amount Paid | APC | EOB Codes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3/5/15 | | 64555 | | 721.3 | 11 | 1 | $ 650.00 | $ 436.27 | $0.00 | $ 436.27 | | 758 |
| 2 | 3/5/15 | | L8680 | | 721.3 | 11 | 3 | $ 3,009.00 | $ 1,509.84 | $0.00 | $ 1,509.84 | | |
| 3 | 3/5/15 | | A6237 | | 721.3 | 11 | 1 | $ 45.00 | $ 10.39 | $0.00 | $ 10.39 | | |
| | | | | | | Totals: | | $ 3,704.00 | $ 1,956.50 | $0.00 | $ 1,956.50 | | |

**EOB Code    Description**
758            This is the principal procedure of multiple procedures billed on this date of service.

Sample E.O.B

# Explanation of Benefits

MEDICARE PART B
532 RIVERSIDE AVE.
JACKSONVILLE, FL   32231

Page 1

Check/EFT #:
Check Date: 02/05/2015
Check Amt: 6415.37
NPI Provider#:

Patient:
HIN:
Patient Control Number:
ICN#:
Status: Primary

| Dates of Service | Units | CPT4/Mods | Billed | CoIns | Allwd | Deduct | Paid | Adj | Adj Cd |
|---|---|---|---|---|---|---|---|---|---|
| 01/19/2015-01/19/2015 | 1.00 | 64555 SG GA | 6840.14 | 719.64 | 3598.19 | 0 | 2820.98 | 57.57 | CO253 |
| 01/19/2015-01/19/2015 | 1 | G8907 | 0.00 | 0 | 0 | 0 | 0 | 0 | |
| 01/19/2015-01/19/2015 | 1 | G8918 | 0.00 | 0 | 0 | 0 | 0 | 0 | |
| Totals: | | | 6840.14 | 719.64 | 3598.19 | 0 | 2820.98 | 57.57 | |

Claim Level Adjudication Codes: MA01;
Remark Codes: N620
Reason Codes: CO45-3241.95; CO253-57.57; PR2-719.64

HIPAAX12 Code List Summary:
CO253 - On-The-Fly ERA
CO45 - Charges exceed your contracted/ legis...
PR2 - Coinsurance Amount

Sample E.O.B

**Provider Explanation of Medical Payment Report**                                    ᖷ Cigna

| ovider Number | Provider Name | | | | | | | | Date through which claims were processed | | | THIS IS NOT A BILL | | Page |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 01/16/2015 | | | Retain for Your Records | | 1 |

| ! Procedure Date | Procedure Code | Adjusted Procedure Code | Billed Amount | Adjusted Procedure Code Amount | Allowed Amount | Not Covered/ Discount | Deduct/Copay Amount | Coinsurance Amount | DRG / Per Diem Type | DRG / Per Diem Number | DRG/Per Diem Amount | DRG/ Per Diem Benefit Amount | Plan Benefit | See Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Reminder: A coverage determination, prior authorization, or certification that is made prior to a service being performed is not a promise to pay for the service at any particular rate or amount. The patient's summary plan description governs amount payable, as every claim submitted is subject to all plan provisions, including, but not limited to, eligibility requirements, exclusions, limitations, and applicable state mandates.

PATIENT NAME:  ▮▮▮  PATIENT#: ▮▮  OPERATION LOCATION/GROUP# ▮▮  RECEIVE DATE: 12/30/2014 PROCESS DATE: 01/16
MEMBER NAME: ▮▮  SUBSCRIBER#: ▮▮  REF#: ▮▮  CHECK#: ▮▮

| 1 | 12302014 | 64655 | 00400 | 415.00 | 415.00 | | 0.00 | | | | 0.00 | 0.00 | 0.00 | A0 |
| 2 | 12302014 | L8680 | | 1785.00 | | 1785.00 | 0.00 | | | | 0.00 | 0.00 | 1785.00 | |
| 3 | 12302014 | 00400 | | 415.00 | | 140.00 | 275.00 | | | | 0.00 | 0.00 | 140.00 | A1 |
| 4 | | | | | | | 0.00 | | | | 0.00 | 0.00 | 0.00 | A2 |
| | TOTAL | | | 2200.00 | | 1925.00 | 275.00 | | | | | | 1925.00 | |

BALANCE.................... $0.00

VIEW ELIGIBILITY, BENEFITS, AND CLAIM DETAILS AND GET PRECERTIFICATION ANSWE
RS FAST AT THE CIGNA FOR HEALTH CARE PROFESSIONALS WEBSITE (WWW.CIGNAFORHCP.COM)

PAYMENT OF    $1,925.00 TO ▮▮

DL0 MPT

PATIENT NAME: ▮▮  PATIENT#: ▮▮  OPERATION LOCATION/GROUP# ▮▮  RECEIVE DATE: 12/30/2014 PROCESS DATE: 01/15
MEMBER NAME: ▮▮  SUBSCRIBER#: ▮▮  REF#: ▮▮  CHECK#: ▮▮

| 5 | 12122014 | 64655 | 00400 | 415.00 | 415.00 | | 0.00 | | | | 0.00 | 0.00 | 0.00 | A0 |
| 6 | 12122014 | L8680 | | 1785.00 | | 1785.00 | 0.00 | | | | 0.00 | 0.00 | 1785.00 | |
| 7 | 12122014 | 00400 | | 415.00 | | 140.00 | 275.00 | | | | 0.00 | 0.00 | 140.00 | A1 |
| 8 | | | | | | | 0.00 | | | | 0.00 | 0.00 | 0.00 | A2 |
| | TOTAL | | | 2200.00 | | 1925.00 | 275.00 | | | | | | 1925.00 | |

BALANCE.................... $0.00

PAYMENT OF    $1,925.00 TO ▮▮

DL0 PDU

PATIENT NAME: ▮▮  PATIENT#: ▮▮  OPERATION LOCATION/GROUP# ▮▮  RECEIVE DATE: 01/08/2015 PROCESS DATE: 01/16
MEMBER NAME: ▮▮  SUBSCRIBER#: ▮▮  REF#: ▮▮  CHECK#: ▮▮

| 9 | 12302014 | 64655 | 00400 | 415.00 | 415.00 | | 0.00 | | | | 0.00 | 0.00 | 0.00 | A0 |
| 0 | 12302014 | L8680 | | 1785.00 | | 892.50 | 892.50 | | | | 0.00 | 0.00 | 892.50 | A1 |
| 1 | 12302014 | 00400 | | 415.00 | | 140.00 | 275.00 | | | | 0.00 | 0.00 | 140.00 | A1 |
| 2 | | | | | | | 0.00 | | | | 0.0 | .00 | 0.00 | A2 |
| | TOTAL | | | 2200.00 | | 1032.50 | 1167.50 | | | | | | 1032.50 | |

BALANCE.................... $0.00

PAYMENT OF    $1,032.50 TO ▮▮

DL0 AMA

A0) THE PROCEDURE CODE IS DISALLOWED BECAUSE A SURGICAL
CODE WAS BILLED RATHER THAN AN ANESTHESIA CODE.

<span style="color:red; font-size:2em;">Sample E.O.B</span>

**MEDCOST BENEFIT SERVICES, LLC**
P.O. BOX 25987
WINSTON-SALEM, NC  27114-5987



**Electronic Service Requested**



| For Customer Service, Call |
| --- |
| 800-795-1023 |
| Visit us at www.medcost.com |

| | |
| --- | --- |
| Group: | |
| Group No: | |
| Paid Date: | 01/15/2015 |
| Check No: | |

## PROVIDER COPY

# EXPLANATION OF BENEFITS

Provider:
Provider No:  Employee:  Patient:  Vendor Na
Pat Acct No:  Claim No:

| Date of Service | CPT Code | Total Charges | PPO Discount | Over R & C | Non Covered | Deduct | Co-Pay | Co-Ins | Paid At % | Codes | Paid |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 12/12/2014-12/12/2014 | 64555 | 415.00 | 249.00 | .00 | .00 | .00 | .00 | 49.80 | 70 | A | 116.20 |
| 12/12/2014-12/12/2014 | L8680 | 1,785.00 | 611.55 | .00 | .00 | .00 | .00 | 352.04 | 70 | A | 821.41 |
| Claim Totals | | 2,200.00 | 860.55 | .00 | .00 | .00 | .00 | 401.84 | | | 937.61 |

Provider Paid Amount ............ 937.61
Employee Paid Amount ............ .00
Total Payment ............ 937.61
Patient Responsibility ............ 401.84

Provider:
Provider No:  Employee:  Patient:  Vendor No
Pat Acct No:  Claim No:

| Date of Service | CPT Code | Total Charges | PPO Discount | Over R & C | Non Covered | Deduct | Co-Pay | Co-Ins | Paid At % | Codes | Paid |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 12/18/2014-12/18/2014 | 64555 | 415.00 | 249.00 | .00 | .00 | .00 | .00 | 49.80 | 70 | A | 116.20 |
| 12/18/2014-12/18/2014 | L8680 | 1,785.00 | 611.55 | .00 | .00 | .00 | .00 | 352.04 | 70 | A | 821.41 |
| Claim Totals | | 2,200.00 | 860.55 | .00 | .00 | .00 | .00 | 401.84 | | | 937.61 |

Provider Paid Amount ............ 937.61
Employee Paid Amount ............ .00
Total Payment ............ 937.61
Patient Responsibility ............ 401.84

## Claim Summary

| Claim Number | Patient | Total Charges | PPO Discount | Over R & C | Non Covered | Deduct | Co-Pay | Co-Ins | Provider Paid | Employee Paid |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2,200.00 | 860.55 | .00 | .00 | .00 | .00 | 401.84 | 937.61 | .00 |
| | | 2,200.00 | 860.55 | .00 | .00 | .00 | .00 | 401.84 | 937.61 | .00 |
| | Totals | 4,400.00 | 1,721.10 | .00 | .00 | .00 | .00 | | 1,875.22 | .00 |

| Payment To | Amount |
| --- | --- |
| | 1,875.22 |

| Claim Number | Code | Description |
| --- | --- | --- |
| --- | A | A-MEDCOST PPO ADJUSTMENT, PATIENT NOT RESPONSIBLE |
| --- | * | The Employee Retirement Income Security Act (ERISA) provides you ... within 180 days after you have received this notice. ... for details. Further explanation of denied claims will be provided upon written request at no additional charge to the claimant. |

Sample E.O.B



## EXPLANATION OF BILL REVIEW

| | | |
|---|---|---|
| PAYOR | RECEIVED BY VENDOR | DATE OF INJURY |
| Sedgwick | 2015 | |
| BILL ID (ICN) | PROCESSED BY VENDOR | SOCIAL SECURITY NUMBER |
| | 2015 | |
| INJURED NAME (LAST, FIRST, MI) | TPA CLAIM NUMBER | |

**sedgwick.**

PROVIDER NAME AND ADDRESS

| | | |
|---|---|---|
| INJURED ADDRESS | PATIENT ACCOUNT NUMBER | |
| | EMPLOYER CONTRACT NUMBER | |
| IMAGE NUMBER (DCN) | TPA TRANSACTION # (MBDCN) | |
| EMPLOYER NAME | CARRIER NAME | |

TREATING PROVIDER

PROVIDER TAX ID

| | | |
|---|---|---|
| EMPLOYER ADDRESS | CARRIER ADDRESS | |

DATES OF SERVICE

2015 ~ 2015

| PROVIDER NPI | ICD CODES | | | |
|---|---|---|---|---|
| | 722.10 | 847.0 | 847.1 | 847.2 |

| Date of Service | Submitted Code | Mod(s) | Units | Reimbursed Code | Billed Amount | FS/UCR Reduction | Negotiated/ Discount | Network Reduction | Recommended Allowance |
|---|---|---|---|---|---|---|---|---|---|
| 01/14/2015 L8680 IMPLANTABLE NEUROSTIMULATOR EL | | | 3 | | 2,100.00 REASON CODES | 950.76 309 | 0.00 | 0.00 | 1,149.24 |
| 01/14/2015 64555 PRQ IMPLTJ NEUROSTIMULATOR ELT | | | 1 | | 425.00 | 0.00 | 0.00 | 0.00 | 425.00 |
| 01/14/2015 A6237 HYDROCOLLOID DRESS STERL 16 SQ | | | 1 | | 25.00 REASON CODES | 17.04 309 | 0.00 | 0.00 | 7.96 |

Explanation of Reason Codes For Detail Lines
309 THE CHARGE FOR THIS PROCEDURE EXCEEDS THE FEE SCHEDULE ALLOWANCE.

Explanation of Bill Review:
Unless otherwise stated, reimbursement is made according to the Delaware
Department Labor Workers' Compensation Health Care Payment System Fee Schedule."
Pursuant to Title 19 Del. C. 2322RF(I), a provider shall not hold an employee
liable for costs related to non-disputed services for a compensable injury and
shall not bill or attempt to recover from the employee the difference between
the provider's charge and the amount paid by the employer or insurance carrier
on a compensable injury." Any reduction is due to the billed charges exceeding
the fee schedule allowance for the service provided and/or the application of
the appropriate discounts based on the individual provider's agreement with the
preferred provider organization." Pursuant to Title 19 Del C. 2322 (h), this

**Sample E.O.B**

# IN CLOSING

➢ **The NSS system is highly effective in the treatment of pain and the reduction of harmful narcotics. In the continuous climate of rising costs and reduction in reimbursements in the medical industry the NSS system is also an extraordinary economic solution to any modern medical practice.**

➢ **You owe it to your patients and your practice to integrate this exciting new technology into your practice.**



# Exhibit 3



---------- Forwarded message ----------
From: **Bobby Smith** <bobby@ihcsnation.com>
Date: Mon, Aug 17, 2015 at 11:08 AM
Subject: Introduction to NSS/ Please confirm receipt
To: "rt.bhambhani@gmail.com" <rt.bhambhani@gmail.com>


Dr Bhambhani,  My company has the exclusive rights to a recently FDA and VA approved device for acute and chronic pain. I live in Maryland and am selecting key practices now. We have launched with prominent Physicians and larger surgery groups throughout the U.S. I have attached the Slideshow above along with a short Science Video https://vimeo.com/user17291718/review/108118730/56e5ec2571.   They feature the technology along with the extraordinary reimbursement for this treatment.  Select practices can participate in our Full Service Program outlined on the attached PowerPoint
>
> Our expert billing team will provide:
>
> *      All pre certifications required (not required for Medicare patients)
>

> *        All follow up requests from insurance providers
>
> *        Provide bi- weekly  A&R reports
>
> *        90 Day billing terms
>
>
> This device is:
>
> *        FDA and VA approved
>
> *        Utilized by leading Physicians and Surgery Centers
>
> *        Featured in the Key Evolutions in the Device Arena at the Highly acclaimed Beckers
ASC Ortho, Spine& Pain Conference
>
> *        Featured at Pain Week in Las Vegas, the Nation's largest Pain Conference
> ASC's utilize this cutting edge technology for:
>
> *        Post surgical pain control
>
> *        Acute and Chronic pain
> Our expert training staff will provide:
> Easy to follow training videos for the placement of the devices
> A full day of training upon request for the initial scheduled patients
> Patient educational handouts
>
> Please review the attached slide show to fully understand the impact that this technology can
have on your patients and your practice.
>
> Robert A Smith
> Innovative Health Care Solutions Inc.
> VP of Sales and Marketing
> C 410-977-8777
> F 410-561-4772
>

# Exhibit 4



---------- Forwarded message ----------
From: **Kristen Brannon** <kristen@ihcsnation.com>
Date: Tue, Sep 8, 2015 at 9:53 AM
Subject: NSS Billing Information
To: "rt.bhambhani@gmail.com" <rt.bhambhani@gmail.com>
Cc: Bobby Smith <bobby@ihcsnation.com>


It was a pleasure speaking with you on Friday. See attached the NSS Billing information we discussed on Friday.  Please review and I will be glad to answer any questions during our 10am call this morning.


Kristen Brannon

Innovative Healthcare Solutions

Director Of Operations

502-561-0963 Office

502-303-0919 Cell

1-800-884-9650 efax

# FSP Billing and Precertification Overview

## Prior Authorization Protocols

1.    IHCS will initiate all prior authorizations (PA) for the NSS Device.

2.    For each patient referred by your office, we need documents in order to facilitate the authorization and billing of the device.  Please fax this information to: 800-884-9650.

   A.    Please fill out the NSS Device Pre-Certification form.
   B.    Our office needs a copy of the patient's insurance card(s), front and back, in order to verify coverage and eligibility.
   C.    Patient demographics:  we need the demographics for billing.
   D.    Office Note: for each patient, we need the provider's note ordering the NSS device.

3.    Work Comp:  if a patient is covered by work comp, IHCS will contact the adjuster and verify the claim and coverage.  The adjuster must authorize each device the physician orders for treatment.  In order to increase the likelihood of coverage for work comp patients, we must have all required information and the Office Note in order to call the adjuster.  If the adjuster requires additional information we will contact your office to obtain this documentation. The documentation requested is required within 72hr of request.

4.    Once the PA has been initiated, we will provide a status update within 72hrs.  As soon as we determine eligibility and coverage we will contact your office with the PA information.

5.    Should IHCS receive either a denial or a request for additional information, IHCS will work with your office to provide the information needed for the insurance company to reach a decision or aid in an appeal of a denial of service.  The request we most often have is for additional information, up to and including a letter from the physician's office to answer their questions regarding patient treatment and medical necessity.  We ask that you answer our requests for information within seventy two (72) hours.

6.    Should you have any questions or concerns about any prior authorization for your patient please send an email to priorauth@ihcsnation.com.  We will respond within 24hrs.

## Billing Protocols

IHCS provides personalized attention to all clients.  As a client, you will receive constant communication from our team.  In order to build a successful partnership, we require that our clients be compliant with all requests within Seventy two (72) hours.  When a team member is working to obtain authorization to treat your patient, we come to a halt when we are asked for

Revised 07/27/15

information that we do not possess.  It is imperative that we receive all requests for information as these are needed by the insurance company in order to render a decision.  Please review the following billing protocols.

1.    New Client Information sheet:  this form is submitted to IHCS by the sales team.

2.    NSS Encounter Forms:  Please forward all NSS encounter forms at the end of each business day.  We bill for services as soon as we have the information in order to expedite payment to your office.

3.    Procedure Note:  your office note for the procedure is needed for our software and for billing.  All documents we receive from your office are uploaded into our software system.

4.    We will submit claims for service within twenty-four hours of receiving your encounter form.

5.    Work Comp:  in order to submit a claim to work comp, IHCS must have the encounter form and the office note.  Work comp insurance companies will not consider a claim without documentation.

6.    Explanation of Benefits:  IHCS requires clients to email EOBs within twenty-four hours for the billing of the NSS device.  We update records daily and for our reports to be accurate we need EOBs to enter payment information.

7.    Client Billing:  in order to track revenue and payments, some offices may bill for the NSS device in their billing software.  It is IMPERATIVE that, as a client for whom we are billing, all such claims are placed in a HOLD status so the claims are not generated.  While participating in the FSP our clients are precluded from billing for the NSS devices.  This will result in duplicate billing.

## **Reporting**

Accounts Receivable Report, Bi-Weekly:  IHCS will send an accounts receivable report bi-weekly.  This report will help clients keep track of their progress.

Accounts Receivable Report, End of Month:  IHCS will send a monthly A/R summary by the 3rd of every month, after the month-end calculations have been completed.

### Neurostimulator Precertification Form
### Office 502-561-0963
### Efax 1-800-884-9650

*Patient Name:*_____ *File #:*_____ *Date:*_____ ☐Initial ☐ Revised

*Diagnoses Codes:* 1_____  2_____  3_____  4_____  5_____  6_____  7_____

*Onset Date of Primary DX*: _____

*Failure of Conservative Treatment*: _____Yes _____No  Notes:_____

*Modalities, Type & Duration, if any*: _____

*Is further surgical intervention warranted*: ____Yes _____No  Notes:_____

*Complicating Factors:*
☐Diabetes ☐Aneurisms ☐Anti-Coagulation Tx ☐Psoriasis/Auricular ☐Recent Heart Attack
☐Blood Pressure ☐Spinal Stenosis ☐Under15 yrs/age ☐Skin Allergies ☐Pregnant
☐Overweight ☐Bell's Palsy ☐Renal Insufficiencies ☐Implanted Electrical Devices
☐Severe Obesity ☐Other_____ ☐Other_____

*ADL Deficits:*
☐Standing_____ ☐Walking_____ ☐Dressing_____ ☐Lifting_____
☐Housework_____ ☐Bathing_____ ☐Sitting_____ ☐Other_____

Notes:_____

*Treatment Goals – Short Term* (aeb=as evidenced by):
☐Decrease Pain/Inflammation by ____% w/I ____ visits      ☐Decrease % of time in pain by ____% w/i _____visits
☐Increase ROM to _____area by _____% w/i ____visits      _____area by _____% w/i _____visits
☐Increase Sleep by:_____
☐Reduce Narcotics by:_____
☐Improve ADLs aeb_____
☐Other_____

*Long Term Treatment Goals* (aeb=as evidenced by):
☐100% or _____% pain reduction of affected area(s)      ☐Restore 100% or _____% of normal ROM of the affected area(s)
☐Restore 100% or _____% of following ADLs: ☐sleep ☐lift ☐sit ☐stand ☐walk ☐work ☐household chores
☐Other_____

┌─────────────────────────────────────────────────────────────────────────┐
*Contraindications to Neurostimulator:* ☐No Known Contraindications ☐Contraindications as follow:
___Epilepsy or Hx of Seizures ___Pacemaker/Irregular Heart Rhythm ___Recent Transplant ___Orthostatic Hypotension
└─────────────────────────────────────────────────────────────────────────┘

*Type of Care:* ☐Acute Pain Management ☐Chronic Pain Management ☐Post-Operative ☐Other_____

*Frequency of Care:*

☐Every 5th day for ___ x's ☐1x/week for ___weeks ☐1x in 2 weeks ☐1x in 3 weeks ☐PRN

Initial estimate # staged neurostimulator procedures_____      Re-evaluation Date:_____

_____      _____  _____
Ordering Provider                                                          Date            Revision Date

<mark>Please include along with this form patient demographic and a copy of the health insurance card (front and back)</mark>

# Practice Info Here

Phone:                                                    Fax:

**PATIENT NAME:**

**DATE**:

**PREPROCEDURE DIAGNOSIS:**
**POSTPROCEURE DIAGNOSIS:**  Same

**COMPLICATIONS:**  None

**PROCEDURES:**
    1.  Percutaneous implantation of neurostimulator electrodes-peripheral nerves

**INDICATIONS:**  *Insert any chronic/acute pain*

**Procedure Performed:**  Analysis of neurostimulator device operation and neurostimulator device placement to the peripheral nerves. Three electrodes and one ground were implanted in the following nerve sites: auricular branches of the occipital, trigeminal, vagal and greater auricular nerves. <span style="color:red">(This is the second of six weekly staged procedures. Each procedure will be performed during the global period.)</span>

**Procedure Detail:**      After consent was obtained, the *(left/right)* mastoid process and ear was cleaned and prepped in the usual fashion using alcohol swabs.  The NSS procedure kit was opened. Neurostimulator generator was then activated, and attached to the sterile needle electrode arrays.  The specific auricular nerve bundles were identified via transillumination and marked with a surgical pen.  The neurostimulator generator was then fixed to the mastoid process.  *Three* electrodes were then percutaneously implanted at the previously listed nerve sites. The NSS generator, electrodes, and wires were then properly taped and protected in the usual fashion using Tagaderm sterile dressing. *No complications* were experienced and the patient was released.
   .

**POSTPROCEDURE**

I.      **RECOVERY:** Uneventful.
II.     **RESPONSE:**  Indeterminate. Follow up appointment in 1 week
III.    **DISPOSITION:**   The patient tolerated the procedure well without any complications or side effects. Heart rate and blood pressure were stable prior to, during and after the procedure.  The patient was monitored for 30 minutes after the procedure.  Pain diary provided. Patient to follow up in one week.

**Insert Doctor's Signature Here**
Name:
Date:

# Exhibit 5



---------- Forwarded message ----------
From: **Bobby Smith** <bobby@ihcsnation.com>
Date: Wed, Sep 9, 2015 at 9:04 PM
Subject: Fwd: Research
To: Ritu Bhambhani <rt.bhambhani@gmail.com>
Cc: Brian Carrico <Brian@i-h-s.com>


Ritu, Attached are a few of the current and ongoing studies for the NSS device.  I will send you under separate cover an additional email with a few training videos.  I have cc'd Brian Carrico one of the owners and pioneers of this technology.  I have informed him as to the tremendous opportunities within your practice.  He is going to forward you some additional studies as well.

Sincerely,

Robert A Smith

Innovative Health Care Solutions Inc.

VP of Sales and Marketing

C 410-977-8777

F 410-561-4772



---------- Forwarded message ----------
From: **Bobby Smith** <bobby@ihcsnation.com>
Date: Wed, Sep 9, 2015 at 9:07 PM
Subject: Training/ patient selection
To: Ritu Bhambhani <rt.bhambhani@gmail.com>


The following short videos will familiarize you with the placement and process of the NSS device; our trainer will be on site to walk you through it:

EAD Training Video:  https://vimeo.com/user17291718/review/110270072/b986ff4479
Dorsal Video:  https://vimeo.com/user17291718/review/125929652/e29b5bd30e

The following are a partial list of applications for the device.  I look forward to working with you to integrate this exciting new technology into your practice.


•Chronic Pain
•Back Pain
•Cancer Pain

- Arthritis & Joint Pain
- Neuropathies
- Craniofacial Pain
- Patients with opioid contraindications, such as addictions or allergies
- Acute Pain
- Migraines
- Wound Care
- Vascular Insufficiency
- Fibromyalgia
- Post Surgical Pain Management


Robert Smith
Innovative Health Care Solutions, LLC.
VP of Sales and Marketing
P 410-977-8777
F 410-561-4772

# Exhibit 6



---------- Forwarded message ----------
From: **Kristen Brannon** <kristen@ihcsnation.com>
Date: Mon, Sep 28, 2015 at 4:12 PM
Subject: I have clarification
To: Ritu Bhambhani <rt.bhambhani@gmail.com>


It's no longer necessary to add modifier 58 to procedure code 64555 in an ASC.  However continue to document that its related to a staged procedure.  Rebill both denials without modifier.


Kristen Brannon

Innovative Healthcare Solutions

VP Of Operations

502-561-0963 Office

502-303-0919 Cell

1-800-884-9650 efax



---------- Forwarded message ----------
From: **Kristen Brannon** <kristen@ihcsnation.com>
Date: Tue, Sep 29, 2015 at 3:34 PM
Subject: Billing in an ASC
To: Ritu Bhambhani <rt.bhambhani@gmail.com>
Cc: Bobby Smith <bobby@ihcsnation.com>


Medicare is no longer requiring that you pin a modifier with the code 64555. Bill all claims with no modifier except when you are billing your professional fee.  You can rebill the claims that were denied because when a claim is rejected it's as if it has never been billed. Also, when a claim is rejected with Medicare you cannot correct over the phone only denied claims can be corrected over the phone this claim was rejected..


Kristen Brannon

Innovative Healthcare Solutions

VP Of Operations

502-561-0963 Office

502-303-0919 Cell

1-800-884-9650 efax

# Exhibit 7



---------- Forwarded message ----------
From: **Kristen Brannon** <kristen@ihcsnation.com>
Date: Tue, Dec 8, 2015 at 3:55 PM
Subject: RE:
To: Ritu Bhambhani <rt.bhambhani@gmail.com>


64555 & L8680 X 3


---

**From:** Ritu Bhambhani [mailto:rt.bhambhani@gmail.com]
**Sent:** Tuesday, December 08, 2015 3:47 PM
**To:** Kristen Brannon
**Subject:**


Good Afternoon,

I'm trying to follow up on Tammy Long's authorization for the PNS. What codes are used for workers compensation.

Thank you,

Kristina

**

100 Walter Ward Boulevard
Suite 300
Abingdon, MD 21009


Office: (410) 569-3333
Fax:  (877) 595-7180

Note: *This email and its attachments may contain privileged and confidential information and/or protected health information (PHI) intended solely for the use of _____ and the recipient(s) named above.  If you are not the recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any review, dissemination, distribution, printing or copying of this email message and/or any attachments is strictly prohibited.  If you have received this transmission in error, please notify the sender immediately at Ph: 1-410-569-3333 and permanently delete this email and any attachments.*

# Exhibit 8

---------- Forwarded message ----------
From: **Brian Carrico** <Brian@i-h-s.com>
Date: Thu, Sep 1, 2016 at 1:50 PM
Subject: NSS Devices
To: rt.bhambhani@gmail.com
Cc: Bobby Smith <bobby@ihcsnation.com>


Hi Dr Bhambhani

I hope this finds you well.  I have been told of the CMS request for documents.  IHS has not
and does not get involved in billing and coding in any way but I do have an attorney I can
refer you to who specializes in dealing with these situations.

Bobby also let me know you have devices that you want to return.  I have good and bad news.
The bad news is that we have a strict policy related to the FDA which does not allow us to
return devices.  The good news is that you see a lot of commercial patients which require a pre
auth which protects you.  I am guessing you, like countless other physicians, have not done
these because it requires significant time to do pre authorize, etc.  IHS has been referring
physicians like yourself to Alliance Med in Scottsdale, AZ for a while and they do a

tremendous job of pre authorizing and billing for the NSS which will allow you to have 0 headaches, help patients, be very profitable, and be protected.

I would strongly urge you to let me connect you with them so you can continue to help people in a more controlled and protected environment.

I look forward to hearing back from you today.

Thank You


Brian Carrico
VP of Sales
Innovative Health Solutions
317-409-7617
Brian@I-H-S.com
www.I-H-S.com