**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| RITU BHAMBHANI, M.D. and SUDHIR RAO, M.D., *on behalf of themselves and all others similarly situated,* | Civil Action No.: 19-cv-00355-RDB |
| *Plaintiff,* | |
| - v. - | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| INNOVATIVE HEALTH SOLUTIONS, INC., INNOVATIVE HEALTHCARE SOLUTIONS, LLC, ACCLIVITY MEDICAL, LLC, RYAN KUHLMAN, DRAGONSLAYER STRATEGIES LLC, JOY LONG, and COLEMAN CERTIFIED MEDICAL BILLING & CONSULTANT, LLC, | *Jury Trial Demanded* |
| *Defendants.* | |

Plaintiffs Ritu Bhambhani, M.D. ("Dr. Bhambhani") and Sudhir Rao, M.D. ("Dr. Rao"), on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief formed after an inquiry reasonable under the circumstances, for their Third Amended Class Action Complaint against Defendants Innovative Health Solutions, Inc. ("IHS"), Innovative Healthcare Solutions, LLC ("IHCS"), Acclivity Medical LLC ("Acclivity"), Ryan Kuhlman ("Kuhlman"), DragonSlayer Strategies LLC ("Dragon Slayer"), Joy Long ("Long"), and Coleman Certified Medical Billing & Consultant, LLC ("Coleman") (collectively, "Defendants") hereby allege as follows:

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

1. Dr. Bhambhani and Dr. Rao are but two among many medical professionals and

facilities (collectively "medical providers") who agreed to purchase a medical device known as the Neuro-Stim System ("NSS") after being given false and/or fraudulent advice concerning how to bill and collect health insurance reimbursements (including Medicare) for the cost of the device and the services associated with the device's implantation by Defendants.

2. The NSS is a device purportedly designed to provide field stimulation to peripheral and cranial nerves in the auricle over a five-day period. It is purportedly recommended for pre-operative, intra-operative, and post-operative pain therapy as well as for the treatment of chronic pain. It is placed behind the patient's ear and connected to stimulation electrode arrays placed percutaneously in the auricle. However, the NSS was cleared by the Food and Drug Administration ("FDA") in 2014 merely for use in acupuncture, not medical applications. In the 501(k)-premarket clearance application submitted to the FDA, IHS explicitly described the device as an electro acupuncture device for use exclusively in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states; not as an implantable medical device. *See* FDA 510(k) Clearance Letter K140530 at Exhibit 1.

3. IHS then sold and marketed the device throughout the United States as a surgically implantable medical device, not just a tool for acupuncture. IHS engaged in this fraudulent scheme through a series of exclusive-rights sales-agent distributors ("Sales Agents"), including but not limited to IHCS and Acclivity. Upon information and belief, IHCS continues to be owned and controlled by its members Robin Campbell ("Campbell") and Troy Guinn ("Guinn"). Prior to its dissolution in June 2017, Acclivity was owned and controlled by its sole member Kuhlman, who IHS now employs directly as its "National Director." IHS and its Sales Agents invested substantial sums in advertising and marketing the NSS throughout the United States, including on websites, at trade shows, in brochures, in newsletters, in videos, on phone calls, in emails, and in on-site

presentations at physician offices and ambulatory surgery centers.

4. For example, in a slide show utilized by IHCS in promoting the device to Dr. Bhambhani and other medical providers, IHCS explicitly referred to the NSS as being "FDA-approved," and claimed that "NSS is the first and only FDA approved electro-auricular, peripheral nerve stimulator currently on the market to treat acute and chronic pain." *See* IHCS Physician Power Point Slide Show at Exhibit 2. Notably, while the IHCS Physician Power Point Slide Show cited to FDA 510(k) Clearance Letter K140530, no reference to acupuncture or electro-acupuncture is made anywhere within the IHCS Physician Power Point Slide Show.

5. Similarly, in a "FAQ Sheet for Clinicians" prepared by IHS (as evidenced by the branding on the document) and provided to Dr. Rao by Acclivity, the NSS is referred to as "FDA cleared for targeting acute and chronic pain." *See* FAQ Sheet for Clinicians at Exhibit 3. Incredibly, nowhere in the 20-page FAQ Sheet for Clinicians does the word acupuncture appear.

6. Defendants promoted the NSS as a surgically-implantable nerve stimulator billable to third-party payers, including Medicare, under a corresponding set of standardized national medical billing codes. In that regard, Current Procedural Terminology ("CPT") codes are the national standard for how medical professionals document and report medical, surgical, radiology, laboratory, anesthesiology, and evaluation and management services. All healthcare providers, payers, and facilities (including Plaintiffs and the Proposed Class) are required to use CPT codes. These codes are used by insurers to help determine the amount of reimbursement that a practitioner will receive for services provided. CPT codes are developed, maintained, and copyrighted by the American Medical Association, and are mandatory under the transaction standards promulgated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") for reporting the performance of medical procedures when submitting electronic billing. In short, CPT is the

uniform language of medical providers, including Plaintiffs and the Proposed Class.

7. As a means of enticing Dr. Bhambhani, Dr. Rao, and other medical providers to purchase the NSS and implement it into their clinical practices, the Defendants promoted the billing of the NSS using a specific set of codes used to report implantable nerve stimulators, including CPT 64555, Percutaneous Implantation of Neurostimulator Electrodes at a Peripheral Nerve (the "NSS Coding Scheme"). This code, and the ancillary codes billed with it covering both professional and facility charges, provided for between $4,800.00 and $11,400.00 *per patient* in reimbursement from payers for a procedure with little associated cost, that takes ten minutes to perform. As a result of the NSS Coding Scheme, Defendants sold tens of thousands of NSSs throughout the United States and touted itself as the market leader of the industry.

8. To further buttress to the NSS Coding Scheme, IHS and its Sales Agents employed the services of so-called independent coding consultants ("Coding Agents"), including but not limited to Dragon Slayer, which, prior to its dissolution in 2015, was owned and controlled by Long, and Coleman Certified Medical Billing & Consultant, LLC ("Coleman"). Coleman is owned and controlled by Kimberly Coleman.

9. For example, in a September 2015 email to one of Dr. Rao's employees, Dragon Slayer, through Long and on behalf of Acclivity, provided more than twenty pages of attachments, including a coding memorandum and "template" procedure notes and letters of medical necessity characterizing the NSS as a neurostimulator, reportable under CPT 64555, and "clearly delineated from acupuncture" or electro-acupuncture. *See* September 22, 2015 Email with attachments from Joy Long at Exhibit 4. Similarly, in an August 2016 email to Dr. Rao, Coleman, through Kimberly Coleman and on behalf of Acclivity, purported to provide additional research supporting billing CPT 64555 for the NSS, stating that the "NSS is a percutaneous implantation neurostimulator

electrode array that are applied and leads are placed for specific nerves." *See* August 5, 2016 Email with attachments from Kimberly Coleman at Exhibit 5. These representations are knowingly false and were knowingly false when made.

10. Defendants deliberately concocted the NSS Coding Scheme intending, or having reason to expect, that the substance of these billing, coding, and reimbursement misrepresentations would be communicated and repeated to Dr. Bhambhani, Dr. Rao, and other medical providers by and through IHS's Sales Agents (including, but not limited to IHCS and Acclivity) and IHS's Coding Agents (including, but not limited to, Dragon Slayer and Coleman). Defendants also intended their misrepresentations to induce Dr. Bhambhani, Dr. Rao, and other medical providers to rely upon said misrepresentations and upon which Dr. Bhambhani, Dr. Rao and other medical providers did, indeed, justifiably rely to their detriment when deciding to purchase the NSS from IHS and/or its Sales Agents.

11. Dr. Bhambhani and Dr. Rao bring this action on behalf of all medical providers who suffered harm as a result of their reliance upon Defendants' deliberate misrepresentations concerning the correct billing, coding, and reimbursement for the NSS.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A).

13. This Court has subject matter jurisdiction over Plaintiffs statutory claims brought under 18 U.S.C. §§ 1962 (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act

pursuant to 28 U.S.C. § 1331 (federal subject matter jurisdiction) and 18 U.S.C. §§ 1965(b) and (d) (RICO).

14. This Court also has personal jurisdiction over Defendants because they are authorized to do business and in fact do business in this state and District, and/or Defendants have sufficient minimum contacts with this state and District, and/or Defendants otherwise intentionally avail themselves of the markets in this state and District through the promotion, marketing, and sale of the NSS in this state, which renders the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this District under 28 U.S.C. § 1391. Defendants do substantial business in this state and within this District, advertise in this this state and within this District, receive substantial compensation and profits from the sale of the NSS in this state and within this District, and engaged in deliberately misleading representations concerning the correct billing, coding, and reimbursement for the NSS in this state and within this District to subject Defendants to *in personam* jurisdiction in this District. Furthermore, the transactions between Defendants and the named Plaintiffs occurred in this state and within this District.

**THE PARTIES**

16. Dr. Bhambhani is a medical doctor practicing in Abingdon, MD. She is board-certified in both Anesthesiology and Pain Medicine and is affiliated with multiple hospitals in the area, including MedStar Franklin Square Medical Center and University of Maryland Harford Memorial Hospital. She received her medical degree from Maulana Azad Medical College, completed both a residency and fellowship at the prestigious Cleveland Clinic Foundation in Ohio, and has been in private practice for more than 20 years. She is the managing member of both Ritu Bhambhani LLC d/b/a Complete Care of Maryland, through which she conducts her private

medical practice, and Box Hill Surgery Center LLC, a state-of-the art ambulatory surgery center where Dr. Bhambhani performs many of her more invasive pain management procedures.

17. Dr. Rao is a medical doctor practicing primarily in Mount Airy, MD, but also practices in Elkridge, Ellicott City, Fredrick, Rockville, Germantown, and Hagerstown, MD, as well as Harrisonburg, VA and several offices in PA. He is board-certified in Anesthesiology and Pain Medicine by the American Board of Anesthesiology and is affiliated with multiple hospitals in the tri-state area, including Frederick Memorial Hospital and Highlands Hospital. He received his medical degree from St. George's University School of Medicine; completed an internship at the Greater Baltimore Medical Center; completed a residency at Albert Einstein College of Medicine/Montefiore Medical Center; and completed a fellowship at St. Sinai College of Medicine. He has since been in private practice for more than 12 years, practicing interventional pain medicine. He is the sole owner of SimCare, LLC ("SimCare"), and an owner of Pain and Spine Specialists of Maryland, LLC ("PASS MD"), Radiance Surgery Center ("Radiance"), Elkridge Surgery Center, and Gemini ASC-Elkridge.

18. IHS is an Indiana corporation which at all relevant times herein, was and is engaged in the business of marketing, selling, and distributing the NSS, as more fully described herein, throughout Maryland and the United States, with a registered office at 829 S. Adams St., Versailles, IN 47042.

19. IHCS is an Ohio limited liability company that participated in the NSS Billing Scheme, as more fully described herein, throughout Kentucky, Maryland and the United States, with a registered office at 9551 Bridlewood Trail, Dayton, OH 45458, operating from 3011 Long Creek Way, Louisville, KY 40245. Upon information and believe, IHCS has historically held itself out to be a Kentucky limited liability company, however it is believed that the identically-named

IHCS entity actually incorporated in Kentucky (associated with an individual known as Terri Anderson) is wholly unrelated to the IHCS identified in this complaint.

20. Acclivity was a Kentucky limited liability company which at all relevant times herein, was and is engaged in the business of marketing, selling, and distributing the NSS, as more fully described herein, throughout Maryland and the United States, with a registered office at 456 Glengarry Way, Fort Wright, KY 41011.

21. Kuhlman was the sole member of Acclivity until he dissolved the entity on June 5, 2017 by filing Articles of Dissolution with the Secretary of State of the Commonwealth of Kentucky. Under Kentucky law, therefore, Kuhlman is personally responsible for liabilities of Acclivity relative to its participation in the NSS Billing Scheme, and the misrepresentations it made to Dr. Bhambhani and others as a Sales Agent of IHS promoting the NSS. Kuhlman resides at 2446 Bluffcrest Lane, Cincinnati, OH 45238-3190. Notably, Kuhlman is now directly employed by IHS as its "National Director," and in fact has been employed by IHS since January 2013, which, as noted below, overlaps with the time Acclivity served as a Sales Agent on behalf of IHS, distributing the NSS to Dr. Bhambhani, Dr. Rao, and other medical providers.

22. Dragon Slayer was an Indiana limited liability company that participated in the NSS Billing Scheme, as more fully described herein, throughout Maryland and the United States, with a registered office at 1425 Coachlite Drive, Greenfield, IN, 46140.

23. Long was the sole member of Dragon Slayer until it was dissolved by the Secretary of State of Indiana on May 14, 2014. Under Indiana law, therefore, Long is personally responsible for liabilities of Dragon Slayer relative to its participation in the NSS Billing Scheme, and the misrepresentations it made to Dr. Rao and others as a Coding Agent of IHS promoting the NSS. Long resides at 2329 East 500 North, Greenfield, IN 46140.

24. Coleman is an Ohio limited liability company that participated in the NSS Billing Scheme and is liable for misrepresentations it made to Dr. Rao and others as a Coding Agent of IHS promoting the NSS, as more fully described herein, throughout Maryland and the United States, with a registered office at 7768 Arthur Street, Masury, Ohio, 44438.

## FACTS COMMON TO ALL COUNTS

### A. IHS Development and Sale of the NSS.

25. Before developing the NSS, IHS was the exclusive U.S. distributor of the device that was listed as the NSS's primary predicate on FDA 510(k) Clearance Letter K140530, the "P-STIM." The P-STIM was developed by Biegler GbmH, an Austrian Company. IHS invested substantial sums into advertising and marketing its P-STIMs throughout the United States, through Sales Agents and Coding Agents, including on its website, at trade shows, in brochures, in newsletters, in videos, on phone calls, in emails, and during on-site presentations at physician offices and ambulatory surgery centers. In just a few short years, IHS sold tens of thousands of P-STIMs to medical providers who treat patients suffering from acute or chronic pain.

26. The success of its sales and marketing efforts relative to the P-STIM—based on the identical billing, coding, and reimbursement representations it adopted as part of the NSS Billing Scheme—led IHS to develop its own device, one that was "substantially similar" to the P-STIM both in functionality and outcomes. To do so, IHS engaged Key Electronics, Inc. ("Key Electronics"), an electronics manufacturing service provider of custom-built products, located in Jeffersonville, Indiana. Key Electronics is listed as the manufacturer of the NSS on FDA 510(k) Clearance Letter K140530, but, upon information and belief, the development of the NSS was done on a "work for hire" basis, with ownership of all intellectual property associated with the NSS, including the trade-name and one or more utility patents, belonging to IHS.

27. Once the FDA cleared the NSS to be marketed, IHS engaged multiple Sales Agents, including but not limited to IHCS and Acclivity, to market the NSS to medical providers treating patients suffering from acute or chronic pain. IHS largely employed the same sales and marketing tactics it used with the P-STIM—focusing on representations made through mail and electronic communications related to the billing, coding, and reimbursement of the devices. IHS provided information and documents related to the billing, coding, and reimbursement it employed relative to the P-STIMs to the Sales Agents and Coding Agents it engaged to sell and market the NSS on behalf of IHS, including, but not limited to, IHCS and Acclivity. Dr. Bhambhani and Dr. Rao were two of the physicians that IHCS and Acclivity, as Sales Agents of IHS, promoted the NSS to using the information and documents IHS provided them as part of the NSS Billing Scheme.

28. A primary driver of IHS's development of the NSS and subsequent fraudulent advertising and marketing effort was to escape the "negative stigma" of the P-STIM and to increase its use by falsely promising that purchasing and dispensing the NSS to patients would be highly profitable to medical providers, like Plaintiffs and the Proposed Class. To accomplish that fraudulent end, IHS and its Sales Agents and Coding Agents worked together as an association-in-fact to build and market a false narrative. In 2011 the P-STIM had already been deemed not applicable to the coding sequence that IHS and its Sales Agents and Coding Agents promoted in written communications, presentations, and other materials to Plaintiffs and the Proposed Class. Further, in April 2011, the Centers for Medicare and Medicaid Services ("CMS") created the Healthcare Common Procedure Coding System ("HCPCS") code "S8930": Electrical stimulation of auricular acupuncture points, each 15 minutes of personal one-on-one contact with the patient, specifically for devices such as the P-STIM and NSS. And electro acupuncture services reported to CMS under that code were excluded from coverage by most Medicare Administrative

Contractors ("MAC") starting immediately.

29. Thus, IHS President Brian Carrico explicitly instructed IHS Sales Agents: "It's a peripheral neurostimulator. That's how we sell this. Don't ever use the word acupuncture or meridian point or anything like that." This precise advice was provided to all IHS Sales Agents, including not only IHCS and Acclivity, but also Tomahawk Medical and Dixon Medical Distributors. The development of the NSS was specifically intended to circumvent the payer scrutiny focused on the P-STIM, and the NSS Billing Scheme was specifically intended to mirror the billing scheme IHS and other distributors of the P-STIM perpetrated previously.

30. To further insulate itself from the NSS Billing Scheme, IHS only used "independent" Sales Agents to distribute the NSS, with the country divided into exclusive sales territories. As Mr. Carrico explained it to IHS Sales Agents, even the IHS website was merely a lead generator. If a medical provider attempted to purchase the NSS through the IHS website directly, that prospective purchaser's information would be provided to the Sales Agent with exclusivity over that territory, or as Mr. Carrico conceded, "if somebody orders on there, quote/unquote, 'orders,' that's simply a lead. If the lead comes from Alabama then it goes to [Daniel]. If it goes to Kalamazoo, it goes to Christa, and so on and so forth."

31. Not only did IHS only sell the NSS through Sales Agents, but it provided ***and paid*** the Coding Agents to assist the Sales Agents by "confirming" the billing, coding, and reimbursement instructions that are at the heart of the NSS Coding Scheme. IHS directly compensated those Coding Agents $180 per "new account" to provide pre-populated "pre-cert instructions," "coding," "diagnosis codes," "post-op follow-up documentation," and "dictation," or as Mr. Carrico told his Sales Agents, "everything like that that you need. They get that directly to your account, something you'll never have to worry about."

32. The coding information being conveyed to potential NSS purchasers by Sales Agents and Coding Agents very clearly originated from IHS. For example, materials provided to Dr. Rao by Long via email in September 2015 used identical language to a subsequent email to Dr. Rao from Acclivity in July 2016 purporting to quote "an excerpt from a former AMA advisor as the [] use of CPT code for NSS." *Compare* Exhibit 4 *with* July 14, 2016 email with attachments from Matthew Miller ("Miller") at Exhibit 6. Incredibly, both Long and Acclivity opined that the NSS "is clearly delineated from acupuncture and other neuro-stimulator treatments." *See id.* And the materials provided to medical providers by IHCS, Acclivity, Tomahawk Medical, Dixon Medical Distributors, and other IHS Sales Agents, were all substantively identical in both form and substance.

33. Notwithstanding the dubious attempts of IHS to separate itself from the implementation of the NSS Coding Scheme it devised, payer reimbursement based on its fraudulent characterization of the NSS as an implantable nerve stimulator while having it cleared by the FDA as an electroacupuncture device was the spark that gave life to Defendants' entire scheme. That IHS used Sales Agents and Coding Agents as its proxies to the medical providers it solicited is of no consequence. Mr. Carrico admitted to his Sales Agents that "You cannot go wrong by going to a physician because the reimbursement is so strong."

34. Nevertheless, the NSS is no different than the "negative stigma" of the P-STIM. Indeed, in August 2016, Novitas published Local Coverage Advisory A55240, which specifically: (i) identified the NSS as electro acupuncture device; and (ii) noted that the NSS was not covered by the Medicare program. The NSS Coding Scheme was built on a house of cards.

**B. Dr. Bhambhani's Experience with the NSS Coding Scheme.**

35. Dr. Bhambhani was originally contacted by IHCS on August 17, 2015. She received

an email from Robert A. "Bobby" Smith ("Smith"), Vice President of Sales and Marketing for IHCS, which introduced the NSS, and enclosed the IHCS Physician Power Point Slide Show. Smith's email stated:

> Dr Bhambhani, My company has the exclusive rights to a recently FDA and VA approved device for acute and chronic pain. I live in Maryland and am selecting key practices now. We have launched with prominent Physicians and larger surgery groups throughout the U.S. I have attached the Slideshow above along with a short Science Video https://vimeo.com/user17291718/review/108118730/56e5ec2571. They feature the technology along with the ***extraordinary reimbursement*** for this treatment. Select practices can participate in our Full Service Program outlined on the attached PowerPoint.

*See* August 17, 2015, Email from Smith, Exhibit 7.

36. So, from the start, the false promise of extraordinary reimbursement and the IHCS Physician Power Point Slide Show were the foundation of how IHS marketed, promoted, and sold the NSS to Dr. Bhambhani. Among the representations made in the IHCS Physician Power Point Slide Show were the following:

a. NSS is a patented, FDA approved peripheral nerve stimulator designed to provide field stimulation to peripheral and cranial nerves in the auricle over a 5-day period.

b. It is FDA approved for chronic and acute pain.

c. NSS is the first and only FDA approved electro-auricular, peripheral nerve simulator currently on the market to treat acute and chronic pain.

d. NSS is reimbursed by Medicare when performed at an ASC.

e. The following Insurers pay for in office and ASC: Major health insurers; workers compensation insurers; and personal injury insurers.

*See* Exhibit 2, 3, 12, 14.

37. The IHCS Physician Power Point Slide Show promised guaranteed profits through a "turn-key program" with "no upfront cost":




*See* Exhibit 2, 15.

38. As to the guarantee of profits, IHCS offered two distinctly different programs: the "Full Service Program" and the "Direct Purchase Program." The difference between the two programs was relatively straightforward. With the Full-Service Program, IHCS (or its affiliates, including Acclivity) would provide "full-service" billing and collections services:




*See* Exhibit 2, 18.

39. With the Direct Purchase Program, IHCS provided billing/collections protocols

they received from IHS as part of the Direct Purchase:




*See* Exhibit 2, 21.

40. These billing protocols, which were identical to the billing protocols IHS created to promote the P-STIM, in no uncertain terms, included specific coding advice whereby the NSS was to be billed under "CPT 64555, Percutaneous Implantation of Neurostimulator Electrodes at a Peripheral Nerve":




*See* Exhibit 2, 22.

41. Regardless of program, however, the touchstone of the sales pitch was profit—just as it was when IHS promoted the P-STIM:




*See* Exhibit 2, 26.

42. Incredibly, however, nowhere in the IHCS Physician Power Point Slide Show, or any other information or document provided to Dr. Bhambhani, was it disclosed that the NSS was in fact cleared by the FDA as an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture.

43. On September 8, 2015, Kristen Brannon ("Brannon"), Vice President of Operations for IHCS, sent an email to Dr. Bhambhani attaching certain NSS "billing information," including a Precertification and Billing Overview; an NSS Precertification Form; and an NSS Procedure Note Template, all of which were provided to IHCS by the NSS Enterprise. *See* September 8, 2015, Email from Brannon, Exhibit 8. Notably, the NSS Procedure Note Template referred to the NSS service by the CPT descriptor only, and again contained no reference to electro acupuncture.

44. On September 9, 2015, Smith sent Dr. Bhambhani two more email solicitations. *See* September 9, 2015, Emails from Smith, Exhibit 9. The first contained certain clinical studies

purporting to extol the efficacy of the NSS, on which Mr. Carrico, as "one of the owners and pioneers of this technology," was copied. The second included links to training videos and an extensive list of applications for the device.

45. In reliance upon IHCS statements concerning the efficacy of the NSS, as well as the corresponding reimbursement figures devised by IHS, Dr. Bhambhani enrolled in the IHCS Full Service Program, at a cost of $900 per NSS; and made orders that were fulfilled through Acclivity on September 14, 2015 and October 6, 2015. *See* Exhibit 10, 1, 2.

46. On September 28 and 29, 2015, Brannon sent emails providing additional coding advice to Dr. Bhambhani vis-a-vis the NSS. *See* September 28 and 29, 2015, Emails from Brannon, Exhibit 11. Specifically, Brannon stated that a modifier is no longer necessary to bill CPT code 64555 for the NSS service. She further guided Dr. Bhambhani on what to do when a Medicare claim is rejected and how to successfully "rebill" such a claim.

47. Again, on December 8, 2015, Brannon provided coding advice by stating the codes to use for workers compensation claims and confirmed the propriety of the same code sequence set forth on the IHCS Physician Power Point Slide Show. *See* December 8, 2015, Email from Brannon, Exhibit 12.

48. In all, between September 2015 and June 2016, Dr. Bhambhani purchased 420 NSSs, for $264,000, all paid to Acclivity. *See* Exhibit 10.

49. In or about August 2016, however, Dr. Bhambhani's reporting of the code sequences explicitly provided by the Defendants prompted Novitas, the MAC responsible for administration of the Medicare program in Maryland, to initiate both post-payment and prepayment audits of both Dr. Bhambhani's private practice and her ambulatory surgical center.

50. Upon learning that the audits were initiated due to the suspicion that Dr. Bhambhani

and her entities were improperly submitting bills for electro acupuncture to the Medicare program, she attempted to return her remaining inventory of NSSs to IHS.

51. On or about September 1, 2016, Mr. Carrico responded to Dr. Bhambhani's return request with a bold-faced lie, telling her that "IHS has not and does not get involved in billing and coding in any way." *See* September 1, 2016, Email from Carrico, Exhibit 13. He went on to suggest, rather, that IHS could not accept the device returns, but would be happy to assist her in billing them to commercial insurance companies, and recommended a third-party billing services that would "do a tremendous job of pre-authorizing and billing for the NSS which will allow you to have 0 headaches, help patients, be very profitable, and be protected." *See id.*

52. In November and December of 2016, Dr. Bhambhani's practice and surgery center were hit with a series of refund demands from Novitas on behalf of the Medicare program, with the total amount of refunds exceeding $1,000,000.00. While those refunds were appealed and remain pending before the Office of Administrative Law, a substantial portion of the disputed refund amount has already been offset from other claims payable to Dr. Bhambhani's practice and surgery center, and Dr. Bhambhani has already spent tens of thousands of dollars in legal fees and other related expenses relative to defending the Medicare audits—all on account of the deliberate misrepresentation of IHS and its Sales Agents relative to the NSS.

**C. Dr. Rao's Experience with the NSS Billing Scheme.**

53. Dr. Rao was initially solicited to purchase the NSS by Acclivity on or about September 15, 2015, through an email from Miller, whose email signature identified him as a Distributor/Principal of Acclivity. Attached to this email was a document entitled "ASC BILLING POST OP PAIN MANAGEMENT." *See* Exhibit 14. That document provided coding and reimbursement advice consistent with the slide show provided to Dr. Bhambhani by IHCS, and the NSS Coding Scheme overall: "The ASC will receive the bulk of the reimbursement (device

reimbursement is rolled into the procedure reimbursement). However, physician can also bill for 64555 with a modifier "PC" which pays just under $200 in most cases." *See id.*

54. Dr. Rao asked Miller to provide information on the NSS to one of his staff members, Ginny Goldbach ("Goldbach"), Chief Financial Officer for Radiance. In response, Miller forwarded Goldbach an email with several attachments, including the FAQ Sheet for Clinicians prepared by IHS (*See* Exhibit 3), a document titled "NSS – Science and Overview" (*See* Exhibit 15), and a document titled "EAD Brochure" (*See* Exhibit 16). Notably two of these three documents were prepared by IHS and branded accordingly. And more importantly, not one of these documents stated that the NSS was FDA-cleared as an electroacupuncture device. Thus, consistent with Mr. Carrico's explicit instructions to all IHS Sales Agents, the word "acupuncture" did not appear even once in these materials.

55. An hour later, Miller forwarded Goldbach an email from Kuhlman attaching several "exemplar" Explanation of Benefits ("EOB") statements. *See* Exhibit 17. These EOBs showed payments to other medical providers from a variety of insurance companies and other third-party payers, including Medicare, for bills submitted under the codes promoted by Defendants as part of the NSS Coding Scheme, including CPT 64555. Miller explicitly identified these in email correspondence to Goldbach as being EOBs "for NSS use," and pointed to reporting not only CPT 64555 but also code modifiers and placement sites to be used with the code. *See id.*

56. Later that day, Miller put Goldbach in contact with Long to discuss coding and billing for the NSS. The two spoke by phone first, and Long followed up with an email to Goldbach with several attachments, including a coding memorandum and "template" procedure notes and letters of medical necessity characterizing the NSS as a neurostimulator, reportable under CPT 64555, and "clearly delineated from acupuncture" or electro-acupuncture. *See* Exhibit 4. In those

documents sent to Goldbach by email, Long represented:

a. In the example pre-qualification letter that "[t]he neurostimulator technique that we are using with this patient ***is clearly delineated from acupuncture*** and other neurostimulator treatments" and that "[t]he unique nerve mapping techniques and direct stimulation of the neurovascular complexes acts at the mid-brain, trigeminal complex, and spinal cord affecting descending and ascending inhibition of neuro-matrix alteration and thus clearly ***separates the use of NSS from acupuncture, electro-acupuncture***, certain other surgically implantable nerve stimulators(such as spinal cord stimulators) and TENS. And so, it is important to re-iterate that with the implementation of the above mentioned techniques, the use of ***the NSS modality is NOT considered acupuncture or electro-acupuncture*** as meridian points, acu-points, reflexology points and/or dermatomes are NOT targeted."

b. That the NSS was a "non-programmable neurostimulator used for both therapeutic and diagnostic purposes" which is "transcutaneously placed on the mastoid process and the twelve (three lead – 4 pin) electrodes are percutaneous implanted in the appropriate nerve bundle within the cranial or peripheral nerve bundles that traverse through the auricular area."

c. That "MDs, Dos, Pas, NPs, and CRNAs are typically reimbursed for performance of the procedure. DCs should check their state Scope of Practice as many states do not allow chiropractors to puncture the skin. Historically, podiatrists struggle to receive in-office reimbursement for electrodes implanted in the ear, even though treating a foot condition."

d. That NSS service claims be specifically coded with CPT 64555 for peripheral nerve implantation or CPT 64553 for cranial nerve implantation and included detailed information about when the "-58 modifier" should be used with CPT 64555.

e. That "for CPT 64555 and CPT 64553: There are differing opinions about 'implantation' in these definitions. The neurostimulator generator is not implantable; the electrodes are. Some people, including Medicare personnel I have discussed this with, consider the needle electrode arrays of the device to be percutaneously implanted when being placed directly into certain nerves in either the cranial or peripheral nerve bundles. The code definition says 'percutaneous implantation of neurostimulator electrodes', which is what I believe you are doing when placing the device. There are others that disagree and believe that there must be an incision made for the procedure to be 'implantation'. The guidance addresses devices that are 'implants' but not electrodes that can be implanted without an incision. Your office will have to decide which they agree with. If you do not believe the electrodes are implanted, use CPT 64999 – Unlisted procedure; nervous system."

f. That "[o]ne of the services that I offer is a review of provider documentation

to determine if it is clearly supporting the procedures being performed and the coding the provider is choosing to use. I am providing some sample codes below. However, you must code per your documentation and coding training."

g. That the NSS could be billed in pre-operative, intra-operation, and post-operative circumstances.

h. That "[t]here are a wide range of provider types using neurostimulators," but she never mentioned acupuncture as one of those qualifying providers.

i. That 64555 was emphatically the appropriate code as "there are less acceptable diagnoses for use with the 64553, cranial nerve, procedure than the 64555, peripheral nerve, procedure. Historically, there have been more diagnosis mismatch denied/pending claims when using the 64553 procedure. Again, code to the highest level of specificity and per your documentation but be aware of this issue."

j. And specifically advised Dr. Rao to conceal the name of the device if doing pre-certified claims, stating: "I do recommend pre-certifying and using the coding description language. By this I mean referring to 'neurostimulator' rather than the trade name of the device. The device is just a type of neurostimulator and while the payer may ask for more information, which should be provided when requested, starting with asking to get pre-authorization under a trade name may automatically bring extra questions because they haven't heard of the device or may cause them to reference policies that do not apply to how the device is actually being used."

*See* Exhibit 4 (emphasis added).

57. So, from the start, the promise of extraordinary reimbursement was the foundation of Acclivity's (on behalf of and as directed by IHS) pitch to Dr. Rao and his staff. Yet nowhere in the materials provided to Dr. Rao by Acclivity and/or Long is it disclosed that the NSS was in fact cleared by the FDA as an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture. This, too, was in line with IHS's specific orders and directions to avoid the word acupuncture. And the coding and billing advice that Long provided to Dr. Rao was identical in form and substance to that utilized by all IHS Sales Agents and Coding Agents as part of the NSS Coding Scheme.

58. After experiencing some difficulties and receiving several inquiries from payers

regarding his use and billing of the NSS, Dr. Rao contacted Miller in July 2016 and requested a call to discuss various coding-related issues. By that time, Long was no longer working with Acclivity or IHS. So, Miller brought in two other Coding Agents to further perpetrate the NSS Coding Scheme. First, Miller sent an email to Dr. Rao and Goldbach on July 14, 2016 purporting to quote a letter from a "former AMA advisor as the [] use of CPT code for NSS" which stated:

> **AMA Advisor Review:**
>
> **"A thorough review of the coding literature and the LCDs generated by many Medicare carriers show that the CPT code 64555 appears to be the most accurate when applying use of the NSS system.** The neuro-stimulator technique that is used with these patients is clearly delineated from acupuncture and other neuro-stimulator treatments. The neuro-stimulator is programmed to provide a stimulation comprised of 0-10 HZ , impulse interval 1000 ms, monophasic impulse width 1 ms, ims/bipolar., changing polarity ( to avoid polarizing effects) , with an maximum amplitude of 3.2 V.
>
> **Procedure**: Mapping is done of patient's unique trigeminal, Greater Occipital, Lesser Occipital, cranial and peripheral nerve anatomy with subsequent placement of neuro-stimulator generator and percutaneous electrode array implantation at verified nerve sites.
>
> Medicare LCDs, Noridian in particular relate that "Peripheral Nerve Stimulation may be covered for relief of chronic intractable pain for patients with conditions known to be responsive to this form of therapy." "Severe neuropathic pain is typically well suited for successful responses to PNS."
>
> Such LCDs relate the treatment of occipital, trigeminal, peripheral, intercostal and ilio-inguinal nerves as well as lower back and trunk syndromes.
>
> 64555 Percutaneous implantation of neurostimulator electrode array; peripheral nerve- is the descriptor both in CPT and that recognized by Medicare and most private payers today.
>
> I would opine that this is the most appropriate CPT code for such service."
>
> Former advisor to AMA CPT editorial panel

*See* Exhibit 6 (emphasis in original). Miller copied Kimberly Coleman on that email.

59. On July 19, 2016, Kimberly Coleman, Miller, Dr. Rao, and Goldbach spoke by

telephone. During that call, Coleman summarized her findings with respect to coding for the NSS when utilized in an ASC setting. These "findings" were, of course, identical to those: (i) communicated to Dr. Rao and/or Goldbach by Miller, Long, and the "AMA Advisor" whose letter Miller claims to have provided an excerpt of to Dr. Rao; (ii) communicated to Dr. Bhambhani by IHCS and/or Acclivity; (iii) utilized by IHS during its prior promotion of the P-STIM prior to the development of the NSS; and (iv) those coding protocols found in the various template treatment notes, letters of medical necessity, and other materials provided to medical providers solicited by IHS Sales Agents, including IHCS, Acclivity, and others.

60. On August 5, 2016, in a follow-up email, Coleman summarized her findings in an email to Dr. Rao and Goldbach:

> a. "Billing 64555 for Highmark, commercials. Recommended for office use as they paid for the LCode. I provide local policies. Aetna, Cigna, UHC HealthAmerica and UPMC will pay for the NSS with prior authorization. Note; For these insurance companies it is diagnosis based. ONLY USE 64553 is used for Migraine and Chronic Headache. 64555 for all pain neck and below. Again this is also diagnosis driven."
>
> b. "CPT guidelines state that use the most specific code available. **<u>As long as documentation can prove 100% medical necessity</u>**, it is justified."
>
> c. "NSS is a percutaneous implantation neurostimulator electrode array that are applied and leads are placed for specific nerves. You are providing the same type of services when you do a SCS Trial."
>
> d. "Unless a it [sic] specifies in a particular LCD not to use the 64555 or 64553 and L8600 you use these codes."

*See* <u>Exhibit 5</u> (emphasis in original).

61. In all, between September 2015 and October 2016, Dr. Rao purchased 90 NSSs, to the tune of $45,194.00, all paid to Acclivity, who served as distributor and an agent-in-fact on behalf of IHS. *See* <u>Exhibit 18</u>.

62. On or about March 15, 2017, however, Dr. Rao's reporting of the code sequences

explicitly recommended by IHS and its agents as part of the NSS Coding Scheme prompted SafeGuard Services ("SGS"), the northeastern Unified Program Integrity Contract ("UPIC") administrator, responsible for evaluating claims payment data for areas of risk for inappropriate program payment, potential fraud, waste, and abuse, of the Medicare program in the northeastern area of the United States, including Maryland, initiated prepayment audits of both Dr. Rao's practice at SimCare and PASS MD based on their reporting of "suspicious" procedure coding.

63. Then, on May 22, 2017, Dr. Rao's reporting of the code sequences explicitly recommended by IHS and its agents prompted SGS to also initiate a post-payment audit of both Dr. Rao's practice at SimCare and PASS MD based on the same coding concerns.

64. On September 29, 2017, Dr. Rao's practice at SimCare and PASS MD received a series of refund demands from SGS on behalf of the Medicare program, with the total SGS refund demand exceeding $400,000.00.

65. On October 19, 2017, Dr. Rao's practice at SimCare and PASS MD received a series of additional refund demands from Novitas on behalf of the Medicare program, with the total Novitas refund demands exceeding $350,000.00.

66. Together, the total amount of all refund demands received by Dr. Rao's practice at SimCare and by PASS MD on behalf of the Medicare program exceeded $750,000.00. While those refunds were appealed and remain pending before the Office of Administrative Law, a substantial portion of the disputed refund amount has already been offset from other claims payable to Dr. Rao's practice at SimCare and to PASS MD, and Dr. Rao has already spent tens of thousands of dollars in legal fees and other related expenses relative to defending the Medicare audits—all on account of the deliberate misrepresentations by IHS and its agents vis a via the NSS Coding Scheme.

## RICO ALLEGATIONS

### A. The NSS Enterprise

67. Plaintiffs hereby replead and incorporate by reference each allegation set forth above, and further states as follows:

68. Defendants and the individuals named herein are "persons" within the meaning of 18 U.S.C. § 1961(3).

69. Based upon Plaintiffs' current knowledge, the following persons constitute a union or group of individuals associated in fact that Plaintiffs hereinafter refer to as the "NSS Enterprise."

a. IHS;

b. IHCS;

c. Campbell;

d. Guinn;

e. Acclivity;

f. Kuhlman;

g. Dragon Slayer;

h. Long;

i. Coleman;

j. Kimberly Coleman;

k. Carrico;

l. Smith;

m. Brannon;

n. Miller;

o. Tomahawk Medical;

p. Dixon Medical Distributors;

q. Yet-to-be identified Sales Agents of IHS; and

r. Yet-to-be-identified Coding Agents of IHS.

70. The common purpose of the NSS Enterprise was to sell the NSS to medical providers. IHS profited from the sale of each NSS its Sales Agents sold. IHS Sales Agents profited from a spread between the wholesale price it paid to IHS for each NSS and the retail price it ultimately charged medical providers for each device whether as part of Full Service or Direct Purchase programs. The Consulting Agents were paid a flat fee per "account" to put their name and credentials behind the NSS Coding Scheme.

71. The relationships by and among the members of the NSS Enterprise were well-defined:

a. IHS is the owner and licensor of the NSS.

b. IHS sought and received clearance from the FDA to market the NSS as an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture based on its representation that the NSS was substantially equivalent to the P-STIM.

c. IHS developed the NSS Coding Scheme, fashioned from billing and coding protocols it previously deployed in marketing the P-STIM.

d. IHS compiled information and documents on the clinical attributes of the device, proper indications for deploying the device, and purporting to support the NSS Coding Scheme (the "NSS Sales Materials").

e. IHS provided the NSS Sales Materials to its Sales Agents, including the precise documents provided to the Plaintiffs as alleged herein, and controlled all messaging associated with marketing and selling the devices including, most notably, that no mention was to be made that the NSS was in fact FDA-cleared as an electroacupuncture device only.

f. IHCS, Acclivity, Tomahawk Medical, Dixon Medical Distributors, and other yet-to-be identified Sales Agents of IHS were "exclusive" distributorships engaged by IHS to market and sell the NSS in defined geographic areas using the NSS Sales Materials or modified versions thereof.

g. Campbell, Guinn, Smith, and Brannon were officers and/or executives with IHCS, tasked with marketing and selling the NSS in defined geographic areas using the NSS Sales Materials or modified versions thereof.

h. Kuhlman and Miller were officers and/or executives with Acclivity, tasked with marketing and selling the NSS in defined geographic areas using the NSS Sales Materials or modified versions thereof.

i. Concurrent to his association with Acclivity, Kuhlman also served as a National Director for IHS.

j. Dragon Slayer, Coleman, and as yet-to-be identified Coding Agents, were retained and paid directly by IHS to support its Sales Agents by lending their name and the credentials of their owners, Long and Kimberly Coleman, respectively, to the coding sequences and protocols comprising the NSS Coding Scheme.

k. IHS worked with the Coding Agents to develop "templates" to provide purchasing medical providers with boiler-plate chart notes, letters of medical necessity, and other forms (the "NSS Coding Forms") purportedly intended to support the use of the NSS and coding and billing consistent with the NSS Coding Scheme.

l. IHS developed the NSS Coding Forms provided to purchasing medical providers, as evidenced by the Sales Agents and Coding Agents all utilizing identical (not similar, identical) language and formatting with respect to the NSS Coding Forms they distributed to accounts.

m. Acclivity and other Sales Agents processed orders made by accounts, took payments from ordering medical providers, and then remitted payment to IHS who in turn would fulfill each order.

72. The NSS Enterprise maintained its existence from at least October 2014 (when the NSS first received FDA-clearance, *see* Exhibit 1) through October 2016 (the date of Dr. Rao's last purchase of an NSS from IHS through Acclivity, *see* Exhibit 18), and upon information and belief for years beyond October 2016 as the NSS Enterprise continues to market the NSS to this day. In all, the NSS Enterprise either continues to maintain its existence or at the very least maintained its existence long enough to permit these associates to pursue the NSS Enterprise's purpose.

73. While Defendants participate in, are members, and part of the NSS Enterprise, they also have an existence separate and distinct from this association-in-fact enterprise. With respect to IHS, it is distinct from the NSS Enterprise because, as noted above, each member of the NSS Enterprise performed different roles within the enterprise and, as noted below, the separate legal

incorporation of the Sales Agents and the Coding Agents was used to facilitate the NSS Enterprise's pattern of racketeering activity. Specifically, the Sales Agents and Coding Agents and their relationships with IHS were intended to insulate IHS from the NSS Coding Scheme.

74. The NSS Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce. Specifically, the purpose of the NSS Enterprise was to induce medical device sales from a licensor in Indiana, using Sales Agents around the country, including Ohio, Maryland, and Kentucky, assisted by Coding Agents around the country including Indiana and Ohio, to medical providers with offices around the country, including in Maryland, Virginia, and Pennsylvania.

**B. The Pattern of Racketeering Activity**

75. Plaintiffs hereby replead and incorporate by reference each allegation set forth above, and further states as follows:

76. 18 U.S.C. §1961(1) provides that a "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have and continue to engage in conduct violating these laws to effectuate their illegal scheme.

77. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations, or promises, the Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to those transactions and communications set forth in Exhibit 10 as to Dr. Bhambhani, received by Dr. Bhambhani at Box

Hill Surgery Center in Abingdon, MD, as summarized by the chart annexed hereto as Exhibit 19; and Exhibit 18 as to Dr. Rao, received by Dr. Rao at SimCare and PASS MD in Mount Airy, MD, from IHS and/or Acclivity via the Postal Service or commercial interstate carriers by at least 9 separate shipments.

78. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations, or promises, the Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire and through other interstate electronic media, matter and things including but are not limited to those transactions and communications set forth in Exhibit 10 and Exhibit 18 and the chart annexed hereto as Exhibit 20.

79. Other matter and things sent through or received from the Postal Service, commercial carrier, or interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate the fraudulent scheme.

80. Defendants' misrepresentations, acts of concealment, and failures to disclose were made for the purpose of deceiving Plaintiffs and obtaining their property for the Defendants' gain.

81. Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material.

82. As a result, Defendants obtained money and property belonging to Plaintiffs, and Class Plaintiffs were injured in their business or property by Defendants' overt acts of mail and wire fraud.

83. Defendants engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, that is, indictable violations of 18 U.S.C. §§ 1341 and 1343 as described

above, within the past ten years. In fact, the Defendants have committed numerous acts of racketeering activity. Each act of racketeering activity was related; had a similar purpose; involved the same or similar participants and method of commission; had similar results; and impacted similar victims, including Plaintiffs.

84. The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of future repetition and continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

**CLASS ALLEGATIONS**

85. Plaintiffs hereby replead and incorporate by reference each allegation set forth above, and further states as follows:

86. Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class Proposed Class. The Proposed Class consists of:

> All healthcare providers located within the United States who purchased one or more NSSs from IHS either directly or through IHS Sales Agents from within the longest period allowed by statute before filing of this action up through and including the date of judgment in this case. Excluded from this class are any healthcare providers, if any, who have previously settled or compromised claims(s) as identified herein for the class.

87. The members of the Proposed Class are so numerous that joinder of all members is impracticable. While the precise number of members of the Proposed Class is known only to the Defendants, the number of healthcare providers who purchased one or more NSSs from the Defendants from within the longest period of time allowed by statute before the filing of this action is certainly in excess of 100 persons.

88. Common questions of law and fact that can be resolved with common answers exist

as to all class members. Such common questions include, but are not limited to, whether:

a. The NSS Enterprise is as association-in-fact;

b. The acts of the NSS Enterprise affected interstate commerce;

c. Defendants directly or indirectly invested in, maintained an interest in, or participated in the conduct of the NSS Enterprise;

d. Defendants were involved in a pattern of racketeering;

e. Defendants were involved in a scheme to defraud in violation of the mail and wire fraud statutes which constituted racketeering activity in furtherance of a scheme;

f. Defendants' racketeering acts were conducted as part of a pattern;

g. Defendants' racketeering acts were in furtherance of the NSS Coding Scheme;

h. Defendants deliberately made misrepresentations concerning the nature, purpose, and functionality of the NSS;

i. Defendants deliberately made misrepresentations concerning the correct billing, coding, and reimbursement for the NSS;

j. Defendants had reason to expect that the substance of these misrepresentations would be communicated and repeated to Dr. Bhambhani, Dr. Rao, and other medical providers through sales and marketing representatives;

k. Defendants had reason to expect that the substance of these misrepresentations would induce Dr. Bhambhani, Dr. Rao, and other medical providers to rely upon the misrepresentations;

l. Dr. Bhambhani, Dr. Rao, and other medical providers did, indeed, justifiably rely to their detriment on Defendants' misrepresentations;

m. Proposed Class members are entitled to recover compensatory damages, including but not limited to all amounts paid to Defendants for the NSSs they purchased under false pretenses;

n. Proposed Class members are entitled to recover interest on such compensatory damages, including but not limited to interest on all amounts paid to Defendants for the NSSs they purchased under false pretenses;

o. Proposed Class members are entitled to punitive damages based on Defendants' acts or omissions, because such acts or omissions were

actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions; and

p. Proposed Class members are entitled to other equitable relief as sought herein.

89. Plaintiffs' claims are typical of the claims of the Proposed Class.

90. Plaintiffs will fairly and adequately protect the interests of the Proposed Class. Plaintiffs' interests do not conflict with the interests of the Proposed Class members. Furthermore, Plaintiffs have retained competent counsel experienced in class action litigation. Plaintiffs' counsel will fairly and adequately protect and represent the interests of the Proposed Class.

91. The prosecution of separate actions by individual members of the Proposed Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Defendants.

92. By routinely misrepresenting the correct billing, coding, and reimbursement for the NSS, Defendants have acted or refused to act on grounds that apply generally to the Proposed Class.

93. Common questions of law or fact common to the class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because joinder of all members of the Proposed Class is impracticable.

94. Pursuant to applicable law governing the sale of medical devices, Defendants maintain sales records that record who purchased NSSs, in what amounts, and for how much, thus the members of the Proposed Class can be readily and objectively ascertained using records maintained by Defendants.

## CLAIMS FOR RELIEF

### COUNT ONE
### CIVIL VIOLATION OF RICO – 18 U.S.C. § 1962(c)
### (Against all Defendants)

95. Plaintiffs, individually and on behalf of all others similarly situated, repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

96. This claim for relief arises under 18 U.S.C. § 1962(c).

97. Each Plaintiff and each Proposed Class member is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

98. Each Defendant and associate of the NSS Enterprise is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 18 U.S.C. 1962(c).

99. Through agreements between the Defendants and joint management activity between the associates of the NSS Enterprise, the Defendants formed an association-in-fact, referred to herein as the NSS Enterprise, which constitutes an "enterprise" engaged in illegal activities affecting interstate commerce pursuant to 18 U.S.C. §§ 1961(4) and 1962(c).

100. The purpose of the NSS Enterprise was to enhance Defendants' profits by misrepresenting, concealing, and defrauding Plaintiffs and the Proposed Class. At all relevant times, Defendants were associated with the NSS Enterprise through their joint ownership, employment, and/or business relationship with the NSS Enterprise, and its fraudulent and misrepresentative statements about the NSS and reimbursement for the NSS and services rendered. The Defendants were also associated with the NSS Enterprise through their participation in its management and operation by directing is affairs and assisting the fraudulent billing scheme. The Defendants participated, directly and indirectly, in the conduct of the enterprise's affairs through

a pattern of unlawful activity under 18 U.S.C §§ 1961(1)(b), 1961(5), and 1962(c), as follows:

a. Multiple acts of mail fraud, in violation of 18 U.S.C. § 1341, detailed herein;

b. Multiple acts of wire fraud, in violation of 18 U.S.C. § 1943, detailed herein; and

c. Multiple instances of interstate transport of money converted or fraudulent obtained, in violation of 18 U.S.C. § 2314, detailed herein.

101. Each Proposed Class member suffered injury to his or her property, within the meaning of 18 U.S.C. § 1964(c), by reason of the violation of 18 U.S.C. § 1962(c). Plaintiffs and members of the Proposed Class were injured by reason of Defendants' RICO violations, described herein. The injuries of the individual Plaintiffs' and the members of the Proposed Class were proximately caused by Defendants' violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

102. Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs and the members of the Proposed Class are entitled to recover threefold their damages, costs, and attorneys' fees from Defendants and other appropriate relief.

**COUNT TWO**
**CONSPIRACY TO COMMIT**
**CIVIL VIOLATION OF RICO – 18 U.S.C. § 1962(d)**
**(Against all Defendants)**

103. Plaintiffs, individually and on behalf of all others similarly situated, repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

104. This claim for relief arises under 18 U.S.C. § 1962(d).

105. Each Plaintiff and each Proposed Class member is a “person” within the meaning of 18 U.S.C. §§ 1961(3) and 1964(d).

106. Each Defendant and associate of the NSS Enterprise is a “person” within the meaning of 18 U.S.C. §§ 1961(3) and 18 U.S.C. 1962(d).

107. Defendants conspired to conduct or participate, directly or indirectly, in the conduct of the affairs of the NSS Enterprise, through a pattern of racketeering activity. The conspiracy to violate § 1962(c) constitutes a violation of § 1962(d).

108. In furtherance of the conspiracy to violate § 1962(c), Defendants agreed to commit numerous predicate acts of “racketeering activity,” as defined in 18 U.S.C. § 1961(5), prior to and during the RICO Class Period, and they continue to commit such predicate acts, in furtherance of the recoupment scheme, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343.

109. As a direct and proximate result of the conspiracy to violate § 1962(c), Plaintiffs and the Proposed Class members have each been injured in their business and property within the meaning of 18 U.S.C. § 1964(c), and are entitled to recover treble damages together with the costs of this lawsuit, expenses, and reasonable attorneys’ fees.

**COUNT THREE**
**FRAUDULENT MISREPRESENTATION**
**(Against all Defendants)**

110. Plaintiffs, individually and on behalf of all others similarly situated, repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

111. Defendants made material misrepresentations to Plaintiffs and members of the Proposed Class by means of oral representations, labeling, advertisements, promotions/or

marketing, that the NSS could be billed to third party payors and health insurers with a particular resulting reimbursement, as alleged more fully herein above. Although the Defendants may have included disclaimers or caveats with their misrepresentations, those disclaimers or caveats were ambiguous and, in the context of the balance of the communications by the Defendants, misleading. Moreover, the Defendants conduct was inconsistent with the disclaimers and caveats, rendering the latter ineffective. The general disclaimers made by the Defendants were contradicted by their specific representations that the billing advice they gave in connection with their marketing was correct.

112. Defendants' representations were untrue, or at the least, made with reckless disregard for its truth.

113. Defendants made the representations herein alleged with the intention of inducing Plaintiffs and members of the Proposed Class to purchase NSSs from Defendants.

114. At the time Defendants made the representations herein alleged, Defendants knew that the representations were false.

115. Plaintiffs and members of the Proposed Class justifiably relied upon Defendants' fraudulent and intentional misrepresentations and, in reliance on those representations, were induced to purchase NSSs from Defendants.

116. As a direct and proximate result of Defendants' intentional misrepresentations, Plaintiffs and members of the Proposed Class were harmed in an amount to be determined at trial.

**COUNT FOUR**
**INTENTIONAL MISREPRESENTATION BY CONCEALMENT**
**OR NON-DISCLOSURE**
**(Against all Defendants)**

117. Plaintiffs, individually and on behalf of all others similarly situated, repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this

Complaint as if fully set forth herein.

118. Defendants failed to disclose material facts regarding the reimbursement, billing and collections rules and characteristics in connection with the NSSs purchased by Plaintiffs and members of the Proposed Class, and the exposure the Plaintiffs and members of the Proposed Class would have to Medicare and third-party payors if they followed Defendants' billing advice.

119. Defendants had to a duty to disclose, failed to disclose, and purposefully failed to disclose accurate facts about the billing and collections rules and characteristics about the NSS.

120. Specifically, the Defendants intended to deceive the Plaintiffs and members of the Proposed Class of the fact that the NSS did not have the attribute of being billable and reimbursable in the way asserted by the Defendants, and knew that the Plaintiffs and members of the Proposed Class would have not purchased the NSS or NSS services, or paid a lower price for the NSS or NSS services had Plaintiffs and members of the Proposed Class knew of the undisclosed material facts.

121. This failure to disclose induced the Plaintiffs and members of the Proposed Class to act.

122. As a direct and proximate result of Defendants' concealment of material facts, Plaintiffs and members of the Proposed Class were damaged in a way to be determined at trial.

**COUNT FIVE**
**CIVIL CONSPIRACY**
**(Against all Defendants)**

123. Plaintiffs, individually and on behalf of all others similarly situated, repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

124. All Defendants consist of two or more persons.

125. All Defendants did agree or had an understanding to effectuate the intentional misrepresentations, concealment of material facts, and/or the conduct alleged in the foregoing paragraphs.

126. The agreement(s) by all Defendants was designed to pursue an unlawful purpose.

127. As a direct and proximate result of Defendants' agreement(s) to pursue an unlawful purpose, Plaintiffs and members of the Proposed Class suffered and continue to suffer special damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand relief in their favor and against the Defendants as follows:

1. That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that the Plaintiffs are proper class representatives, and that their counsel is adequate class counsel;

2. That the Court certify the Proposed Class identified above;

3. That judgment be entered against Defendants and in favor of Plaintiffs and the Proposed Class on the Causes of Action in this Third Amended Class Action Complaint, for actual, compensatory, and punitive damages, in an amount to be determined at trial;

4. That, pursuant to RICO, the Plaintiffs and the Proposed Class be awarded an amount three times the amount of any and all damages suffered as a result of the illegal acts set forth herein, as well as any and all other amounts or damages allowed to be recovered under RICO;

5. That the Court award the Plaintiffs and the Proposed Class attorneys' fees and litigation costs against Defendants;

6. That judgment be entered imposing pre-judgment interest on damages, attorneys'

fees, and litigation costs against Defendants; and

7. That the Court award against Defendants and for Plaintiffs and the Proposed Class all other and further relief, both at law and in equity, to which they may show themselves justly entitled.

**DEMAND FOR A JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs and the Proposed Class demand a jury trial on all issues so triable.

Dated: November 17, 2020

Respectfully submitted,

*/s/ Ugo Colella*

Ugo Colella (Bar. No. 17443)
COLELLA ZEFUTIE, LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
(202) 920-0880

John J. Zefutie, Jr. (admitted *pro hac vice*)
COLELLA ZEFUTIE, LLC
116 Village Boulevard, Suite 200
Princeton, NJ 08540
(202) 920-0880

John W. Leardi (admitted *pro hac vice*)
Paul D. Werner (admitted *pro hac vice*)
Elizabeth A. Rice (Bar. No. 20426)
Nicole P. Allocca (admitted *pro hac vice*)
Frank X. Wukovits (admitted *pro hac vice*)
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
(609) 799-5150

Robert A. Gaumont (Bar No. 26302)
GORDON FEINBLATT LLC
233 E. Redwood Street
Baltimore, MD 21202
(410) 576-4007

*Attorneys for Plaintiffs Ritu Bhambhani M.D.,*
*Sudhir Rao, M.D., and the Proposed Class*

# Exhibit 1

DEPARTMENT OF HEALTH & HUMAN SERVICES Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center WO66 G609
Silver Spring, MD 20993 0002

October 2, 2014

Navigant Consulting, Inc.
Colleen Hittle
Managing Director
30 S. Wacker Drive, Suite 3100
Chicago, Illinois 60606

Re: K140530
Trade/Device Name: Electro Auricular Device
Regulation Name: Electro Acupuncture Stimulator
Regulatory Class: Unclassified
Product Code: BWK
Dated: August 29, 2014
Received: September 2, 2014

Dear Ms. Colleen Hittle:

We have reviewed your Section 510(k) premarket notification of intent to market the device referenced above and have determined the device is substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA). You may, therefore, market the device, subject to the general controls provisions of the Act. The general controls provisions of the Act include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration. Please note: CDRH does not evaluate information related to contract liability warranties. We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it may be subject to additional controls. Existing major regulations affecting your device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set

forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm. Also, please note the regulation entitled, ″Misbranding by reference to premarket notification″ (21CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Felipe Aguel -S

for Carlos L. Peña, PhD, MS
Director
Division of Neurological and
Physical Medicine Devices
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Food and Drug Administration

# Indications for Use

Form Approved: OMB No. 0910-0120
Expiration Date: January 31, 2017
*See PRA Statement below.*

510(k) Number *(if known)*
K140530

Device Name
EAD (electro auricular device)

Indications for Use *(Describe)*
The EAD is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states.

Type of Use *(Select one or both, as applicable)*

☒ Prescription Use (Part 21 CFR 801 Subpart D) ☐ Over-The-Counter Use (21 CFR 801 Subpart C)

**PLEASE DO NOT WRITE BELOW THIS LINE – CONTINUE ON A SEPARATE PAGE IF NEEDED.**

**FOR FDA USE ONLY**

Concurrence of Center for Devices and Radiological Health (CDRH) *(Signature)*

Felipe Aguel -S Date: 2014.10.02 20:47:21 -04'00'

This section applies only to requirements of the Paperwork Reduction Act of 1995.

***DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.***

The burden time for this collection of information is estimated to average 79 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

Department of Health and Human Services
Food and Drug Administration
Office of Chief Information Officer
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

# 510(k) Summary

**Submitter & Contact Information**

Colleen Hittle, RAC
Managing Director
Navigant Consulting, Inc.
30 S. Wacker Drive
Suite 3100
Chicago IL 60606
Phone: (317) 228-8730
Fax: (317) 228-8701
colleen.hittle@navigant.com

**Date:** June 23, 2014

**Manufacturer:** Key Electronics
2533 Centennial Blvd
Jeffersonville, IN 47130

**Trade Name:** EAD (electro auricular device)

**Common Name:** electro acupuncture device

**Classification Name(s):** BWK – stimulator, electro-acupuncture

**Classification Number:** Unclassified

**Predicate Device(s)**

| | 510(k) Number | Device Name | Submitter Name |
|---|---|---|---|
| Primary Predicate | K050123 | P.Stim System | Neuroscience Therapy Corporation |
| Reference Device | K091875 | E-Pulse | Medevice Corporation |

## Device Description

The EAD system is a battery-operated, single-use device that has a preprogrammed frequency, pulse and duration for the stimulation of auricular point nerve stimulation for pain. The device power supply connects via four (4) stainless steel wires, sheathed in a plastic over-molding, to three (3) needle arrays comprised of four (4) needles each and one (1) needle array comprised of only 1 needle.

The device is powered by one 3 Volt lithium ion battery.

The device modulates a duty cycle between 2 hours on and 2 hours at rest. The maximum performance time frame is 5 days or 120 hours (5 days X 24 hours). Weight is 4 grams including batteries. The power supply dimensions are 36 mm x 17 mm x 7 mm. The needle dimensions are 0.5 mm width x 2 mm length.

## Intended Use(s)

The EAD is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states.

## Technological Characteristics

**Appliance:** Electro-acupuncture Device
**Type description:** EAD
**Power supply:** 1 x 3V battery (Type CR1220 Lithium)
**Output:** (Load impedance range 1k-10kQ) max. 3.2V, Impulse interval 1000ms, impulse width 1ms, 'ims *I* bipolar), max possible total duration of treatment 5x 24 hours
**Protection level:** IP20 Type: B
**Duty type:** approx. 2h duty *I* 2h at rest (periodic duty)
**Weight incl. battery:** 4g Dimensions: 36 x 16 x 7 mm
**Needle Dimensions:** 0.5 mm width x 2 mm length

**Comparison Table: Applicant Device vs. Predicate Devices**

| **Device Name** | EAD | E-Pulse (Reference Device) | P.Stim System (Primary Predicate) |
|---|---|---|---|
| **501(k) Number** | This Submission | K091875 | K050123 |
| **Indication for Use** | The EAD is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states. | The E-Pulse is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states. | The P-Stim is an electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states. |
| **Device Description** | Battery powered device generates low frequency and continual electrical pulse which are transmitted to new endings of the ear. It allows continued therapy over several days.<br>The device is controlled by a micro processor. | Battery powered unit designed to administer auricular point nerve stimulation treatment for pain therapy over a 96-hour period via electrical pulsing.<br>The device is on for 3 hours and then off for 3 hours.<br>The device is controlled by a micro processor. | A micro stimulation appliance for pain therapy.<br>The device generates low frequency and continual electrical pulse which are transmitted to new endings of the ear. It allows continued therapy over several days.<br>The device is controlled by a micro processor. |
| **Target Population** | Patients with acute and chronic pain | Patients with acute and chronic pain | Patients with acute and chronic pain |
| **Human Factors** | To be applied by a qualified practitioner of acupuncture | To be applied by a qualified practitioner of acupuncture | To be applied by a qualified practitioner of acupuncture |
| **Where Used** | At the clinic and at home | At the clinic and at home | At the clinic and at home |
| **Software Based** | Yes | Yes | Yes |
| **Performance** | 2 hours on/2 hours off; pulses with modulating frequency (1 to 10 Hz) | 3 hours on/3 hours off; pulse monophasic at 1 Hz | 3 hours on/3 hours off; pulse monophasic at 1 Hz |
| **Power Source** | Lithium ion battery | Zinc air battery | Zinc air battery |
| **Duration** | Up to 120 hours | 96 hours | 96 hours |

| | | | |
|---|---|---|---|
| **Generator** | Attached behind patient ear | Attached behind patient ear | Attached behind patient ear |
| **Leads** | Four electrode needle leads | Three leads that can attach to needles | Three leads that can attach to needles |
| **Needles** | Titanium straight shaft | Titanium hook shaft | Titanium straight shaft |
| **Shape** | Elliptical | Round | Elliptical |

## Non-Clinical Performance Data

**Biocompatibility Testing**
The biocompatibility evaluation for the adhesive for the EAD device was conducted in accordance with the FDA Blue Book Memorandum #G95-1 "Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing,'" May 1, 1995, and International Standard ISO 10993-1 "Biological Evaluation of Medical Devices − Part 1: Evaluation and Testing Within a Risk Management Process," as recognized by FDA. The battery of testing included the following tests:

- Cytotoxicity
- Sensitization
- Irritation

The EAD adhesive is considered tissue contacting for a duration of less than 30 days. The other patient contacting materials contained in the subject device are unchanged from the P-Stim predicate device.

**Electrical Safety and Electromagnetic Compatibility (EMC)**
Electrical safety and EMC testing were conducted on the EAD device. The system complies with the IEC 60601-1 and IEC 60601-2-10 standards for safety and the IEC 60601-1-2 standard for EMC.

**Software Verification and Validation Testing**
Software verification and validation testing were conducted and documentation was provided as recommended by FDA's Guidance for Industry and FDA Staff, "Guidance for the Content of Premarket Submissions for Software Contained in Medical Devices." The software for this device was considered as a "minor" level of concern, since a failure or latent flaw in the software could not directly result in serious injury or death to the patient or operator.

**Sterility/Shelf Life**
Sterilization Validation was conducted on the EAD device needles and wiring harness using the VDMAX25 method according to ISO 11137-2 and ISO 11737-2. Performance and stability of the EAD packaging was validated in accordance with ISO 11607-1 and Accelerated aging of the EAD was performed in accordance with ASTM F1980-07. Packaging qualifications are according to ISO 11607-1 and machine qualifications for the sealing process are according to ISO 11607-2.

## Conclusion

The non-clinical data support the safety of the device and the hardware and software verification and validation demonstrate that the EAD device should perform as well as the predicate device in the specified use conditions.

# Exhibit 2

# INNOVATIVE HEALTHCARE SOLUTIONS

## *THE NEURO-STIM SYSTEM (NSS)*

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# TESTIMONIAL

"I have been using the NSS Neuro-Stim system for some time now. It has proved to be highly effective in the treatment of acute and chronic pain for my patients"

Dr. Peter S. Baek. MD

Johns Hopkins University

Duke University School of Medicine



INNOVATIVE HEALTHCARE SOLUTIONS

# THE NEURO-STIM SYSTEM

- NSS is a patented, FDA approved peripheral nerve stimulator designed to provide field stimulation to peripheral and cranial nerves in the auricle over a 5 day period.
- It is FDA approved for chronic and acute pain

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# WHEN IS NSS USED?






Peripheral nerve stimulation by NSS is mainly used to treat *pain* . Use of the device is recommended for *pre-operative, intra-operative and post-operative pain therapy* as well as for the treatment of *chronic pain*.

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# HOW NSS WORKS

**NSS** is placed behind the patient's ear and connected to stimulation electrode arrays placed percutaneously in the auricle. The advantage of using the ear for such treatment is that it offers easy access to many nerve bundles allowing for a very minimally invasive procedure.



IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# HOW NSS WORKS

- The device transmits low-frequency electrical impulses to exposed nerve bundles, which trigger the release of endorphins.
- **NSS** not only relieves pain, but also reduces sympathetic nervous system activity resulting in decreased inflammation and increased arterial perfusion/oxygenation.

***Pain signal:***

***Action of endorphins on brain signal:***




***The pain signal is transmitted from brain cell to brain cell.***

***Endorphins combine with receptors to block the transmission of pain.***

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# HOW NSS WORKS

- The built-in microchip creates periods of stimulation and rest, each lasting 2 hours over a 5 day period. It is pre-programmed to neuromodulate from 1 Hz-10Hz and back each second.

- Patients will feel a mild tapping upon placement. This typically goes away quickly allowing for normal daily activities to be resumed.



IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# BENEFITS OF NSS

The NSS is  minimally invasive and is applied in an economical time frame.

The device is removed and disposed of by the patient after five days.

It is light weight, allowing a patient to enjoy normal daily act ivies without restrictions.

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# BENEFITS OF NSS

- **NSS** is a non-narcotic alternative to treat pain. An advantage over drug therapy is that the patient no longer suffers any of the possible side-effects of pain-killers such as impaired reactions.
- In most cases, the patient claims an improvement in overall clarity and quality of life.



IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# TYPICAL TREATMENT – CHRONIC PAIN 6 TREATMENTS ON AVERAGE

- Patient fitted with 3 devices with each new device being placed every 7 days.
- Patient then given 7 days off.
- If pain increases over off period, patient receives 3 more devices placed every 7 days.
- Generally, after 6 devices have been placed, patient will have achieved maximum therapeutic benefit.

*This Protocol allows time for the central nervous system to balance itself*

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# TYPICAL TREATMENT – ACUTE PAIN
# 3 TREATMENTS

- Patient fitted with device up to 5 days prior to procedure
- Patient wears device through procedure and then is fitted with new device immediately after procedure
- Patient will often benefit from one additional device 5 days post-procedure

# NSS IS FDA APPROVED

**NSS** is the first and only FDA approved electro-auricular, peripheral nerve simulator currently on the market to treat acute and chronic pain.

FDA 510(K) # K140530

APPROVED FDA APPROVED

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS STUDIES

**Walter Reed Military Hospital (DOD):**

- Reduced pain scores
- Reduced narcotic consumption
- Improved sleep




**Multiple private institutions are in the protocol discovery stage.**

# NSS IS REIMBURSED BY MAJOR PRIVATE AND PUBLIC PAYORS

**NSS is reimbursed by..**

- Medicare when performed at an ASC

**The following Insurers pay for in office and ASC**

- Major health insurers
- Workers compensation insurers
- Personal injury insurers

IHCS
INNOVATIVE HEALTHCARE SOLUTIONS

# NSS IS GOOD MEDICINE AND GOOD BUSINESS




IHCS
INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR CHRONIC PAIN – FULL SERVICE PROGRAM IN OFFICE

Average procedures for chronic pain:
6

Physician profit per device:
$700

Physician profit per patient:
$4,200

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR ACUTE PAIN / PROCEDURE FULL SERVICE PROGRAM IN OFFICE

Average devices per procedure:
3

Physician profit per device:
$700

Physician profit per patient:
$2,100

IHCS
INNOVATIVE HEALTHCARE SOLUTIONS

# FULL-SERVICE PROGRAM




IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR CHRONIC PAIN DIRECT PURCHASE IN OFFICE

Average procedures for chronic pain:
6

Physician profit per device:
$1,000

Physician profit per patient:
$6,000

IHCS
INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR ACUTE PAIN PROCEDURE DIRECT PURCHASE IN OFFICE




IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# DIRECT PURCHASE PROGRAM




IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# IN OFFICE BILLING PROCEDURE

Check your major commercial payer contracts/policies for exact Reimbursement amounts.

64555: Percutaneous implantation of electrodes

L8680 x3: Neurostimulator electrodes (each)



L8699 x3: Neurostimulator electrodes (each)

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR CHRONIC PAIN – FULL SERVICE PROGRAM AT ASC

Average procedures for chronic pain: 6

Physician profit per device: $1,600

Physician profit per patient: $9,600

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR ACUTE PAIN / PROCEDURE FULL SERVICE PROGRAM

## AT ASC

Average devices per procedure:
3

Physician profit per device:
$1,600

Physician profit per patient:
$4,800

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# FULL-SERVICE PROGRAM




IHCS
INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR CHRONIC PAIN DIRECT PURCHASE

## AT ASC

Average procedures for chronic pain: 6

Physician profit per device: $1,900

Physician profit per patient: $11,400

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# DIRECT PURCHASE PROGRAM




IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

# NSS FOR ACUTE PAIN PROCEDURE DIRECT PURCHASE
## AT ASC

Average devices per procedure:
3

Physician profit per device:
$1,900

Physician profit per patient:
$5,700

IHCS
INNOVATIVE HEALTHCARE SOLUTIONS

# ASC BILLING PROCEDURE

Check your major commercial payer contracts/policies for exact Reimbursement amounts.

64555: Percutaneous implantation of electrodes

*Modifier 58 must be used after initial procedure*



L8680 x3: Neurostimulator electrodes (each)

L8699 x3: Neurostimulator electrodes (each)

IHCS

INNOVATIVE HEALTHCARE SOLUTIONS

Date: 3/20/2015

compmanagement health systems

P.O. Box 1040
Dublin, OH 43017

**Pay to Provider:**
**Pay To NPI:**
**Pay To Taxonomy:**

**Service Provider:** ******
**Service NPI:**
**Service Taxonomy:**

If you have any questions regarding this summary, please call or send a copy of your statement and copy of this summary to:
**CompManagement Health Systems, Inc.**
**Attn: Bill Review Department Toll Free**
**Phone: 888-247-7799 Option #2 Toll Free**
**Fax: 800-334-4229**

*Note: Charges were reduced according to the Ohio Bureau of Workers' Compensation Fee Schedule, unless otherwise noted. See end of statement for description of EOB codes.

**For Electronic Billing: Call Emdeon at 877-363-3666.**

An EOB of 714 indicates that the line item was priced according to the Ohio Comp Network Health Group's pricing policies and fee schedules.

The Ohio Bureau of Workers' Compensation prohibits a provider from billing an injured worker for any difference between the provider's charge and the amount paid.

**BWC Claim:** **Check/Voucher #:** **Bill Doc #:** **DRG Pricing:**

**Patient:** **Patient Acct #:** **CARE Invoice #:** [redacted]

| Line # | DOS | Rev Code | CPT Code | Modifier | Diagnosis Code | Place of Svc | Units | Charge | MCO Price | Interest | Amount Paid | APC | EOB Codes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3/5/15 | | 64555 | | 721.3 | 11 | 1 | $ 650.00 | $ 436.27 | $0.00 | $ 436.27 | | 758 |
| 2 | 3/5/15 | | L8680 | | 721.3 | 11 | 3 | $ 3,009.00 | $ 1,509.84 | $0.00 | $ 1,509.84 | | |
| 3 | 3/5/15 | | A6237 | | 721.3 | 11 | 1 | $ 45.00 | $ 10.39 | $0.00 | $ 10.39 | | |
| | | | | | | Totals: | | $ 3,704.00 | $ 1,956.50 | $0.00 | $ 1,956.50 | | |

| EOB Code | Description |
|---|---|
| 758 | This is the principal procedure of multiple procedures billed on this date of service. |

Sample E.O.B

# *Explanation of Benefits*

MEDICARE PART B
532 RIVERSIDE AVE.
JACKSONVILLE, FL 32231

Page 1

[redacted]

Check/EFT #: [redacted]
Check Date: 02/05/2015
Check Amt: 6415.37
NPI Provider#: [redacted]

Patient: [redacted]
HIN: [redacted]
Patient Control Number: [redacted]
ICN#: [redacted]
Status: Primary

| Dates of Service | Units | CPT4/Mods | Billed | CoIns | Allwd | Deduct | Paid | Adj | Adj Cd |
|---|---|---|---|---|---|---|---|---|---|
| 01/19/2015-01/19/2015 | 1.00 | 64555 SG GA | 6840.14 | 719.64 | 3598.19 | 0 | 2820.98 | 57.57 | CO253 |
| 01/19/2015-01/19/2015 | 1 | G8907 | 0.00 | 0 | 0 | 0 | 0 | 0 | |
| 01/19/2015-01/19/2015 | 1 | G8918 | 0.00 | 0 | 0 | 0 | 0 | 0 | |
| *Totals:* | | | *6840.14* | *719.64* | *3598.19* | *0* | *2820.98* | *57.57* | |

Claim Level Adjudication Codes: MA01;
Remark Codes: N620
Reason Codes: CO45-3241.95; CO253-57.57; PR2-719.64

HIPAAX12 Code List Summary:
CO253 - On-The-Fly ERA
CO45 - Charges exceed your contracted/ legis...
PR2 - Coinsurance Amount

Sample E.O.B

**Provider Explanation of Medical Payment Report**

Cigna

| ovider Number | Provider Name | Date through which claims were processed | THIS IS NOT A BILL Retain for Your Records | Page |
|---|---|---|---|---|
| [redacted] | | 01/16/2015 | | 1 |

Reminder: A coverage determination, prior authorization, or certification that is made prior to a service being performed is not a promise to pay for the service at any particular rate or amount. The patient's summary plan description governs amount payable, as every claim submitted is subject to all plan provisions, including, but not limited to, eligibility requirements, exclusions, limitations, and applicable state mandates.

PATIENT NAME: [redacted] PATIENT#: [redacted] OPERATION LOCATION/GROUP# [redacted] RECEIVE DATE: 12/30/2014 PROCESS DATE: 01/16
MEMBER NAME: [redacted] SUBSCRIBER#: [redacted] REF#: [redacted] CHECK#: [redacted]

| | Procedure Date | Procedure Code | Adjusted Procedure Code | Billed Amount | Adjusted Procedure Code Amount | Allowed Amount | Not Covered/ Discount | Deduct/Copay Amount | Coinsurance Amount | DRG / Per Diem Type | DRG / Per Diem Number | DRG/Per Diem Amount | DRG/ Per Diem Benefit Amount | Plan Benefit | See Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12182014 | 64555 | 00400 | 415.00 | 415.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 | AD |
| 2 | 12182014 | L8680 | | 1785.00 | | 1785.00 | 0.00 | | | | | 0.00 | 0.00 | 1785.00 | |
| 3 | 12182014 | 00400 | | 415.00 | | 140.00 | 275.00 | | | | | 0.00 | 0.00 | 140.00 | A1 |
| 4 | | | | | | | 0.00 | | | | | 0.00 | 0.00 | 0.00 | A2 |
| | TOTAL | | | 2200.00 | | 1925.00 | 275.00 | | | | | | | 1925.00 | |

BALANCE.................... $0.00

VIEW ELIGIBILITY, BENEFITS, AND CLAIM DETAILS AND GET PRECERTIFICATION ANSWERS FAST AT THE CIGNA FOR HEALTH CARE PROFESSIONALS WEBSITE (WWW.CIGNAFORHCP.COM)

PAYMENT OF $1,925.00 TO [redacted]

DL# MPT

PATIENT NAME: [redacted] PATIENT#: [redacted] OPERATION LOCATION/GROUP# [redacted] RECEIVE DATE: 12/30/2014 PROCESS DATE: 01/15
MEMBER NAME: [redacted] SUBSCRIBER#: [redacted] REF#: [redacted] CHECK#: [redacted]

| | Procedure Date | Procedure Code | Adjusted Procedure Code | Billed Amount | Adjusted Procedure Code Amount | Allowed Amount | Not Covered/ Discount | Deduct/Copay Amount | Coinsurance Amount | DRG / Per Diem Type | DRG / Per Diem Number | DRG/Per Diem Amount | DRG/ Per Diem Benefit Amount | Plan Benefit | See Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 12122014 | 64555 | 00400 | 415.00 | 415.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 | AD |
| 6 | 12122014 | L8680 | | 1785.00 | | 1785.00 | 0.00 | | | | | 0.00 | 0.00 | 1785.00 | |
| 7 | 12122014 | 00400 | | 415.00 | | 140.00 | 275.00 | | | | | 0.00 | 0.00 | 140.00 | A1 |
| 8 | | | | | | | 0.00 | | | | | 0.00 | 0.00 | 0.00 | A2 |
| | TOTAL | | | 2200.00 | | 1925.00 | 275.00 | | | | | | | 1925.00 | |

BALANCE.................... $0.00

PAYMENT OF $1,925.00 TO [redacted]

DL# PDU

PATIENT NAME: [redacted] PATIENT#: [redacted] OPERATION LOCATION/GROUP# [redacted] RECEIVE DATE: 01/08/2015 PROCESS DATE: 01/16
MEMBER NAME: [redacted] SUBSCRIBER#: [redacted] REF#: [redacted] CHECK#: [redacted]

| | Procedure Date | Procedure Code | Adjusted Procedure Code | Billed Amount | Adjusted Procedure Code Amount | Allowed Amount | Not Covered/ Discount | Deduct/Copay Amount | Coinsurance Amount | DRG / Per Diem Type | DRG / Per Diem Number | DRG/Per Diem Amount | DRG/ Per Diem Benefit Amount | Plan Benefit | See Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 | 12302014 | 64555 | 00400 | 415.00 | 415.00 | | 0.00 | | | | | 0.00 | 0.00 | 0.00 | A1 |
| 0 | 12302014 | L8680 | | 1785.00 | | 892.50 | 892.50 | | | | | 0.00 | 0.00 | 892.50 | A1 |
| 1 | 12302014 | 00400 | | 415.00 | | 140.00 | 275.00 | | | | | 0.00 | 0.00 | 140.00 | A1 |
| 2 | | | | | | | 0.00 | | | | | 0.0 | .00 | 0.00 | A2 |
| | TOTAL | | | 2200.00 | | 1032.50 | 1167.50 | | | | | | | 1032.50 | |

BALANCE.................... $0.00

PAYMENT OF $1,032.50 TO [redacted]

DL# AMA

Sample E.O.B

A0) THE PROCEDURE CODE IS DISALLOWED BECAUSE A SURGICAL CODE WAS BILLED RATHER THAN AN ANESTHESIA CODE.

MEDCOST BENEFIT SERVICES, LLC
P.O. BOX 25987
WINSTON-SALEM, NC 27114-5987

MEDCOST BENEFIT SERVICES

Electronic Service Requested

[redacted]

For Customer Service, Call
800-795-1023
Visit us at www.medcost.com

Group: [redacted]
Group No:
Paid Date: 01/15/2015
Check No: [redacted]

# PROVIDER COPY

# EXPLANATION OF BENEFITS

Provider: [redacted] Employee: [redacted] Patient: [redacted] Vendor No: [redacted]
Provider No: [redacted] Pat Acct No: [redacted] Claim No: [redacted]

| Date of Service | CPT Code | Total Charges | PPO Discount | Over R & C | Non Covered | Deduct | Co-Pay | Co-Ins | Paid At % | Codes | Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/12/2014-12/12/2014 | 64555 | 415.00 | 249.00 | .00 | .00 | .00 | .00 | 49.80 | 70 | A | 116.20 |
| 12/12/2014-12/12/2014 | L8680 | 1,785.00 | 611.55 | .00 | .00 | .00 | .00 | 352.04 | 70 | A | 821.41 |
| Claim Totals | | 2,200.00 | 860.55 | .00 | .00 | .00 | .00 | 401.84 | | | 937.61 |
| Provider Paid Amount | | | | | | | | | | | 937.61 |
| Employee Paid Amount | | | | | | | | | | | .00 |
| Total Payment | | | | | | | | | | | 937.61 |
| Patient Responsibility | | | | | | | | | | | 401.84 |

Provider: [redacted] Employee: [redacted] Patient: [redacted] Vendor No: [redacted]
Provider No: [redacted] Pat Acct No: [redacted] Claim No: [redacted]

| Date of Service | CPT Code | Total Charges | PPO Discount | Over R & C | Non Covered | Deduct | Co-Pay | Co-Ins | Paid At % | Codes | Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/18/2014-12/18/2014 | 64555 | 415.00 | 249.00 | .00 | .00 | .00 | .00 | 49.80 | 70 | A | 116.20 |
| 12/18/2014-12/18/2014 | L8680 | 1,785.00 | 611.55 | .00 | .00 | .00 | .00 | 352.04 | 70 | A | 821.41 |
| Claim Totals | | 2,200.00 | 860.55 | .00 | .00 | .00 | .00 | 401.84 | | | 937.61 |
| Provider Paid Amount | | | | | | | | | | | 937.61 |
| Employee Paid Amount | | | | | | | | | | | .00 |
| Total Payment | | | | | | | | | | | 937.61 |
| Patient Responsibility | | | | | | | | | | | 401.84 |

## Claim Summary

| Claim Number | Patient | Total Charges | PPO Discount | Over R & C | Non Covered | Deduct | Co-Pay | Co-Ins | Provider Paid | Employer Paid |
|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | 2,200.00 | 860.55 | .00 | .00 | .00 | .00 | 401.84 | 937.61 | .00 |
| | | 2,200.00 | 860.55 | .00 | .00 | .00 | .00 | 401.84 | 937.61 | .00 |
| | Totals | 4,400.00 | 1,721.10 | .00 | .00 | .00 | .00 | | 1,875.22 | .00 |

Payment To: [redacted] — Amount: 1,875.22

| Claim Number | Code | Description |
|---|---|---|
| --- | A | A-MEDCOST PPO ADJUSTMENT, PATIENT NOT RESPONSIBLE |
| --- | * | The Employee Retirement Income Security Act (ERISA) provides you [illegible] by sending a written request within 180 days after you have received this notice. [illegible] for details. Further explanation of denied claims will be provided upon written request at no additional charge to the claimant. |

Sample E.O.B

sedgwick.

# EXPLANATION OF BILL REVIEW

| | | |
|---|---|---|
| PAYOR [redacted] | RECEIVED BY VENDOR [redacted]015 | DATE OF INJURY [redacted] |
| BILL ID (ICN) [redacted] | PROCESSED BY VENDOR [redacted]015 | SOCIAL SECURITY NUMBER [redacted] |

| | | |
|---|---|---|
| PROVIDER NAME AND ADDRESS [redacted] | INJURED NAME (LAST, FIRST, MI) [redacted] | TPA CLAIM NUMBER [redacted] |
| | INJURED ADDRESS [redacted] | PATIENT ACCOUNT NUMBER [redacted] |
| | | EMPLOYER CONTRACT NUMBER [redacted] |
| | IMAGE NUMBER (DCN) [redacted] | TPA TRANSACTION # (MBDCN) [redacted] |
| | EMPLOYER NAME [redacted] | CARRIER NAME [redacted] |
| TREATING PROVIDER [redacted] | EMPLOYER ADDRESS [redacted] | CARRIER ADDRESS [redacted] |
| PROVIDER TAX ID [redacted] | | |
| DATES OF SERVICE [redacted]2015 - [redacted]2015 | PROVIDER NPI [redacted] | ICD CODES 722.10 / 847.0 / 847.1 / 847.2 |

| Date of Service | Submitted Code | Mod(s) | Units | Reimbursed Code | Billed Amount | FS/UCR Reduction | Negotiated/ Discount | Network Reduction | Recommended Allowance |
|---|---|---|---|---|---|---|---|---|---|
| 01/14/2015 | L8680 IMPLANTABLE NEUROSTIMULATOR EL | | 3 | | 2,100.00 REASON CODES | 950.76 309 | 0.00 | 0.00 | 1,149.24 |
| 01/14/2015 | 64555 PRQ IMPLTJ NEUROSTIMULATOR ELT | | 1 | | 425.00 | 0.00 | 0.00 | 0.00 | 425.00 |
| 01/14/2015 | A6237 HYDROCOLLOID DRESS STERL 16 SQ | | 1 | | 25.00 REASON CODES | 17.04 309 | 0.00 | 0.00 | 7.96 |

Explanation of Reason Codes For Detail Lines
309 THE CHARGE FOR THIS PROCEDURE EXCEEDS THE FEE SCHEDULE ALLOWANCE.

Explanation of Bill Review:
Unless otherwise states, reimbursement is made according to the Delaware Department Labor Workers Compensation Health Care Payment System Fee Schedule." Pursuant to Title 19 Del. C. 2322RF(1), a provider shall not hold an employee liable for costs related to non-disputed services for a compensable injury and shall not bill or attempt to recover from the employee the difference between the provider's charge and the amount paid by the employer or insurance carrier on a compensable injury." Any reduction is due to the billed charges exceeding the fee schedule allowance for the service provided and/or the application of the appropriate discounts based on the individual provider's agreement with the preferred provider organization." Pursuant to Title 19 Del C. 2322 (h), this

Sample E.O.B

# IN CLOSING

- **The NSS system is highly effective in the treatment of pain and the reduction of harmful narcotics. In the continuous climate of rising costs and reduction in reimbursements in the medical industry the NSS system is also an extraordinary economic solution to any modern medical practice.**
- **You owe it to your patients and your practice to integrate this exciting new technology into your practice.**

IHCS

# Exhibit 3

# FAQ Sheet For Clinicians

## When is it appropriate to use the Neuro-Stim System (NSS)?

The generator itself is FDA cleared for targeting acute and chronic pain. As a rule of thumb any condition that is either sympathetically mediated or sympathetically maintained can be helped by the use of the device. At first most clinicians use them as a last ditch effort on patients with whom all other procedures have failed. As you gain experience in the clinical use of the devices you will get more comfortable and use them as an integral therapy according to the patient's needs.

## Can I use the NSS along with other treatments ?

Yes. The device can be used by itself (primary), after other treatments have been tried (secondary), or along with other co-treatments (tertiary). In fact many times because of the co-morbidities often associated with complex pain entities the NSS is utilized as a part of a pain management program.

## How many devices are required ?

As a rule of thumb long term chronic conditions (with neuroplasticity and mal-adaptation) take longer to treat. For instance a long term fibromyalgia patient will often require more devices than a patient with a short term condition. It is recommended in cases other than acute injury or surgery that the devices be used in a series of three. In other words treat initially with three devices and re-evaluate the patient. If the symptoms are not reduced to a satisfactory level then consider another series of three devices or treat with just one additional device with weekly re-evaluations. Again, a long term pain patient with associated central sensitization, spinal cord wind-up, etc. should be advised that this type of treatment is a process toward quiescence just like their progress to their present pain state was often a process. However each patient should be evaluated on an individual basis and treated according to their personal needs.

## Can I place one device and see what happens?

It is normally not recommended to only treat with one device and "see what happens" unless device placement is used to help differentiate sympathetic involvement post surgically or part of a diagnostic process. It is common for patients to feel much better after one device placement and not see an equal effect with the second. In fact, it is very common for patients to say, "I don't think the device is working" after the second placement. It is thought this is due to adaptive physiology and endorphin production. However after the third placement a residual effect can often be seen. It is important that both the clinician and the patient commit to treatment.

## How often do I place the devices ?

Each device runs for 120 hrs (5 days) and then turns itself off. It is recommended that there is a two day non-treatment period between applications to avoid attenuation and/or tissue breakdown. So each patient should be appointed no sooner than once every 7 days. The exceptions are outlined in the clinical protocols.

# FAQ Sheet For Clinicians

## Do I need to place all four leads?

Yes. It is recommended that all four leads are implanted according to the training videos, unless otherwise noted in the clinical protocols.

## What about migraines?

Migraines are the exception to the rule. Use only one lead anterior to the tragus (trigeminal/superficial temporal artery) and the ground wire on the lobe. Implanting all the arrays may increase migraines. Also it is advised to not have any non-treatment times in between device application and place at least two back to back. Patients do not “kind of” have a migraine. They either do or they don’t. After two applications often the sympathetic cycle has been broken. Further device treatment is advised on a case by case basis. Remember, patients still need to avoid their migraine triggers. The longer they remain migraine free the more likely they are to remain quiescent.

## How about use in conjunction with surgery?

Devices have been used successfully in hundreds of surgical situations. Placing a device several days pre-surgically will help reduce any sympathetic overlays (muscle pain, guarding, edema, ischemia, inflammation ) and help patients achieve higher pre-surgical endorphin levels. Placing a device immediately post-surgically will assist in unwanted sympathetic reactions and help keep the patient’s surgical pain manageable often with minimal central acting opioids.

# Scheduling

Patient scheduling can often be a challenge when treating chronic pain patients with IHS device therapy. Each patient is different and will require custom treatment by the treating physician. Other than in acute surgical situations multiple visits are needed for device placement. When this therapy is integrated into your routine you and your scheduling assistant will find scheduling a challenge. At first it is recommended that the treating clinician perform the total procedure to sharpen clinical skills. However many clinicians will delegate the intake, pain scales, device assembly and placement to a licensed assistant and complete the final implantation themselves to be more time effective. After a few placements the total time of the treating clinician may be five minutes or less.

**Here's some helpful tips :**

1. Patients should commit to you and you to them. Make sure when initial therapy is initiated that your office can follow up with proper sequence. Skipping a week can cause relapse and should be avoided. It may be best to delay initial treatment until everyone can make their commitments. Convey this to your patients.

2. Trying a device and "seeing how it goes" is not often recommended. You may get false success or false failure. As a rule of thumb chronic conditions should be treated in a series of three to achieve maximum sympathetic reduction and physiological adaptation. The exceptions are acute conditions, surgical use, use to help with a differential diagnosis and the clinician's clinical judgment. All protocols should be considered guidelines not absolutes. All factors should be weighed and final device placement based accordingly.

3. Make sure that all procedures performed or delegated are within your state's scope of practice and the individual's licensure.

4. Financial arrangements should be made in advance. This includes any necessary third party arrangements, cash, etc. Many patients with chronic conditions have financial considerations that should be honored. Be sure to not pre-judge patients on what they can or cannot afford. That is not your job. Your job is to diagnose, offer suggested treatment outlines and let them make their own financial decisions.

IHS works with several coding companies which can help advise and guide you in this process. IHS has no financial ties to any recommended companies and does not make coding decisions. If further information is desired please contact IHS or your local representative.

## Scheduling

5. Enjoy the process. Treating chronic conditions is always a challenge. You will find that using IHS device therapy will add a whole new dimension to your practice. Patients you were previously unable to help will often respond in a positive manner, be grateful and refer their friends. We at IHS are hopeful that using the device therapy will open many doors as an emerging science and encourage you to learn further to be a more effective diagnostician and treating clinician. We are dedicated to your support and education providing online learning modules and encourage communication. You will find your local representative to be a valuable, well trained asset to your practice. Any questions you may have will be researched and discussed. Our team of advisors will attempt to answer them to your satisfaction.

One last personal note…
The most common response I have received from my patients through the years is not that their pain has not gone away but that we have changed their lives allowing them to once again have a life not focused on their pain but rather focused on the things that make life enjoyable. That may be as simple as going to the mall, not missing a grandchild's birthday party or not having their child comment "I hope we can go tomorrow if mommy doesn't have a headache." Many times patients with chronic conditions lose hope along the way knowing they are living a life of pain with an occasional short–term respite. Integrating the IHS family of devices into your practice can help you provide them with a life not centered around their pain.

While not every case is successful and not everyone qualifies for device treatment, you will find great success and satisfaction from those you help. The IHS family of devices designed for a target population of acute and chronic pain.

**Christopher R. Brown DDS, MPS**
**Head of Scientific Research and Development**
**Innovative Health Solutions**

# Introduction to Protocols

The following are suggested guidelines for specific clinical entities. However it must be remembered that chronic conditions are often multi-factorial in nature and require a muli-modal approach. The use of an IHS device is therefore often a part of an ongoing process.

Along with mal-adaptive neuroplasticity often comes mal-adaptive behavior which may need to be addressed as well. Since the target population of this type of treatment is acute and chronic pain the clinician must be aware of the sustaining co-factors which contribute to the condition.

Entities such as Central Sensitization Syndrome, Fibromyalgia, and PTSD have a heavy sympathetic overlay by nature and often predictably respond satisfactorily to the use of the IHS devices. “Spinal wind-up”, neuroplasticity and micro-glial responses occur over an extended period of time and the patient as well as the clinician must be aware that it will often take time to “un-wind” the physiological adaptation processes.

Patients with long term pain conditions must set reasonable goals to assist in the process of acceptable pain reduction, increase in physical activity, and the amount of device therapy it may take to achieve these goals. Your treatment estimation is based upon a combination of their condition, their desire to get better, adhering to treatment guidelines, your clinical experience and rate of symptom reduction. These factors should be discussed before any treatment is initiated.

The treating clinician, the patient, and their significant support system all work together as a team to help achieve a more pain-free life. The IHS family of devices are wonderful tools to assist in achieving those goals.

If you have specific questions about technique or need educational support along the way IHS is accessible through the web site, our 24 hr. hot-line and your local rep. If you have questions about insurance coding please address them with the IHS certified representatives. Innovative Health Solutions does not give any coding advice but rather refers you to unaffiliated professional coders with whom you can directly work to assist you and your patient.

The IHS family of neuro-stimulation devices, the modern non-narcotic alternatives for pain management.

**Christopher R. Brown DDS, MPS**
**Head of Scientific Research and Development**
**Innovative Health Solutions**

All protocols and recommendations are based upon anecdotal clinical evidence. Final application of devices should be determined on an individual basis. University and Department of Defense randomized double-blind clinical trials are on-going.

IHS Innovative Health Solutions
www.i-h-s.com

NSS The Neuro-Stim System
support@i-h-s.com

# Protocol for Post Arthroscopy/Arthrocentesis

Arthroscopic and joint arthrocentesis intervention of any joint in the body is designed to be minimally invasive. The use of device therapy has proven successful in reducing unwanted sympathetic rebound reducing localized edema/ischemia and sympathetically mediated pain. Placement of a device pre-operatively or immediately post-operatively will help achieve maximum success. All four electrodes should be implanted per protocol (three ventral, one dorsal) for maximum neurovascular field effect.

The exception to this is for TMJ procedures. The device must be placed on the procedural side. The single pin ground lead is implanted on the ventral of the lobe. The first 4 pin array is implanted anterior/superior to the tragus, superior to the TMJ. This location is ascertained by palpation of the lateral aspect of the mandibular condyle. Have the patient open and close their mouth for definitive condylar palpation. This will allow implantation directly over the auriculo-temporal branch of Cranial V (trigeminal) and the superficial temporal artery which branches into the posterior lamina of the TMJ. The second 4 pin array will be implanted in the inner concha in the area of Cranial X (vagal). The third 4 pin array will be implanted into the upper third of the ear affecting cranial nerves V, VII , and branches of the superficial temporal artery.

As in all surgical procedures post-op care should be carefully instructed including physical therapy, exercises, etc.

**Summary:**

**3 - 5 Days Pre-Op**
(Chronic)
One device is placed implanting all four leads followed by a device placed immediately post-surgically.

**Day 1 Immediately Post-Op**
(Acute)
One device is placed immediately post-surgically.

# Protocol for Central Sensitization Syndrome

Clinicians treating chronic often encounter patients who seem to hurt "all over", have emotional co-factors, multiple chemical sensitivity, endocrine system hypo or hyper function, sleep disorders, chronic fatigue, and a seemingly exhaustive list of medications and myriads of doctor visits. These patients often have a component referred to as CSS. (For review please refer to the Robert's paper in the IHS certification program.) This condition is multi-factorial with multiple sustaining co-factors commonly referred to as triggers all or most of which may need to be addressed. Chronic pain syndromes such as fibromyalgia and functional pain may involve central sensitization, spinal wind up, altered microl-glia and/or neuroplasticity. These conditions are often associated with a heavy sympathetic overlay via mediation or maintenance and respond to the use of IHS devices. Reduction of the sympathetic drive can often reduce the patient's symptoms where individual "triggers" can be successfully addressed. These conditions are long term and progressive. Successful treatment will take time and multiple device applications. The patient needs to commit to three device placements placed once per week after which an evaluation should be performed to evaluate success. If symptoms have been reduced to an acceptable level than discontinue treatment until symptoms reappear. Device therapy can then be utilized on a PRN basis. If symptoms are not at an acceptable level and the patient desires to receive further treatment then another series of three are placed one/week. All four electrodes should be implanted per protocol (three ventral, one dorsal) for maximum neurovascular field effect. Please note with long term neuroplastic adaptation and spinal wind up these patients may relapse after a long period of quiescence and may need further treatment. If so treat one device at a time PRN.

**Summary:**

**Week One-Three**

One device placed each week with two days non treatment in between devices.

**Week Four**

Non-treatment for evaluation of residual effect. If patients symptoms begin to increase after several days then an additional set of three devices should be placed.

**Week Five-Six**

One device placed eachweek with two days non-treatment in between devices.

**Week Seven**

Non-treatment for evaluation of residual effect. Proceed as described.

**Future Treatment**

If relapse occurs devices should be utilized one at a time on a PRN basis.

# Protocol for CRPS (Complex Regional Pain Syndrome)

CRPS is by definition a sympathetic response often to a physical insult resulting in several stages of painful progression. IHS device therapy can be a very vital supportive adjunct to treatment. Reducing pain, reducing sympathetic stimulation, increasing range of motion and peripheral arterial perfusion often allows the patient to do the things they have been advised to do and as a result encourages physical therapy to be more effective. CRPS often has a traumatic onset but can also result from disease with a progressive onset of symptoms. The most effective use of devices is in sets of three allowing treatment for 21-28 days. If symptoms have been reduced give the patient a week of non-treatment to be able to observe for residual effect. If after a few days the patient's symptoms ramp up then another set of three devices should be advised. As the patient improves a mutual decision should be made to extend non-treatment times in between devices but usually not before the initial three and often may continue beyond six. As soon as there are observable changes in the tissue, reduction in pain, and a restoration of function then device therapy can be discontinued.

Use of the IHS devices is often in conjunction with physical therapy and medications and should be considered adjunctive in nature as part of an overall treatment plan. The devices are the most effective when CRPS symptoms first occur and not waiting until the tertiary stage. Early use will reduce symptoms, the amount of devices used and speed of recovery.

All four leads should be used as indicated by IHS training to achieve maximum cranial neuro-vascular field effect.

**Summary:**

**Weeks One-Three**
One device placed each week with two days non-treatment in between devices.

**Week Four**
Non-treatment for evaluation of residual effect. If patients symptoms begin to increase after several days then an additional set of three devices should be placed.

**Weeks Five-Six**
One device placed/week with two days non-treatment in between devices.

**Week Seven**
Non-treatment for evaluation of residual effect. Proceed as described.

# Protocol for Chronic Pain

When reviewing chronic pain publications the term "chronic" is defined many different ways. There is evidence to support there is physiological and neuro-plastic adaptation as soon as 21-28 days. While this definition can be argued it is a reasonable working model for the use of the IHS devices designed for a target population of acute and chronic pain. Chronic pain is often a multi-factorial, multi-system entity with heavy sympathetic overlay. IHS device therapy can be a very vital supportive adjunct to treatment. Reducing pain, increasing sleep and increasing range of motion often allows the patient to do the things they have always been advised to do but couldn't.

While chronic pain is by definition > 21-28 days the etiology can have an onset from trauma or disease and is often progressive accruing collective symptoms. The most effective use of devices is in sets of three allowing treatment for 21-28 days. If symptoms have been reduced give the patient a week of non-treatment to be able to observe for residual effect. If after a few days the patient's symptoms elevate then another set of three devices should be advised. As the patient improves, a mutual decision should be made to extend non-treatment times in between devices but usually not before the initial three.

All four leads should be implanted as indicated by IHS training to achieve the maximum cranial neuro-vascular field effect

**Summary:**

**Weeks One-Three**
One device placement every week with two days of non treatment in between devices.

**Week Four**
Non-treatment for evaluation of residual effect. If patients symptoms begin to increase after several days then an additional set of three devices should be placed.

**Weeks Five-Six**
One device placement every week with two days of non-treatment in between devices.

**Week Seven**
Non-treatment for evaluation of residual effect. Proceed as described.

# Protocol for Fibromyalgia

Fibromyalgia is a multi-factorial, multi-system entity with heavy sympathetic overlay. IHS device therapy can be a very vital supportive adjunct to treatment. Reducing pain, increasing the quality of sleep and increasing range of motion often allows the patient to do the things they have always been advised to do but couldn't. Fibromyalgia which can have a rapid onset from trauma or disease is often however a chronic condition with progressive onset of collective symptoms. The most effective use of devices is in sets of three allowing treatment for 21-28 days. If symptoms have been reduced give the patient a week of non-treatment to be able to observe for residual effect. If after a few days the patient's symptoms ramp up then another set of three devices should be advised. As the patient improves a mutual decision should be made to extend non-treatment times in between devices but usually not before the initial three and often continuation beyond six. All four leads should be used as indicated by your training to achieve maximum cranial neuro-vascular field effect.

**Summary:**

**Weeks One-Three**

One device placed each week with two days non-treatment in between devices.

**Week Four**

Non-treatment for evaluation of residual effect. If patient's symptoms begin to increase after several days then an additional set of three devices should be placed.

**Weeks Five-Six**

One device placed each week with two days non-treatment in between devices.

**Week Seven**

Non-treatment for evaluation of residual effect. Proceed as described.

# Protocol for Low Back Pain

Low back pain is one of the most ubiquitous conditions in the world, elusive to treatment and is one of the leading causes of disability in the United States. While LBP is a diagnostic entity it is often multi-factorial in etiology with a heavy sympathetic overlay and often requires a multi-disciplinary approach for resolution.

IHS device therapy can be a very vital supportive adjunct to treatment. Reducing pain, increasing quality of sleep and increasing range of motion often allows the patient to do the things they have always been advised to do but couldn't. If symptoms have been reduced give the patient a week of non-treatment to be able to observe for residual effect. If after a few days the patient's symptoms elevate then another series of three devices should be advised. As the patient improves a mutual decision should be made to extend non-treatment times in between devices but usually not before the initial three.

All four leads should be implanted as indicated by IHS training to achieve the maximum cranial neuro-vascular field effect.

A word of caution. Advise the patient NOT to increase their activity beyond normal during the first week of treatment. Patients often feel better and want to "get on with life" lifting too much, doing neglected chores and can easily re-injure themselves.

**Summary:**

**Weeks One-Three**
One device placed each week with two days non-treatment in between devices.

**Week Four**
Non-treatment for evaluation of residual effect. If patient's symptoms begin to increase after several days then an additional series of three devices should be placed.

**Weeks Five-Six**
One device placed each week with two days non-treatment in between devices.

**Week Seven**
Non-treatment for evaluation of residual effect. Proceed as described.

# Protocol for Migraines

The patients with migraines require a specific protocol different from all other device protocols. Only two leads are used which are placed in the following manner:
A. An array anterior/superior to the tragus (trigeminal and superficial temporal artery).
B. The single pin ground lead is implanted on the ventral aspect of the lobe.

This will reduce the risk of over-stimulation of the sympathetic system which may increase migraine intensity.

The second device is placed on the 5th day with no non-treatment period as in other protocols again using only two leads as per the first device.

If the headaches cycle is not broken than additional devices should be placed without interruption. If there appears to be skin irritation at the implantation sites than consider switching ears for patient comfort.

As soon as the headache cycle is broken then treatment can be discontinued. Place devices as needed to help the patient reach quiescence.

**Summary:**

**Days 1-5**
First device placement. Implant only one array anterior/superior to the tragus and the single pin lead on the lobe.

**Days 5-10**
Second device placement. Continue stimulation as described without a non-treatment period to avoid rebound headache.

**Days 10-15**
Third device placement. As needed. If the headache cycle is broken then treatment can be discontinued.

The number of devices required will vary from patient to patient. Continue with device placement every 5 days PRN until quiescent.

# Protocol for Narcotic Reduction

The patient with a background of central acting opioids must be handled cautiously. Patients on narcotics longer then 21-28 days may experience physical attenuation, addiction, or have developed an emotional or psychological dependence. This should be discussed and documented by the prescribing clinician, the clinician treating with the device and the patient.

It may take at least three weeks for the patient to regain the ability to produce endorphins. Therefore it is advisable that the base-line narcotics as prescribed, remained unchanged for up to three weeks even during device use. Reduction of breakthrough medications may begin immediately as determined by the prescribing clinician and the patient.

The devices may be implanted every fifth day for the first three devices to avoid rebound pain. After that time period once a week placement will normally suffice.

When the patient's pain levels have reduced to a level acceptable by both patient and the clinician base-line central acting opioids can be reduced at a rate determined by the prescriber to minimize the physical symptoms of withdrawal.

The use of the device for the substitute for central acting opioids should be considered as adjunctive treatment along with counseling, physical therapy, alternative medications and other modalities as directed by the treating clinician.

**Summary:**

**Days 1-5**
First device placement. Break-through pain medications can be reduced but should be taken as needed with the aim of reduction of total dosage. Background opioids should remain the same.

**Days 6-10**
Second device placement. Continue reduction of break-through medications as tolerated.

**Days 11-16**
Third device placement. Continue reduction of break-through pain medications and background opiods can be reduced according to clinical guidelines and judgment.

**Days 17-18**
No device placement. Continue with medication reduction.

**Days 19-23**
Fourth device placement. Continue with reduction of break-through and background medications.

**Days 24-25**
No device placement. Evaluate patient opioid consumption and continue with device therapy if needed.

# Protocol for Occipital Neuralgia and Cervicalgia

Patients with these conditions have often previously received multiple treatments. These conditions can be multi-factorial in nature and using the devices in conjunction with other modalities should be considered. Proper device placement will provide direct access into the occipital nerves and the upper cervical spine blocking both afferent and efferent stimulae.

The single pin ground lead should be implanted in the ventral aspect of the lobe. The first 4 pin array should be implanted in the lower third of the outer rim of the ear. The second 4 pin array should be implanted on the dorsal lower third of the ear near a branch of the posterior auricular artery. The third 4 pin array should be implanted on the superior aspect of the dorsal of the ear near an arterial branch. This placement will affect the peripheral branches of the lesser and greater occipital nerves and the posterior auricular arterial branches.

**Summary:**

**Week One**
One device placed followed by two days of non-treatment.

**Week Two**
One device placed followed by two days of non-treatment.

**Week Three**
One device placed followed by two days of non-treatment.

**Week Four**
No device placement.

**Week Five**
Evaluate and treat PRN.

# Protocol for Peripheral Neuropathy

Peripheral neuropathy can be a primary diagnosis or a symptom as a result of other pathologies. PN can cause pain, alteration of movement, alteration of sensation, or even organ dysfunction. PN can be acute as a result of trauma, chemically induced (CIPN-see suggested protocol), or commonly found as a result of chronic conditions such as diabetes.

IHS device therapy has proven effective in helping relieve PN's and helps restore patients to pain free or pain reduced function. Treatment is recommended at the first sign of symptoms and should continue on a PRN basis being careful to monitor all precipitating and/or perpetuating co-factors.

All four leads should be used as indicated by your training to achieve a maximum cranial neuro-vascular field effect.

**Summary:**

**Weeks One-Three**
One device placed each week with two days non treatment in between devices.

**Week Four**
Non-treatment for evaluation of residual effect. If patients symptoms begin to increase after several days then an additional set of three devices should be placed.

**Weeks Five-Six**
One device placed/ week with two days non treatment in between devices.

**Week Seven**
Non-treatment for evaluation of residual effect. Proceed as described.

# Protocol for Surgery

Device use to augment surgery is designed to reduce unwanted sympathetic reactions (post-op edema/ischemia), sympathetically mediated/maintained pain and reduce the need for post-op opioids.

If surgery is required for a chronic condition with associated muscle guarding, edema/ischemia, localized inflammation and associated pain, device placement is recommended 3-5 days pre-op. All four leads should be implanted for maximum desired affect. A new device should be placed immediately post operatively which will result in a total of 8-10 days of stimulation.

If surgery is required for an acute situation with minimal pre-operative sympathetic involvement than one device placed immediately post surgically will suffice.

All four leads should be implanted as indicated by IHS training to achieve maximum cranial neuro-vascular field effect.

**Summary:**

3-5 Days Pre-Op
(Chronic)
One device is placed implanting all four leads followed by a device placed immediately post-surgically.

**Day 1 Immediately Post-Op**
(Acute)
One device is placed immediately post-surgically.

# Protocol for Tinnitus

Tinnitus can have multiple etiologies and is often elusive to diagnose and treat. Use of the device has been effective but unpredictable from patient to patient. As in all chronic conditions realistic goals should be established before initiating treatment. Treatment may be completely successful or completely unsuccessful. The decision for treatment lies in a combination of the willingness of the clinician to treat and the patient to allow treatment knowing the variation of success.

All four leads should be implanted per protocol (three ventral, one dorsal) for maximum neurovascular field effect. Patients need to commit to three placements as both a diagnostic and potentially therapeutic treatment. It is advisable to not have any non-treatment time in between devices for the first two placements to achieve maximum sympathetic suppression as symptoms can spontaneously re-appear. After the second device a two day non-treatment period can be utilized if desired. When the patient's symptoms have reached MMI (maximum medical improvement) treat with one more device. This is known as "quiescence plus one".

**Summary:**

**Days 1-5**
First device placement. Implantation in sites previously described on the symptomatic side.

**Days 5-10**
Second device placement. Implantation in sites of the first device.

**Days 10-15**
Third device placement. Evaluate and treat if the patient is still symptomatic. The number of devices needed is determined by remaining symptoms.

# Protocol for Tonsillectomy Pain Control

The use of IHS device therapy has proven successful in post-tonsillectomy pain control. The device can be placed pre-operatively to help encourage endorphin production and reduce edema. A device can be placed immediately post-surgically as well to help reduce discomfort, swelling, and reduce pain medication consumption.

The device may be placed on the either ear. The single pin ground lead is placed on the ventral of the lobe. The first 4 pin array is implanted anterior/superior to the tragus superior to the TMJ. This location is ascertained by palpation of the lateral aspect of the mandibular condyle. Have the patient open and close their mouth for definitive condylar palpation. This will allow implantation directly over the auriculo-temporal branch of cranial V (trigeminal) and the superficial temporal artery which branches into the posterior lamina of the TMJ. The second 4 pin array will be implanted in the inner concha in the area of Cranial X (vagal). The third 4 pin array will be implanted into the upper third of the ear affecting Cranial nerves V, VII, and branches of the superficial temporal artery.

**Summary:**

**3-5 Days Pre-Op**
**(Optional)**
One device is placed implanting all four leads followed by a device placed immediately post-surgically.

**Day 1 Immediately Post-Op**
**(Acute)**
One device is placed immediately post-surgically.

# Protocol for Trigeminal Neuralgia

Patients with trigeminal neuralgia can often be assisted with device use. Dramatic results can be obtained rapidly but follow up and elimination of triggers is imperative.

The device must be placed on the side of the TGN. The single pin ground lead is implanted on the ventral of the lobe. The first 4 pin array is implanted anterior/superior to the tragus superior to the TMJ. This location is ascertained by palpation of the lateral aspect of the mandibular condyle. Have the patient open and close their mouth for definitive condylar palpation. This will allow implantation directly over the auriculo-temporal branch of Cranial V (trigeminal) and the superficial temporal artery. The second 4 pin array will be implanted in the inner concha in the area of Cranial X (vagal). The third four pin array will be implanted near the outer rim of the lower third of the ear affecting Cranial nerves VII, X and branches of the posterior auricular artery. The second device must be implanted on the fifth day. All triggers should be avoided throughout this period.

A third device may need to be placed but the need is dictated by the patient's symptoms and clinical judgment. Multiple applications may be necessary and non-treatment time will be symptomatically dictated.

**Summary:**

**Days 1-5**
First device placement. Implantation in sites previously described on the symptomatic side .

**Days 5-10**
Second device placement. Implantation at sites of the first device.

**Days 10-15**
Third device placement. Evaluate and treat if the patient is still symptomatic. The number of devices needed is determined by remaining symptoms.

# Protocol for Vertigo

Vertigo can be one of the most debilitating conditions which can be effectively treated with the IHS devices if there is a sympathetic component. The use of the devices are often secondary in nature but if all pathological entities have been ruled out then it may be used as primary treatment. A reduction in symptoms may be noticed within minutes. It is recommended that patients are treated to “quiescence plus one” (usually two to three devices). All four leads should be implanted per protocol (three ventral, one dorsal) for maximum neurovascular field effect. The first two devices should be placed without a non-treatment period in between to break the sympathetic cycle. If symptomatic reduction has been achieved then a two day non-treatment period is used before placement of the third device.

**Summary:**

**Days 1-5**
First device placement. Implantation in sites previously described.

**Days 5-10**
Second device placement. Implantation in sites of the first device.

**Days 10-15**
Third device placement. Evaluate and treat if the patient is still symptomatic. The number of devices needed is determined by remaining symptoms.

# Exhibit 4

**Ginny Goldbach**

| | |
|---|---|
| **From:** | joy.long@dragonslayerstrategies.com |
| **Sent:** | Tuesday, September 22, 2015 4:41 PM |
| **To:** | Ginny Goldbach |
| **Cc:** | matthewmiller1025@gmail.com |
| **Subject:** | Radiance Surgery Center - Neurostimulator Information - PA |
| **Attachments:** | NeuroStim Dx Chart with DX Trial Info - 10-29-14.doc; Neurostimulator Pre Qual-Tx Plan 1-2015.docx; NeuroStim Narrative Letter of Medical Necessity 1-22-15.docx; NeuroStim Sample Procedure Note 1-22-15.docx; NeuroStim Pre-Auth Sample Procedure Description 1-22-15.docx; Radiance Surgery Ctr - ASC - Neurostimulator Information 9-21-15.docx |

Hello! It was a pleasure to speak with you today. I am an independent coding/billing consultant that has worked extensively with the NeuroStim procedure and I will be glad to assist your office!

Attached you will find:

- Coding/reimbursement memo
- Sample diagnoses chart
- Pre-authorization sample procedure description - should be included with pre-authorization request along with H/P, Office Notes, Treatment Plan, Letter of Medical Necessity and any other supporting documentation
- Sample Treatment Plan
- Narrative Letter of Medical Necessity Sample procedure note template - contains all of the information that should be included in your dictated procedure/operation report. Any format can be used, as long as the information on the sample is included.

It is very important for a smooth start-up that your staff understand the best way to approach this procedure and the most effective way to perform pre-authorization. P*lease review these materials and let me know what questions you still have.*

I lwill review the policies you asked about and get back with you. I look forward to working with your office!

Joy Long
DragonSlayer Strategies
(317) 496-8647 - p
(888) 872-0548 - f
www.dragonslayerstrategies.com

***Anticipated Procedure Description for Pre-Authorization Purposes***

Date:____________ Patient Name:____________________________________________________________

Performing Provider:__________________________________

Subjective: *Discuss the patient reported symptoms here*

Objective: *Discuss the provider observation of patient condition and/or symptoms*

Assessment: *This is the area to discuss why provider believes this procedure is needed*

Plan: *This is the area where you should discuss if you plan to place more than one device. State that they will be done as "X" # of staged procedures and include the timing of the additional procedures.*

*If you are using this as a Medicare diagnostic trial to assess patient suitability for permanent implantation – discuss that here.*

***Description of Neurostimulator Procedure***

**Procedure To Be Performed: :** Mapping of patient's unique trigeminal, Greater Occipital, Lesser Occipital, cranial and peripheral nerve anatomy with subsequent placement of neurostimulator generator and percutaneous electrode array implantation at verified nerve sites. Analysis of neurostimulator device operation

**Anticipated Procedure Detail:** The patient will be brought into the procedure room and placed on the procedure table. The mastoid process and ear will cleaned and prepped in the usual fashion, using Prep & Stay electrode skin preparation and Tac Gel electrically conductive gel. The neurostimultor battery and pulse generator will then opened, activated and tested using the electric stylet. The neurostimulator is programmed to provide a stimulation comprised of 0-10 HZ , impulse interval 1000 ms, monophasic impulse width 1 ms, ims/bipolar., changing polarity ( to avoid polarizing effects) , with an maximum amplitude of 3.2 V. A generator produces electrical stimulation impulses which are transferred via an electrode/ needle array directly to branches of cranial and/or occipital nerves and sympathetic fibers of the arterial branches.

Nerve mapping of both the ventral and dorsal aspects will be initiated. Optimal electrode array placement within the neurovascular bundles will be ascertained by review of the patient's trigeminal, greater occipital, lesser occipital, arterial, peripheral and cranial nerve anatomy and verified by trans-illumination utilizing a specialized neurovascular transilluminator conjoined with skin resistance measurements utilizing a nerve locating OHM stylus. Mapping will ascertain maximal optimum implantation points facilitating electrode implantation into the neurovascular bundles allowing for direct access and neural stimulation to cranial nerves V, VII, IX and X and the trigeminal nerves, as well as branches of the lesser and greater occipital nerves originating from spinal nerves C2 and C3, thereby facilitating access to the peripheral nerve bundle as well as the cranial nerve bundle. This is done in order to effectively modulate pain signals. After careful mapping, a sterile pen will be used to mark the sites for electrode

implantation. The targeted peripheral nerve distributions affecting the patient's pain and related symptoms are expected to be as follows: Ventral Aspect: Lesser Occipital nerve distribution, Trigeminal nerve (V3) distribution, and Vagus nerve distribution. Dorsal Aspect: Spinal nerve distributions C2/C3 – Lesser Occipital nerve.

The neurostimulator generator will be placed in the appropriate position and secured with sterile dressings. A single-pin electrical ground electrode will then be percutaneously inserted at the previously marked site. At the other previously marked nerve sites, each four-pin electrode array will be percutaneously implanted. Placement will be verified by reviewing modulation of the parasympathetic system throughout the body as evidenced by autonomic monitors as well as other indices, e.g. heart rate, respiratory, SpO2, blood pressure and pain perception. Implantation sites will be changed if indicated. All implantation sites will then be secured using sterile dressings. No reprogramming will be conducted.

# *Sample NeuroStim Diagnosis List*

*Following are **sample** diagnoses for which neurostimulator application may be ordered. It is typical with this procedure to code the symptom diagnosis as primary. The **BOLDED** Diagnoses have been the most commonly used symptom diagnoses. **This is not an exhaustive list**. There is a lack of payer diagnosis guidance for this procedure and payers regularly change their policies on payable procedures and diagnoses.*

*There is not enough available information or history on use of the 6 4553 with mental disorders and how/whether payers will reimburse with these diagnoses but from a clinical standpoint, treatment of these diagnoses using the cranial nerve may be reasonable.

| *Category* | *Code* | *Description* | *64555* | *64553* | *Medicare Diagnostic Trial Use* |
|---|---|---|---|---|---|
| | V14 | Personal history of allergy to medicinal agents | X | X | X |
| | V15 | Other personal history presenting hazards to health (use for addiction history) | X | X | X |
| Herpetic Disorders | 053.12 | Post Herpetic Trigeminal Neuralgia | X | X | X |
| | 053.13 | Post Herpetic Polyneuropathy | X | X | X |
| | 053.19 | Herpes Zoster w/other nervous system complications | X | X | X |
| Mental Disorders | 300.00 | Anxiety state, unspecified | X | * | |
| | 300.01 | Panic disorder without agoraphobia | X | * | |
| | 300.02 | Generalized anxiety disorder | X | * | |
| | 300.09 | Other anxiety states | X | * | |
| | 309.0 | Adjustment disorder with depressed mood | X | * | |
| | 309.1 | Prolonged depressive reaction | X | * | |
| | 309.24 | Adjustment disorder with anxiety | X | * | |
| | 309.28 | Adjustment disorder with mixed anxiety & depressed mood | X | * | |
| | 309.4 | Adjustment disorder with mixed disturbance of emotions & conduct | X | * | |
| | 309.81 | Post- traumatic stress disorder | X | * | |
| | 309.82 | Adjustment reaction with physical symptoms | X | * | |
| | 311 | Depressive disorder, not elsewhere classified | X | * | |
| Disorder of Autonomic Nervous System | 337.20 | Reflex Sympathetic Dystrophy, Unspecified | X | X | X |
| | 337.21 | Reflex Sympathetic Dystrophy of the upperlLimb | X | X | X |
| | 337.22 | Reflex Sympathetic Dystrophy of the lower limb | X | X | X |
| | 337.29 | Reflex Sympatheic Dystrophy of other specified limb | X | X | X |
| **Pain** | **338.0** | **Central pain syndrome** | X | | |
| | **338.11** | **Acute pain due to trauma** | X | | |
| | **338.18** | **Other acute postoperative pain** | X | | |
| | **338.19** | **Other acute pain** | X | | |
| | **338.21** | **Chronic pain due to trauma** | X | | |
| | **338.22** | **Chronic post-traumatic headache** | X | X | X |
| | **338.28** | **Other chronic postoperative pain** | X | | |
| | **338.29** | **Other chronic pain** | X | | |
| | **338.3** | **Neoplasm related pain (acute) (chronic)** | X | | |
| | **338.4** | **Chronic pain syndrome** | X | | |
| Other headache syndromes | 339.00 | Cluster headache syndrome, unspecified | X | | |
| | 339.02 | Chronic cluster headache | X | X | X |
| | 339.04 | Chronic paroxysmal hemicrania | X | | |
| | 339.09 | Other trigeminal autonomic cephalgias | X | | |
| | 339.12 | Chronic tension type headache | X | | |

| | | | | | |
|---|---|---|---|---|---|
| | 339.21 | Acute post-traumatic headache | X | | |
| | 339.22 | Chronic post-traumatic headache | X | X | X |
| | 339.41 | Hemicrania continua | X | | |
| | 339.42 | New daily persistent headache | X | | |
| | 339.44 | Other complicated headache syndrome | X | X | X |
| Other disorders of the central nervous system | 346.00 | Migraine with aura, without mention of intractable migraine without mention of status migrainosus | X | X | |
| | 346.01 | Migraine with aura; with intractable migraine, so stated, without mention of status migrainosus | X | X | |
| | 346.02 | Migraine with aura; without mention of intractable migraine with status migrainosus | X | X | |
| | 346.03 | Migraine with aura; with intractable migraine, so stated, with status migrainosus | X | X | X |
| | 346.10 | Migraine without aura; without mention of intractable migraine without mention of status migrainosus | X | X | |
| | 346.11 | Migraine without aura; with intractable migraine, so stated, without mention of status migrainosus | X | X | X |
| | 346.12 | Migraine without aura; without mention of intractable migraine with status migrainosus | X | X | |
| | 346.13 | Migraine without aura; with intractable migraine, so stated, with status migrainosus | X | X | X |
| | 346.20 | Variants of migraine, not elsewhere classified; without mention of intractable migraine without mention of status migrainosus | X | X | |
| | 346.21 | Variants of migraine, not elsewhere classified; with intractable migraine, so stated, without mention of status migrainosus | X | X | X |
| | 346.22 | Variants of migraine, not elsewhere classified; without mention of intractable migraine with status migrainosus | X | X | |
| | 346.23 | Variants of migraine, not elsewhere classified; with intractable migraine, so stated, with status migrainosu | X | X | X |
| | 346.30 | Hemiplegic migraine; without mention of intractable migraine without mention of status migrainosus | X | X | |
| | 346.31 | Hemiplegic migraine; with intractable migraine, so stated, without mention of status migrainosus | X | X | |
| | 346.32 | Hemiplegic migraine; without mention of intractable migraine with status migrainosus | X | X | |
| | 346.33 | Hemiplegic migraine; with intractable migraine, so stated, with status migrainosus | X | X | |
| | 346.50 | Persistent migraine aura without cerebral infarction; without mention of intractable migraine without mention of status migrainosus | X | X | |
| | 346.51 | Persistent migraine aura without cerebral infarction; with intractable migraine, so stated, without mention of status migrainosus | X | X | |
| | 346.52 | Persistent migraine aura without cerebral infarction; without mention of intractable migraine with status migrainosus | X | X | |
| | 346.53 | Persistent migraine aura without cerebral infarction; with intractable migraine, so stated, with status migrainosus | X | X | |
| | 346.60 | Persistent migraine aura with cerebral infarction; without mention of intractable migraine without mention of status migrainosus | X | X | |
| | 346.61 | Persistent migraine aura with cerebral infarction; with intractable migraine, so stated, without mention of status migrainosus | X | X | |

| | | | | | |
|---|---|---|---|---|---|
| | 346.62 | Persistent migraine aura with cerebral infarction; without mention of intractable migraine with status migrainosus | X | X | |
| | 346.63 | Persistent migraine aura with cerebral infarction; with intractable migraine, so stated, with status migrainosus | X | X | |
| | 346.70 | Chronic migraine without aura; without mention of intractable migraine without mention of status migrainosus | X | X | |
| | 346.71 | Chronic migraine without aura; with intractable migraine, so stated, without mention of status migrainosus | X | X | |
| | 346.72 | Chronic migraine without aura; without mention of intractable migraine with status migrainosus | X | X | |
| | 346.73 | Chronic migraine without aura; with intractable migraine, so stated, with status migrainosus | X | X | |
| | 346.80 | Other forms of migraine; without mention of intractable migraine without mention of status migrainosus | X | X | |
| | 346.81 | Other forms of migraine; with intractable migraine, so stated, without mention of status migrainosus | X | X | |
| | 346.82 | Other forms of migraine; without mention of intractable migraine with status migrainosus | X | X | |
| | 346.83 | Other forms of migraine; with intractable migraine, so stated, with status migrainosus | X | X | |
| | 346.90 | Migraine, unspecified, without mention of intractable migraine without mention of status migrainosus | X | X | |
| | 346.91 | Migraine, unspecified, with intractable migraine, so stated, without mention of status migrainosus | X | X | |
| | 346.92 | Migraine, unspecified, without mention of intractable migraine with status migrainosus | X | X | |
| | 346.93 | Migraine, unspecified, with intractable migraine, so stated, with status migrainosus | X | X | |
| Disorders of the Peripheral Nervous System | 350.1 | Trigeminal neuralgia | X | X | X |
| | 350.2 | Atypical face pain | X | X | |
| | 350.8 | Other specified trigeminal nerve disorders | X | X | |
| | 350.9 | Trigeminal nerve disorder, unspecified | X | X | |
| | 353.0 | Brachial plexus lesions | X | | |
| | 353.1 | Lumbosacral plexus lesions | X | X | X |
| | 353.2 | Cervical root lesions, not elsewhere classified | X | X | X |
| | 353.3 | Thoracic root lesions, not elsewhere classified | X | X | X |
| | 353.4 | Lumbosacral root lesions, not elsewhere classified | X | X | X |
| | 353.5 | Neuralgic amyotrophy | X | | |
| | 353.6 | Phantom limb (syndrome) | X | | |
| | 353.8 | Other nerve root & plexus disorders | X | X | X |
| | 353.9 | Unspecified nerve root & plexus disorder | X | X | X |
| | 354.0 | Carpal tunnel syndrome | X | | |
| | 354.1 | Other lesion of median nerve | X | | |
| | 354.2 | Lesion of ulnar nerve | X | | |
| | 354.3 | Lesion of radial nerve | X | | |
| | 354.4 | Causalgia of upper limb | X | X | X |
| | 354.5 | Mononeuritis multiplex | X | | |
| | 354.8 | Other mononeuritis of upper limb | X | | |
| | 354.9 | Mononeuritis of upper limb, unspecified | X | | |
| | 355.0 | Lesion of sciatic nerve | X | | |
| | 355.1 | Meralgia paresthetica | X | | |

| | | | | | |
|---|---|---|---|---|---|
| | 355.2 | Other lesion of femoral nerve | X | | |
| | 355.3 | Lesion of popliteal nerve | X | | |
| | 355.4 | Lesion of medial popliteal nerve | X | | |
| | 355.5 | Tarsal tunnel syndrome | X | | |
| | 355.6 | Lesion of plantar nerve | X | | |
| | 355.71 | Causalgia of lower limb | X | X | X |
| | 355.79 | Other mononeuritis of lower limb | X | | |
| | 355.8 | Mononeuritis of lower limb, unspecified | X | | |
| | 355.9 | Mononeuritis of unspecified site | X | X | X |
| | 356.0 | Hereditary peripheral neuropathy | X | | |
| | 356.1 | Peroneal muscular atrophy | X | | |
| | 356.2 | Hereditary sensory neuropathy | X | | |
| | 356.3 | Refsum's disase | X | | |
| | 356.4 | Idiopathic progressive polyneuropathy | X | | |
| | 356.8 | Other specified idiopathic peripheral neuropathy | X | | |
| | 356.9 | Unspecified hereditary & idiopathic peripheral neuropathy | X | | |
| | 357.0 | Acute infective polyneuritis | X | | |
| | 357.1 | Polyneuropathy in collagen vascular disease | X | | |
| | 357.2 | Polyneuropathy in diabetes | X | | |
| | 357.3 | Polyneuropathy in malignant disease | X | | |
| | 357.4 | Polyneuropathy in other diseases classified elsewhere | X | | |
| | 357.5 | Alcoholic polyneuropathy | X | | |
| | 357.6 | Polyneuropathy due to drugs | X | | |
| | 357.7 | Polyneuropathy due to other toxic agents | X | | |
| | 357.81 | Chronic inflammatory demvelinating polyneuritis | X | | |
| | 357.82 | Critical illness polyneuropathy | X | | |
| | 357.89 | Other inflammatory and toxic neuropathy | X | | |
| | 357.9 | Unspecified inflammatory & toxic neuropathy | X | | |
| Dentofacial anomalies, including malocclusion | 524.60 | Temporomandibular joint disorders; unspecified | X | | |
| | 524.61 | Temporomandibular joint disorders; adhesions & ankytlosis (bony or fibrous) | X | | |
| | 524.62 | Arthralgia of temporomandibular joint | X | | |
| | 524.63 | Articular disc disorder (reducing or non-reducing) | X | | |
| | 524.69 | Other specified temporomandibular joint disorders | X | | |
| Diseases of the Genitourinary System | 625.70 | Vulvodynia , unspecified | X | | |
| | 625.71 | Vulvar vestibulitis | X | | |
| | 625.79 | Other vulvodynia | X | | |
| Infections of skin and subcutaneous tissue | 681.00 | Cellulitis & abscess of finger; unspecified | X | | |
| | 681.01 | Cellulitis & abscess of finger; felon | X | | |
| | 681.02 | Onychia and paronychia of finger | X | | |
| | 681.9 | Cellulitis & abscess of unspecified digit | X | | |
| Chronic ulcer of skin | 707.00 | Pressure ulcer; unspecified site | X | | |
| | 707.01 | Chronic ulcer of skin; elbow | X | | |
| | 707.02 | Chronic ulcer of skin; upper back | X | | |
| | 707.03 | Chronic ulcer of skin; lower back | X | | |
| | 707.04 | Chronic ulcer of skin; hip | X | | |
| | 707.05 | Chronic ulcer of skin; buttock | X | | |
| | 707.06 | Chronic ulcer of skin; ankle | X | | |

| | | | | | |
|---|---|---|---|---|---|
| | 707.07 | Chronic ulcer of skin; heel | X | | |
| | 707.09 | Chronic ulcer of skin; other site | X | | |
| | 707.10 | Ulcer of lower limbs, except decubitus ulcer; Ulcer of lower limb, unspecified | X | | |
| | 707.11 | Ulcer of thigh | X | | |
| | 707.12 | Ulcer of calf | X | | |
| | 707.13 | Ulcer of ankle | X | | |
| | 707.14 | Ulcer of heel and midfoot | X | | |
| | 707.15 | Ulcer of other part of foot | X | | |
| | 707.19 | Ulcer of other part of lower limb | X | | |
| | 707.20 | Pressure ulcer, unspecified stage | X | | |
| | 707.21 | Pressure ulcer, stage I | X | | |
| | 707.22 | Pressure ulcer, stage II | X | | |
| | 707.23 | Pressure ulcer, stage III | X | | |
| | 707.24 | Pressure ulcer, stage IV | X | | |
| | 707.25 | Pressure ulcer, unstageable | X | | |
| | 707.8 | Chronic ulcer of other specified sites | X | | |
| | 707.9 | Chronic ulcer of unspecified site | X | | |
| Diffuse disease of connective tissue | 710.0 | Systemic lupus erythematosus | X | | |
| | 710.1 | Systemic sclerosis | X | | |
| | 710.8 | Other specified diffuse diseases of connective tissue | X | | |
| | 710.9 | Unspecified diffuse connective tissue disease | X | | |
| Ankylosing spondylitis and other inflammatory spondylopathies | 720.0 | Ankylosing spondylitis | X | | |
| | 720.1 | Ankylosing spondylitis | X | | |
| | 720.2 | Sacroiliitis, not elsewhere classified | X | | |
| | 720.81 | Inflammatory spondylopathies in diseases classified elsewhere | X | | |
| | 720.89 | Other inflammatory spondylopathies | X | | |
| | 720.9 | Unspecified inflammatory spondylopathy | X | | |
| Cervical spondylosis without myelopathy | 721.0 | Cervical spondylosis without myelopathy | X | | |
| | 721.1 | Cervical spondylosis with myelopathy | X | | |
| | 721.2 | Thoracic spondylosis without myelopathy | X | | |
| | 721.3 | Lumbosacral spondylosis without myelopathy | X | | |
| | 721.41 | Spondylosis with myelopathy, thoracic region | X | | |
| | 721.42 | Spondylosis with myelopathy, lumbar region | X | | |
| | 721.5 | Kissing spine | X | | |
| | 721.6 | Ankylosing vertebral hyperostosis | X | | |
| | 721.7 | Traumatic spondylopathy | X | | |
| | 721.8 | Other allied disorders of spine | X | | |
| | 721.90 | Spondylosis of unspecified site without mention of myelopathy | X | | |
| | 721.91 | Spondylosis of unspecified site with mention of myelopathy | X | | |
| Intervertebral disc disorders | 722.0 | Displacement of cervical intervertebral disc without myelopathy | X | | |
| | 722.10 | Displacement of lumbar intervertebral disc without myelopathy | X | | |
| | 722.11 | Displacement of thoracic intervertebral disc without myelopathy | X | | |

| | | | | | |
|---|---|---|---|---|---|
| | 722.2 | Displacement of intervertebral disc, site unspecified, without myelopathy | X | | |
| | 722.30 | Schmorl's nodes unspecified region | X | | |
| | 722.31 | Schmorl's nodes thoracic region | X | | |
| | 722.32 | Schmorl's nodes lumbar region | X | | |
| | 722.39 | Schmorl's nodes other region | X | | |
| | 722.4 | Degeneration of cervical intervertebral disc | X | | |
| | 722.51 | Degeneration of thoracic or thoracolumbar intervertebral disc | X | | |
| | 722.52 | Degeneration of lumbar or lumbosacral intervertebral disc | X | | |
| | 722.6 | Degeneration of intervertebral disc, site unspecified | X | | |
| | 722.70 | Intervertebral disc disorder with myelopathy unspecified region | X | | |
| | 722.71 | Intervertebral disc disorder with myelopathy cervical region | X | | |
| | 722.72 | Intervertebral disc disorder with myelopathy thoracic region | X | | |
| | 722.73 | Intervertebral disc disorder with myelopathy lumbar region | X | | |
| | 722.80 | Postlaminectomy syndrome unspecified region | X | | |
| | 722.81 | Postlaminectomy syndrome cervical region | X | | |
| | 722.82 | Postlaminectomy syndrome thoracic region | X | | |
| | 722.83 | Postlaminectomy syndrome lumbar region | X | | |
| | 722.90 | Other and unspecified disc disorder unspecified region | X | | |
| | 722.91 | Other and unspecified disc disorder cervical region | X | | |
| | 722.92 | Other and unspecified disc disorder thoracic region | X | | |
| | 722.93 | Other and unspecified disc disorder lumbar region | X | | |
| Other disorders of cervical region | 723.0 | Spinal stenosis in cervical region | X | | |
| | 723.1 | Cervicalgia | X | | |
| | 723.2 | Cervicocranial syndrome | X | | |
| | 723.3 | Cervicobrachial syndrome (diffuse) | X | | |
| | 723.4 | Brachial neuritis or radiculitis NOS | X | | |
| | 723.5 | Torticollis, unspecified | X | | |
| | 723.6 | Panniculitis specified as affecting neck | X | | |
| | 723.7 | Ossification of posterior longitudinal ligament in cervical region | X | | |
| | 723.8 | Other syndromes affecting cervical region | X | | |
| | 723.9 | Unspecified musculoskeletal disorders and symptoms referable to neck | X | | |
| Other & unspecified disorders of back | 724.00 | Spinal stenosis, unspecified region | X | | |
| | 724.01 | Spinal stenosis, thoracic region | X | | |
| | 724.02 | Spinal stenosis, lumbar region, without neurogenic claudication | X | | |
| | 724.03 | Spinal stenosis, lumbar region, with neurogenic claudication | X | | |
| | 724.09 | Spinal stenosis, other region | X | | |
| | 724.1 | Pain in thoracic spine | X | | |
| | 724.2 | Lumbago | X | | |
| | 724.3 | Sciatic | X | | |
| | 724.4 | Thoracic or lumbosacral neuritis or radiculitis, unspecified | X | | |

| | | | | | |
|---|---|---|---|---|---|
| | 724.5 | Backache, unspecified | X | | |
| | 724.6 | Disorders of sacrum | | | |
| | 724.70 | Unspecified disorder of coccyx | | | |
| | 724.71 | Hypermobility of coccyx | | | |
| | 724.79 | Other disorders of coccyx | | | |
| Other disorders of soft tissue | 729.5 | Pain in limb | X | | |
| | 729.0 | Rheumatism, unspecified and fibrositis | X | | |
| | 729.1 | Myalgia and myositis, unspecified | X | | |
| | 729.7 | Nontraumatic compartment syndrome | X | | |
| | 729.71 | Nontraumatic compartment syndrome, of upper extemity | X | | |
| | 729.72 | Nontraumatic compartment syndrome, of lower extemity | X | | |
| | 729.73 | Nontraumatic compartment syndrome, of abdomen | X | | |
| | 729.79 | Nontraumatic compartment syndrome, of other sites | X | | |
| General symptoms | 780.71 | Chronic Fatigue Syndrome | X | | |
| | 780.96 | Generalized Pain | X | | |
| Symptoms involving skin and other integumentary tissue | 782.0 | Disturbance of skin sensation | X | | |
| Injury & Poisoning | 876.0 | Open wound of back, without mention of complication | X | | |
| | 876.1 | Open wound of back, complicated | X | | |
| | 877.0 | Open wound of buttock, without mention of complication | X | | |
| | 877.1 | Open wound of buttock, complicated | X | | |
| | 880-887 | Multiple open wounds & amputations of upper limb | X | | |
| | 890-897 | Multiple open wounds & amputations of lower limp | X | | |

Date:

Payer Info

RE: Patient:
DOB:
Member ID:
Diagnoses:

***Authorization – Neurostimulator Procedure***

To Whom It May Concern;

The listed patient is being treated for the above listed diagnoses. The patient has experienced list symptoms here for approximately list time frame here. The patient reports a pain level of list pain level here and you can also include % of time (i.e. patient reports they are at an 8 on a 1-10 pain scale 75% of the time). The patient's condition affects their quality of life and ability to list here any way that the patient's ability to function is affected (i.e.: can't work, cannot participate in their normal extra-curricular activities – list them, can't perform their normal housekeeping activities, etc.). The patient has previously been treated with list any previous treatments tried here. Make sure to include any medication treatment, surgery, and/or describe any physical therapy or other course of treatment. Also list any medication treatment and/or any history or substance abuse or allergies that affect use of medications for symptom treatment. The patient has failed to obtain adequate improvement with previous treatments.

Based on the patient's condition and history, I believe that a course of treatment utilizing neurostimulators with percutaneously implanted electrodes is medically necessary and provides the best chance of affecting improvement for the patient. I recommend beginning with ____ staged treatments, over the course of ____ days of continuous stimulation of targeted nerves in an effort to reduce the patient's pain levels, reduce inflammation, control other symptoms, and improve functional levels. The neurostimulator treatment will be used as an adjunct modality with the patient's current pharmacological and medical restoration treatment program but we would anticipate the ability to decrease that pharmacological and medical restoration treatment as the neurostimulator treatment affects the patient.

The neurostimulator technique that we are using with this patient is clearly delineated from acupuncture and other neurostimulator treatments. The neurostimulator is programmed to provide a stimulation comprised of 0-10 HZ , impulse interval 1000 ms, monophasic impulse width 1 ms, ims/bipolar., changing polarity ( to avoid polarizing effects) , with an maximum amplitude of 3.2 V. A neurostimulator generator placed on the mastoid produces electrical stimulation impulses which are transferred via a needle electrode array *directly* to branches of cranial, trigeminal, greater occipital, and lesser occipital thereby accessing the peripheral nerves as well as the sympathetic fibers of the arterial branches. The neurostimulator is programmed to run for two hours on and two hours off for a 120 hr cycle to reduce the risk of adaptation or tolerance. This allows for *direct* continuous, intermittent neural stimulation for up to five days while allowing the patient to remain ambulatory during the treatment of both acute and chronic pain**.** Other percutaneous electrical neural stimulation methods *indirectly* stimulate in only 15, 30-45 minute applications applied twice per week over the course of several weeks. An increase in analgesia is noted by the longer duration of various applications. Each electrode is implanted according to verifications of the patient's arterial, peripheral and cranial nerve anatomy. The precise implantation of the array is dependent upon each patient's medical condition, symptomology and unique neurovascular anatomy. The precise mapping of targeted nerves and appropriate percutaneous implantation of electrodes are assessed utilizing the specific neurovascular transillumination technique. Utilization of this technique is unique and is essential to help verify the most optimal electrode implantation into the underlying targeted peripheral, cranial, trigeminal, greater occipital and lesser occipital neurovascular bundles. The unique nerve mapping techniques and direct stimulation of the neurovascular complexes acts at the mid-brain, trigeminal complex, and spinal cord affecting descending and ascending inhibition of neuro-matrix alteration and thus clearly separates the use of NSS from acupuncture, electro-acupuncture, certain other surgically implantable nerve stimulators(such as spinal cord stimulators) and TENS. And so, it is important to re-iterate that with the implementation of the above mentioned techniques, the use of the NSS modality is *NOT*

considered acupuncture or electro-acupuncture as meridian points, acu-points, reflexology points and/or dermatomes are *NOT* targeted.

The neurostimulator electrodes will be placed with three four-pin electrode arrays directly accessing specific neurovascular nerve bundles. The neurostimulators are safe, effective, and non-narcotic. The device administers continuous Autonomic Nervous System and Vascular stimulation performed by electrical pulses emitted through these selectively positioned percutaneously implanted electrodes. Each of the four pins comprising each array produces a neuro-modulating, three dimensional signal in the pre-programmed manner. The signal must be considered not only in a singular fashion but also in multiple patterns as energy impulses overlap three dimensionally. From a geometric viewpoint there are over 50 unique stimulation patterns. In conjunction with dissimilar tissues, tissue interfaces, and tissue densities, intra-cellular fluids and differing osmotic gradients, the resulting neuro-modulating signals provide an almost infinite distribution pattern. The array and pin design allows the neuro-modulating signals produced by the generator to be distributed in a fractal-like manner. This directly addresses CSS (Central Sensitization) and "resets" the sympathetically mediated pain patterns. The neurostimulator stimulates the patient's pain modulation systems and leads to the release of neurotransmitters such as endogenous endorphins (opioids), helps to normalize the protein expression profile of the hypothalamus caused by neuropathic pain and to exert neuroprotective effects on the dopaminergic neurons. In addition, nerve stimulation has been an approved treatment for many chronic pain conditions, which include widespread pain, by stimulating targeted peripheral and cranial nerves which results in increased endorphin release and concomitant reduction in sympathetic tone, which has an effect on gait mechanisms of chronic pain. The stimulated endorphins result in a reduction of a variety of symptoms and in an increase in blood flow into affected tissues of the affected areas. This increased vascular perfusion promotes wound healing when a wound is present, speeds healing time, helps to reduce localized inflammation and swelling, and decreases pain. An added benefit is that this treatment typically helps to reduce narcotic consumption and need for other medications or treatments used to address pain.

Accepted clinical protocol is to use three single-use/disposable neurostimulator devices in a row over a period of twelve days, with no break, followed by another treatment after seven days of no treatment; four initial treatments over the course of 30 days. When a residual reduction in symptoms is found there is an extension of non-treatment time between each application. The symptom reduction is often cumulative and residual. The majority of patients may require 6-9 separate devices/neurostimulator treatments to reach quiescence. When treating chronic pain conditions, suggested protocol is to initially implement four treatments (each treatment requires a separate disposable, single-use neurostimulator device). This five days on for each treatment with evaluation of whether a rest time between treatments is needed. Then, continue with three sets of three subsequent treatments with a week between each set to obtain optimal results. If maximum medical/clinical improvement of symptoms is not achieved, continue with additional treatments extending the rest time between treatments until the patient achieves three weeks with no additional symptom improvement. Maximum clinical improvement is considered three weeks without neurostimulator treatment without change in symptoms. If symptoms return or increase within the three week rest period then additional treatments may be required. In acute situations such as surgical procedures, a pre-treatment and post-treatment use of the neurostimulator device (2 total treatments) to reduce sympathetic stimulation and increase endorphin production is suggested to minimize post-operative pain, edema, swelling, and to reduce the need for opioid and other pain medications.

I believe that this treatment is medically necessary to affect the fullest recovery from the above listed conditions experienced by this patient, allowing them to participate in their normal work, home, and extra-curricular activities. Therefore, I am requesting authorization for initial treatment of four staged procedures over a course of 30 days. Questions may be directed to my attention at insert preferred contact info here.

Respectfully,

Date:_____________ Patient Name:_______________________________________________________________

Procedure Time In:_______ Time Out:________ Performing Provider:___________________________________

Subjective: *Include here the patients' complaints, statement of level of pain and other symptoms, ADL restrictions, etc.*

Objective: *Include here observations about the current patient status*

Assessment: *Include here diagnosis information and other reasoning for performance of the procedure(s). Make sure to include any information about previous treatments tried, patient substance abuse history, or drug allergies that make pain control through medication problematic.*

Plan: *This is the area where you should discuss if you plan to place more than one device. State that they will be done as "X" # of staged procedures and include the timing of the additional procedures.*

*If you are using this as a Medicare diagnostic trial to assess patient suitability for permanent implantation – discuss that here.*

**Procedure:** Mapping of patient's unique trigeminal, Greater Occipital, Lesser Occipital, cranial and peripheral nerve anatomy with subsequent placement of neurostimulator generator and percutaneous electrode array implantation at verified nerve sites. Analysis of neurostimulator device operation.

The patient was brought into the procedure room and placed on the procedure table. Appropriate monitors were placed and vital signs were noted. The patient was placed in the supine position with the head turned to the side to gain full exposure to the lateral aspect of the neck, mastoid process, and potential implantation sites. The *(left/right)* mastoid process and potential implantation sites were cleaned and prepped in the usual fashion, using Prep & Stay electrode skin preparation and Tac Gel electrically conductive gel. The neurostimultor battery and pulse generator were then opened, activated and tested. The neurostimulator is programmed to provide a stimulation comprised of 0-10 HZ , impulse interval 1000 ms, monophasic impulse width 1 ms, ims/bipolar., changing polarity ( to avoid polarizing effects) , with an maximum amplitude of 3.2 V. A generator produces electrical stimulation impulses which are transferred via an electrode/ needle array directly to branches of cranial and/or occipital nerves and sympathetic fibers of the arterial branches.

Nerve mapping of both the ventral and dorsal aspects was initiated. Optimal electrode array placement within the neurovascular bundles was then ascertained by review of the patient's trigeminal, greater occipital, lesser occipital, arterial, peripheral and cranial nerve anatomy and verified by trans-illumination utilizing a specialized neurovascular transilluminator conjoined with skin resistance measurements utilizing a nerve locating OHM stylus. Mapping was to ascertain maximal optimum implantation points facilitating electrode implantation into the neurovascular bundles allowing for direct access and neural stimulation to cranial nerves V, VII, IX and X and the trigeminal nerves, as well as branches of the lesser and greater occipital nerves originating from spinal nerves C2 and C3, thereby facilitating access to the peripheral nerve bundle as well as the cranial nerve bundle. This is done in order to effectively modulate pain signals. After careful mapping, a sterile pen was used to mark the sites for electrode implantation. The targeted peripheral nerve distributions affecting the patient's pain and related symptoms are as

follows: Ventral Aspect: Lesser Occipital nerve distribution, Trigeminal nerve (V3) distribution, and Vagus nerve distribution. Dorsal Aspect: Spinal nerve distributions C2/C3 – Lesser Occipital nerve.

The neurostimulator generator was placed in the appropriate position and secured with sterile dressings. A single-pin electrical ground electrode was then percutaneously inserted at the previously marked site. At the other previously marked nerve sites, each four-pin electrode array was percutaneously implanted. Placement was then verified by reviewing modulation of the parasympathetic system throughout the body as evidenced by autonomic monitors as well as other indices, e.g. heart rate, respiratory, SpO2, blood pressure and pain perception. No change in implantation sites was indicated. All implantation sites were secured using sterile dressings. No reprogramming was conducted. No intra-operative complications were experienced.

The patient confirmed pulsation and activation of the nerve stimulator prior to discharge. Post-operative care instructions were given to and discussed with the patient and appropriate others. Furthermore, the protocol for further staged procedures, as part of the recommended and authorized treatment for this patient was discussed and the next implantation date was determined. The patient was released without any side effects or complications.

_________________________________________________________ ____________________

Physician/NP/PA Signature Date

Printed Physician/NP/PA Name___________________________________________

## *Neurostimulator Pre-Qualification and Treatment Plan*

***Patient Name:*__________________________________ *File #:*__________ *Date:*_________________ ▢Initial ▢ Revised**

***Diagnoses:*** *1*___________ *2*___________ *3*___________ *4*___________ *5*___________ *6*___________ *7*___________

***Onset Date of Primary DX***: _______________________

***Failure of Conservative Treatment***: _____Yes _____No Notes:_____________________________________________________

***Modalities, Type & Duration, if any***: ____________________________________________________________________________

***Is further surgical intervention warranted:*** ____Yes ____No Notes:___________________________________________________

***Has Psychological Eval Been Recommended or Performed:*** ____Yes ____No Notes:_________________________________

***Complicating Factors:***

▢Diabetes ▢Aneurisms ▢Anti-Coagulation Tx ▢Psoriasis/Auricular ▢Recent Heart Attack
▢Blood Pressure ▢Spinal Stenosis ▢Under15 yrs/age ▢Skin Allergies ▢Pregnant
▢Overweight ▢Bell's Palsy ▢Renal Insufficiencies ▢Implanted Electrical Devices
▢Severe Obesity ▢Other Heart_________________________ ▢Other_________________________

***ADL Deficits:***

▢Standing_______ ▢Walking_______ ▢Dressing_______ ▢Lifting________
▢Housework______ ▢Bathing________ ▢Sitting________ ▢Other______________________________

Notes:____________________________________________________________________________________________________

***Treatment Goals – Short Term*** (aeb=as evidenced by)***:***

▢Decrease Pain/Inflammation by ____% w/I ____ visits ▢Decrease % of time in pain by ____% w/i _____visits
▢Increase ROM to _______________area by _____% w/i _____visits _______________area by _____% w/i _____visits
▢Increase Sleep by:_____________________________________________________________________________________
▢Reduce Narcotics by:___________________________________________________________________________________
▢Improve ADLs aeb______________________________________________________________________________________
▢Other_________________________________________________________________________________________________

***Long Term Treatment Goals*** (aeb=as evidenced by):

▢100% or _____% pain reduction of affected area(s) ▢Restore 100% or _____% of normal ROM of the affected area(s)
▢Restore 100% or _____% of following ADLs: ▢sleep ▢lift ▢sit ▢stand ▢walk ▢work ▢household chores
▢Other_________________________________________________________________________________________________

**Contraindications to Neurostimulator:** ▢No Known Contraindications ▢Contraindications as follow:
___Epilepsy or Hx of Seizures ___Pacemaker/Irregular Heart Rhythm ___Recent Transplant ___Orthostatic Hypotension

***Type of Care:*** ▢Acute Pain Management ▢Chronic Pain Management ▢Post-Operative ▢Other____________________

***Frequency of Care:***

▢Every 6th day for ___ x's ▢1x/week for ___weeks ▢1x in 2 weeks ▢1x in 3 weeks ▢PRN

Initial estimate # staged neurostimulator procedures_________ Re-evaluation Date:_____________

_________________________________________________ ___________ ___________

Ordering Provider Date Revision Date

Copyright 1/2015 Joy Long-DragonSlayer Strategies LLC

**DragonSlayer Strategies**
**(317) 496-8647**
**joy.long@dragonslayerstrategeis.com**
**www.dragonslayerstrategies.com**

# Memo

**Date:** 9/21/15

**To:** Radiance Surgery Center

**From:** Joy Long

**Re:** General Information on Neurostimulator Coding/Reimbursement

---

Hello! Matt Miller asked that I work with you to provide information on the coding and reimbursement of the NeuroStim neurostimulator procedure. DragonSlayer Strategies is pleased to be an independent consultant recommended by your distributor! Below is the information that I send to every new account; *it is lengthy but all of it is important*! We will be glad to assist your office so let us know if you have any questions!

The neurostimulator device is a non-programmable neurostimulator used for both therapeutic and diagnostic purposes (see Medicare Information below). The generator is transcutaneously placed on the mastoid process and the twelve (three lead – 4 pin) electrodes are percutaneous implanted in the appropriate nerve bundle within the cranial or peripheral nerve bundles that traverse through the auricular area. It has a five day battery life. On the sixth day, the device is removed either by the patient or the provider. There are a variety of protocols for when subsequent devices would be placed, dependent on the patients' condition. Some patients may not receive multiple devices. In other cases, providers may place another stimulator on the fifth day; others may take a break of varying time before placing the next device. Most patients commonly receive 3-6 applications. Your representative will talk with you about the protocols for best patient efficacy.

MDs, DOs, PAs, NPs, and CRNAs are typically reimbursed for performance of the procedure. DCs should check their state Scope of Practice as many states do not allow chiropractors to puncture the skin. Historically, podiatrists struggle to receive in-office reimbursement for electrodes implanted in the ear, even though treating a foot condition.

As I am sure that you are aware, ICD, CPT, and HCPC coding guidance instructs to code to the highest level of specificity. In addition, providers are only to code and bill those services that their documentation supports. Therefore, documentation of the diagnoses and all decision making leading up to the implantation of the neurostimulator electrodes, and documentation of the procedure and follow-up are critical to supporting the coding a provider chooses to use. *It is very important that the documentation clearly describes the nerves being targeted.*

***Procedure Coding***

The coding suggestions include the device, implantation of the device, potential testing, and miscellaneous supplies. *Potential* coding is as follows:

***Either*** 64555 *or* 64553 – you would not typically bill these together

64555 – *Percutaneous implantation of neurostimulator electrode array(s); peripheral nerv*e – It is important to note that this code has a 10 day global period. The day of placement is not counted. This means that the global period goes through day 11 and the procedure cannot be billed again until the 12th day. Payers will typically pay this code only one time during the global period, unless it is part of a *staged series of procedures.*

*Can this code ever be billed for a subsequent procedure during the global period?* **Yes**. ***However,*** *the providers' documentation must clearly show that the provider plans "x" number of staged procedures and that additional procedures (staged) will be done during the global period. IF documentation clearly states this, Modifier -58 (staged procedure, can be used) when the procedure is done a second time within the global period. When using Modifier -58, a new global period begins.*

> *If documentation does not address that subsequent procedures will be done within the global period, Modifier -58* ***should not be used*** *and the global period will apply.* Your facility will need to make sure documentation shows intent to conduct staged procedures within the global period OR you will have to determine how you will bill the payers or the patients if the ordering provider is using a protocol that requires subsequent neurostimulators to be placed before the 12th day but documentation does not reflect staged procedures. If the ordering provider is using a protocol of placing subsequent neurostimulators within this global period *but documentation does not support this*, you would not bill the procedure (see example below).

***OR***

64553 – *Percutaneous implantation of neurostimulator electrode array(s); cranial nerve* – ***Note: This code has a much more narrow set of appropriate diagnoses (see Diagnoses Chart) and is seldom done in an ASC setting.*** Most doctors tell me that they are seldom targeting a cranial nerve. As with the above code, this code has a 10 day global period and all of the above information applies.

> *Note for CPT 64555 and CPT 64553:* There are differing opinions about "implantation" in these definitions. *The neurostimulator generator is not implantable; the electrodes are. Some people, including Medicare personnel I have discussed this with, consider the needle electrode arrays of the device to be percutaneously implanted when being placed directly into certain nerves in either the cranial or peripheral nerve bundles. The code definition says "percutaneous implantation of neurostimulator electrodes", which is what I believe you are doing when placing the device. There are others that disagree and believe that there must be an incision made for the procedure to be "implantation". The guidance addresses devices that are "implants" but not electrodes that can be implanted without an incision. Your office will have to decide which they agree with. If you do not believe the electrodes are implanted, use CPT 64999 – Unlisted procedure; nervous system.*

***OR***

*CPT 64999 – Unlisted procedure; nervous system.* – this is one of the code choices for this neurostimulator procedure. When using CPT 64999, you will be asked to submit medical records, and will likely also be asked to submit an invoice copy. When using CPT 64999 you should still list the equipment used but it is not necessary to charge a separate price because equipment reimbursement will be rolled into the procedure reimbursement.

> *Note:* If you decide to use this code, you might consider talking with the payers that you are contracted with to 1) determine that your contract doesn't exclude any "xx999" codes; and 2) determine whether they will review the procedure and your documentation and approve it so that you do not have to submit records for each claim.

***Device Coding***

You will choose from one of the following codes for the device. For ASC procedures, payment for the device is bundled into the procedure regardless of the procedure code you choose to use. Therefore, no separate charge is needed for the device. This is also the case when using CPT 64999 for the procedure.

L8680 – implantable neurostimulator electrode (with any number of contact points) each.

***OR***

E1399 – durable medical equipment, misc – This is a miscellaneous code and will not show an allowable amount on most payer fee schedules. The payer may ask for a copy of the invoice and/or medical records but don't typically in the ASC setting.

***OR***

L8699 – prosthetic implant, not otherwise specified – This code has been recommended by some Medicare carriers as a replacement code for L8680. This is a miscellaneous code and will not show an allowable amount on most payer fee schedules. The payer may ask for a copy of the invoice and/or medical records but don't typically in the ASC setting.

.

***<u>Additional Information for Procedures Performed in an ASC or other Outpatient Hospital Setting</u>***

If the doctor chooses to perform any procedure in an Ambulatory Surgical Center or outpatient hospital setting, the documentation *should clinically support why it is being performed in an ASC/outpatient hospital setting* versus being done in the office. The doctor must be able to support, clinically, where they decide to do these procedures. One of the services that I offer is a review of provider documentation to determine if it is clearly supporting the procedures being performed and the coding the provider is choosing to use. I am providing some sample codes below. However, you must code per your documentation and coding training.

For those procedures that are performed, in conjunction with other procedures, at the ASC or in an outpatient hospital setting, you will need to consider the timing of when the neurostimulator is placed. Some ASCs/outpatient surgical centers have a clinic and will choose to perform the neurostimulator procedure in the clinic rather than the surgery center. We would be glad to discuss the pros/cons of these billing scenarios with you. In general, you must have medical necessity at the time the procedure is performed. In addition, there are some reimbursement considerations.

> *<u>Pre-Op</u>* –Medicare and other payers have set a precedent for allowing pre-operative treatment with a post-operative pain diagnoses. If you use only your standard diagnoses, or a chronic pain diagnosis, the question becomes why you then immediately performed surgery rather than waiting to see the effect the neurostimulator had, potentially eliminating the need for surgery. Therefore, inclusion of the post-op pain diagnoses as the primary diagnoses for this procedure is important. As a preparation for surgery, it might be used pre-operatively for those with a low tolerance to anesthesia or medications, or with a history of drug abuse, or with drug allergies but the diagnoses should then definitely include the V14 – Personal History of allergy to medicinal agents or V15 – Other personal history presenting hazard to health, and the documentation must clearly state what the history is and the clinical rationale - that early placement stimulates the bodies endorphins and pain fighters, resulting in the need for less anesthesia and/or pain medication. You might even consider doing this the day, or several days, before surgery in this scenario. I believe, if documented well, you may also be able to better support pre-operative placement for those patients having surgery that you know tends to be more difficult and/or painful.
>
> Pre-operative placement is often performed by an anesthesiologist or a nurse practitioner.
>
> *If you choose to use a post-operative pain diagnoses but place the device in the 24-hours prior to the main procedure, your documentation must very clearly outline that it is being placed prior to the main procedure to allow for the highest efficacy of the device in addressing the post-operative pain.*
>
> *<u>Intra-Op</u>* – This timing definitely presents more of an issue reimbursement wise and may not provide the best efficacy for the patient. Intra-op placement may be more likely to result in this procedure being rolled into your main procedure, or to result in a multiple procedure reduction, increasing the potential of not getting paid or getting paid at a reduced rate.
>
> *<u>Post-Op</u>* – Post-operative placement is the best for use of a post-operative pain diagnosis, whether it is in the recovery room, or at the next day's follow-up. If performed by the surgeon or same provider that performs the main procedure, you are the least likely to see a multiple procedure reduction if the neurostimulator is placed in recovery or during the follow-up. And follow-up the patient can better express their pain level. However, part of the draw of the device is to keep pain from getting to higher levels so to wait until the follow-up after surgery lessens that effect. Recovery room placement is often performed by an anesthesiologist or nurse practitioner.

It may be that you will develop a different protocol for the different procedures and types of surgery. Perhaps those patients that are having a surgery that you know is more difficult and results in higher pain levels, you do pre-operatively. Those with other

diagnoses and "lesser" surgery, you do post-operatively. Within that post-op protocol, you may have those where you place it in the recovery room and others where you place at the follow-up visit.

***Note: Although there is no written guideline, payers generally take the stance that if a treatment is performed in more than 70% of your cases, it is considered routine care. Routine care is not separately reimbursable.***

***Modifiers***

Remember to use the appropriate modifiers:

- *58 – Staged or Related Procedure or Service by the Same Physician or Other Qualified Health Care Professional During the Postoperative Period* – use only if a subsequent procedure is performed during the global period and the documentation supports that it is a staged procedure.

- *59 - Distinct Procedural Service* – use this to designate that the procedure is not part of a separate, main procedure being performed on the same day;

    - ***Important Information Beginning 1/1/2015***: Four new modifiers have been put in place to be used in some situations where you previously would have used Modifier -59. They are:

        - **XE** – "Separate encounter, A service that is distinct because it occurred during a separate encounter" This modifier should only be used to describe separate encounters on the same date of service. *I would expect this to be used rarely in the ASC setting for this neurostimulator procedure.*

        - **XS** – "Separate Structure, A service that is distinct because it was performed on a separate organ/structure". This is not likely to be appropriate for neurostimulator cases.

        - **XP** – "Separate Practitioner, A service that is distinct because it was performed by a different practitioner". *This is the new modifier that I would anticipate seeing used the most in the ASC setting for this neurostimulator procedure. When the neurostimulator is placed pre-operatively or post-operatively, it is likely that the anesthesiologist, an NP, a PA, or a CRNA will perform placement. Therefore this modifier would apply.*

        - **XU** – "Unusual Non-Overlapping Service, The use of a service that is distinct because it does not overlap usual components of the main service"

- *51 – Multiple Procedure* - Use this if placed intra-operatively or in the "same session" by the same provider

***Reimbursement***

Following are 2015 Medicare reimbursement rates for in-office and ASC. I provide the Medicare allowable amounts because other payers often use the Medicare fee schedule as the basis for determining their rates. Therefore, I believe the Medicare allowable amounts provide a good view of average reimbursement.

| State | Code | In-Office Rate | ASC Rate | Physician Rate when done in ASC |
|---|---|---|---|---|
| Pennsylvania | 64555 | $ 231.49 | $3,530.84 | $ 169.00 |
| | 64553 | $ 233.49 | $3,530.84 | $ 175.28 |
| | 64999 | This is a miscellaneous code; reimbursement is determined after the claim is filed and the payer reviews documentation of the procedure | | |
| | E1399, L8699 | Determined by payer when claim is filed – may be Invoice Amount + Shipping Amount or some other amount | | |

*Example ASC billing for patient on 6 day protocol for in-office peripheral nerve placement when using CPT 64555 or 64999 (this will be used regardless of the number of day protocol because there is no global period assigned to CPT 64999):*

Procedure 1 = 64555 or 64999 with a total charge listed; no equipment is listed on the claim form because equipment Reimbursement will be bundled into the 64555 or 64999 reimbursement.
Procedure 2 on Day 6 = 64555 or 64999
Procedure 3 on Day 12 = 64555 or 64999

*Note: Remember that physicians should have a supportable CLINICAL reason for performing this procedure in an ASC setting. Therefore, I believe that multiple procedures performed on the same patient in the ASC setting will be rare.*

*Example Physician billing when the procedure is performed in an ASC on a 6 day protocol when using CPT 64999:*
Procedure 1 = 64555-PC or 64999-PC with a total charge listed; no equipment is listed on the claim form because the ASC is reimbursed for the equipment; the physician bills only the professional charge for the procedure.
Procedure 2 on Day 6 = 64555-PC or 64999-PC
Procedure 3 on Day 12 = 64555-PC or 64999-PC

***Diagnoses Coding***

There are a wide range of provider types using neurostimulators. There is no specific list of diagnosis codes that the payers are approving for this neurostimulator reimbursement although most payers are using pain and/or neuropathy codes of varying types. Typically providers would not code a symptom as the primary diagnoses but in this case, the symptom may be coded first. In general, if the patient has a diagnosis that pain management would be appropriate for and documentation supports the diagnosis and the reasoning for choosing use of the neurostimulator, you can support the service. And there are diagnoses outside of the pain management realm that are also appropriate. A sample list is attached. ***Please note the V codes that top the sample list***. These can help to support the decision to use the device application rather than prescribing pain medications for some patients.

As mentioned above, there are less acceptable diagnoses for use with the 64553, cranial nerve, procedure than the 64555, peripheral nerve, procedure. Historically, there have been more diagnosis mismatch denied/pending claims when using the 64553 procedure. *Again, code to the highest level of specificity and per your documentation* but be aware of this issue.

***Pre-Certification/Pre-Authorization***

Surgery centers typically have an agreement with ordering physicians as to whether the physician or the facility will conduct pre-authorization activities. This agreement should work for this procedure as well. Providers would simply add this procedure to the authorization for the other procedures being performed, or conduct pre-authorization for only this procedure if it is being done as a stand-alone procedure.

There are many questions about pre-certifying this procedure. Most payers have no *general coverage* guidelines for implantation of a neurostimulator and therefore no pre-certification requirements. Precertification does not seem to be equating with better payment. ***However***, it would help on appeal on the back side if a procedure is denied. I do recommend asking about pre-certification requirements when verifying coverage.

***I do recommend pre-certifying and using the coding description language.*** By this I mean referring to “neurostimulator” rather than the trade name of the device. The device is just a type of neurostimulator and while the payer may ask for more information, *which should be provided when requested*, starting with asking to get pre-authorization under a trade name may automatically bring extra questions because they haven’t heard of the device or may cause them to reference policies that do not apply to how the device is actually being used.

I am providing you with sample letters of medical necessity. ***Providers that are having good luck with pre-certification and subsequent reimbursement for stand-alone procedures*** are using a History/Physical which outlines previous treatments tried for the condition, a current treatment plan (including the anticipated number of staged device applications), the narrative letter of medical necessity, the supplied sample procedure note, and the patient clinical information, providing a clear scenario of what is being done. Getting approval using these items would make it easier to address/fight any refunds requests received at a later date.

For Workers's Compensation, we recommend educating the carriers you commonly work with about the procedure and discussing with them the outcomes. Carriers are particularly interested in how a treatment you are requesting has the potential to avoid more intensive/costly treatments, including medication use, and whether the treatment may help the patient return to work more quickly.

Payers typically will authorize more than one placement at a time, based on your treatment plan.

***Summary***

The Neurostimulator procedure can be a powerful treatment for your patients. I am typically very conservative/protective in my advice. I continually research articles, payer policies, and guidance on issues that could involve the device and procedure. As any changes in recommendations happen, I will make sure to provide them.

The above information is for your consideration in determining how you will document and bill for your neurostimulator procedures. Final coding for procedures is at the discretion of the healthcare provider and the directive of the payers. You are encouraged to code as you are comfortable, according to your documentation and research/training.

I will also be sending you some additional documents that should be helpful in your pre-authorization process and with any denials.

I would be glad to help further. Please contact me at joy.long@dragonslayerstrategies.com with additional questions. I can also be reached at or (317) 496-8647 but am best reached by e-mail!

This memo is intended to provide useful education and information in regard to the subject matter covered. DragonSlayer Strategies, LLC has made every effort to assure that the information is as authoritative and accurate as is reasonably possible and that the sources of information used in preparation are reliable. No assurance or warranty of completeness or accuracy is intended or given, and all warranties of any type are disclaimed. DragonSlayer Strategies, LLC has provided the enclosed information based on laws, regulations, and other guidance effective as of the date of this memo. This information is not intended as legal advice nor is DragonSlayer Strategies, LLC engaged in rendering legal services. This information is intended neither as a replacement for published guidance from federal/state agencies or payers, or as an alternative for individual legal advice. **This memo is copyright DragonSlayer Strategies, LLC 2015 and may be reproduced or distributed only with express written consent from DragonSlayer Strategies, LLC.**

# Exhibit 5

## Ginny Goldbach

**From:** Kimberly Coleman <kdc@colemanmedicalcoding.com>
**Sent:** Friday, August 05, 2016 7:18 AM
**To:** Ginny Goldbach; Sudhir Rao
**Cc:** Matthew Miller
**Subject:** NSS
**Attachments:** CMS RETIRED POLICY.docx

Good morning, hope all is well.

As per our discussion regarding NSS in an ASC setting the following is what i have found:

1. There is not a policy for NSS for Medicare (CMS nationally) . The only policy was for PENS and that policy has been retired (see attached),
2. When doing NSS for Medicare in an ASC setting this should only be done for diagnostic purposes and if the patient has 50% or greater pain relief then the patient should proceed to a permanent implant. Timeline for conversion is not set in stone.
3. Billing 64555 for Highmark, commercials. Recommended for office use as they paid for the LCode. I provide local policies. Aetna, Cigna, UHC HealthAmerica and UPMC will pay for the NSS with prior authorization. Note; For these insurance companies it is diagnosis based. ONLY USE 64553 is used for Migraine and Chronic Headache. 64555 for all pain neck and below. Again this is also diagnosis driven.
4. CPT guidelines state that use the most specific code available. **As long as documentation can prove 100% medical necessity**, it is justified.
5. NSS is a percutaneous implantation neurostimulator electrode array that are applied and leads are placed for specific nerves. You are providing the same type of services when you do a SCS Trial.
6. Unless a it specifies in a particular LCD not to use the 64555 or 64553 and L8600 you use these codes.

If you have any questions please do not hesitate to contact me.

Sincerely,

Kimberly Coleman, CPC, CPC-I

**LCD Information**

Retired

**LCD ID**

L5195

**LCD Title**

Percutaneous Electrical Nerve Stimulation (PENS)

**LCD Information**

**Contractor's Determination Number**

Z-54C

**AMA CPT/ADA CDT/AHA NUBC Copyright**

**Statements**

CPT only copyright 2002-2016 American Medical Association. All rights reserved.

CDT only copyright 2016 American Dental Association. All rights reserved.

UB-04 Manual. OFFICIAL UB-04 DATA SPECIFICATIONS MANUAL, 2014, is copyrighted by American Hospital Association ("AHA"), Chicago, Illinois. No portion of OFFICIAL UB-04 MANUAL may be reproduced, sorted in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without prior express, written consent of AHA. Health Forum reserves the right to change the copyright notice from time to time upon written notice to Company.

**LCD Information**

**CMS National Coverage Policy**

Title XVIII of the Social Security Act, Section 1862(a)(7). This section excludes routine physical examinations.

Title XVIII of the Social Security Act, Section 1862(a)(1)(A) states that no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury.

Title XVIII of the Social Security Act, Section 1833(e) states that no payment shall be made to any provider for any claim that lacks the necessary information to process the claim.

CMS On-line Manual Pub. 100-3, Chapter 1, Sections 160.3, 160.7, 160.71. These sections are specific to the coverage of Electrical Nerve Stimulators.

**Oversight Region**

Region III

| LCD Information |
| --- |
| **Original Determination Effective Date**<br>For services performed on or after 07/24/2000<br><br>**Original Determination Ending Date**<br>12/20/2007<br><br>**Revision Effective Date**<br>For services performed on or after 01/01/2006 |

**LCD Information**

**Revision Ending Date**

12/20/2007

**Indications and Limitations of Coverage and/or Medical Necessity**

*Compliance with the provisions in this policy may be monitored and addressed through post payment data analysis and subsequent medical review audits.*

Peripheral Percutaneous Electrical Nerve Stimulation (peripheral PENS) is a diagnostic procedure, which is used to test effectiveness of nerve stimulation prior to implanting a permanent nerve stimulator. The procedure involves insertion of neurostimulator electrodes through the skin without making an incision as is performed when the electrodes are being placed for long term use.

Indications
To evaluate a patient with chronic neuralgia secondary to injury to a peripheral nerve or a disease affecting it or that caused by complex regional pain syndrome in whom permanent electrode placement is being contemplated.

Limitations

**LCD Information**

Electrical nerve stimulators do not prevent pain but only alleviate pain as it occurs. A patient can be taught how to employ the stimulator, and once this is done, can use it safely and effectively without direct physician supervision. Consequently, it is inappropriate for a patient to visit his/her physician, physical therapist, or an outpatient clinic on a continuing basis for treatment of pain with electrical nerve stimulation. Once it is determined that electrical nerve stimulation should be continued as therapy and the patient has been trained to use the stimulator, it is expected that a stimulator will be implanted. Electrical nerve stimulation treatments furnished by a physician in his/her office, by a physical therapist or outpatient clinic are excluded from coverage.

Since this procedure is a diagnostic test and not a treatment modality, this will be covered only once. If a patient for any reason needs to be re-tested, a special report describing the circumstances and medical necessity of re-testing will need to be submitted with the claim.

The CPT codes listed in this policy may not be used to treat patients with acupuncture, nor may they be used for any variation of the acupuncture techniques.

In addition, services will be denied, prospectively as well as retrospectively, when the Carrier determines that the service is not medically reasonable and necessary and/or the medical documentation does not verify that the service described by the CPT code was provided.

**Coding Information**




**Bill Type Codes:** 

**Coding Information**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

| | |
|---|---|
| 999x | Not Applicable |

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

| | |
|---|---|
| 99999 | Not Applicable |

**Coding Information**

**CPT/HCPCS Codes**

Group 1: Paragraph

Group 1: Codes

| | |
|---|---|
| 64555 | PERCUTANEOUS IMPLANTATION OF NEUROSTIMULATOR ELECTRODES; PERIPHERAL NERVE (EXCLUDES SACRAL NERVE) |
| L8680 | IMPLANTABLE NEUROSTIMULATOR ELECTRODE, EACH |

**ICD-9 Codes that Support Medical Necessity**

Group 1: Paragraph

Group 1: Codes

| | |
|---|---|
| 354.1 | OTHER LESION OF MEDIAN NERVE |
| 354.2 | LESION OF ULNAR NERVE |
| 354.3 | LESION OF RADIAL NERVE |

**Coding Information**

| | |
|---|---|
| 354.4 | CAUSALGIA OF UPPER LIMB |
| 354.9 | MONONEURITIS OF UPPER LIMB UNSPECIFIED |
| 355.1 | MERALGIA PARESTHETICA |
| 355.2 | OTHER LESION OF FEMORAL NERVE |
| 355.3 | LESION OF LATERAL POPLITEAL NERVE |
| 355.4 | LESION OF MEDIAL POPLITEAL NERVE |
| 355.71 | CAUSALGIA OF LOWER LIMB |
| 355.79 | OTHER MONONEURITIS OF LOWER LIMB |
| 355.8 | MONONEURITIS OF LOWER LIMB UNSPECIFIED |
| 723.2 | CERVICOCRANIAL SYNDROME |
| 723.3 | CERVICOBRACHIAL SYNDROME (DIFFUSE) |
| 723.4 | BRACHIAL NEURITIS OR RADICULITIS NOS |
| 724.2 | LUMBAGO |

**Diagnoses that Support Medical Necessity** 

**Coding Information**

**ICD-9 Codes that DO NOT Support Medical Necessity**



Any ICD-9 diagnosis code not listed under the "ICD-9 Codes That Support Medical Necessity" section of this policy.

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**



## Coding Information

**Diagnoses that DO NOT Support Medical Necessity**

## General Information

Retired

**Documentation Requirements**

Documentation in the medical record must contain a history and physical pertinent to the indications of this policy. In addition, the documentation must support the medical necessity for performing this procedure.

**General Information**

**Appendices**

**Utilization Guidelines**

In accordance with CMS Ruling 95-1 (V), utilization of these services should be consistent with locally acceptable standards of practice.

**Sources of Information and Basis for Decision**

**General Information**

Carrier Medical Directors' (CMD) Chronic Pain Management Clinical Workgroup

Ghoname EA, Craig WF, White PF, et al; Percutaneous Electrical Nerve Stimulation For Low Back Pain: A Randomized Crossover Study. JAMA, volume 281, issue 9, March 3, 1999 pages 818-823.

Cauthen JC, Renner EJ, Transcutaneous And Peripheral Nerve Stimulation For Chronic Pain States; Surg Neurol 1975, Jul; 4(1): 102-4

Kirsch WM, Lewis JA, Simon RH, Experiences With Electrical Stimulation Devices For The Control Of Chronic Pain; Med Instrum 1975, Sep-Oct; 9(5): 217-20

Long DM, Electrical Stimulation For The Control Of Pain; Arch Surg 1977, Jul: 112(7): 884-8

Long DM, Uses Of Percutaneous Electrical Stimulation Of The Nervous System; Med Prog Technol 1977, Jul; 15;5(1): 47-50

Law JD, Swett J, Kirsch WM, Retrospective Analysis OF 22 Patients With Chronic Pain Treated By Peripheral Nerve Stimulation; J Neurosurg 1980, Apr; 52(4): 482-5

Picaza JA, Hunter SE, Cannon BW, Pain Suppression By Peripheral Nerve Stimulation. Chronic Effects Of Implanted Devices; Appl Neurophysiol 1977-78; 40(2-4): 223-34

Nashold BS Jr, Goldner JL, Mullen JB, Bright DS, Long-Term Pain Control By Direct Peripheral-Nerve Stimulation; J Bone Joint Surg Am 1982, Jan: 64(1): 1-10

Hamza MA, Ghoname EA, et al; Effect Of The Duration Of Electrical Stimulation On The Analgesic Response In Patients With Low Back Pain; Anesthesiology 1999, Dec; 91(6): 1622-7

Agnew WF, McCreery DB, Considerations For Safety With Chronically Implanted Nerve Electrodes; Epilepsia 1990; 31 Suppl 2: S27-32

Other carrier's policies

HGSAdministrators Medical Director

**General Information**

**Advisory Committee Meeting Notes**

Z-54: CAC presentation: 04/13/2000

This policy does not reflect the sole opinion of the contractor or contractor medical director. Although the final decision rests with the contractor, this policy was developed in cooperation with advisory groups, which includes representatives from Physical Medicine and Rehabilitation.

**Start Date of Comment Period**

03/14/2000

**General Information**

**End Date of Comment Period**

04/28/2000

**Start Date of Notice Period**

06/14/2000

**Revision History Number**

Z-54C

**General Information**

**Revision History Explanation**

12/29/2005 (Z-54C) Policy release date. 2006 CPT/HCPCS update to remove deleted code E0752 and replace with new code L8680 effective for dates of service on or after 01/01/2006.

08/15/2005 (Z-54B) Policy converted from LMRP to LCD format per CMS CR 3010.

01/01/2002 (Z-54A) Revised with the 2002 HCPCS update to include E0752 and to revise the terminology for 64555.

11/26/2005 - CPT/HCPCS code E0752 was deleted from group 1

**Reason for Change**

**General Information**

**Last Reviewed On Date**

**Related Documents**

This LCD has no Related Documents.

**LCD Attachments**

There are no attachments for this LCD.

**All Versions** 

Retired

Updated on 12/20/2007 with effective dates 01/01/2006 - 12/20/2007

Updated on 08/17/2005 with effective dates 08/15/2005 - 12/31/2005

Updated on 08/16/2005 with effective dates 01/01/2002 - 08/14/2005

Updated on 01/24/2003 with effective dates 01/01/2002 - N/A

Updated on 01/20/2003 with effective dates 01/01/2002 - N/A

# Exhibit 6

**Ginny Goldbach**

| | |
|---|---|
| **From:** | Matt Miller <matthewmiller1025@gmail.com> |
| **Sent:** | Thursday, July 14, 2016 3:27 PM |
| **To:** | Sudhir Rao; Ginny Goldbach; Kimberly Coleman; Kimberly Coleman |
| **Cc:** | Matt Miller |
| **Subject:** | NSS Discussion - Radiance/Dr. Rao |
| **Attachments:** | Adrain M interim analysis for world congress 5-14-25.doc; Adrian Miranda Amygdala Neurons and BRIDGE Stim.pdf; Adrian Miranda Spinal Cord Neurons and BRIDGE Stim.pdf; Adrian Miranda Visceral and Somatic Pain and BRIDGE 2.pdf; PastedGraphic-7.tiff |

Greetings:
At the request of Dr. Rao, we would like to see when all parties may be able to field a call next week. **We are looking at Tuesday, July 19th around 9am**. We will discuss NSS for use in ASC environment and applicable coding, patient identification/candidacy, and anything else you want to cover.
Please reply with availability for that day.

Included below is an excerpt from a former AMA advisor as the the use of CPT code for NSS. I thought this may be helpful. Recent studies also attached for your consideration. These are animal based studies, but prove effectiveness of the device. (NSS=BRIDGE device for study purposes)

**AMA Advisor Review:**
**"A thorough review of the coding literature and the LCDs generated by many Medicare carriers show that the CPT code 64555 appears to be the most accurate when applying use of the NSS system.** The neuro-stimulator technique that is used with these patients is clearly delineated from acupuncture and other neuro-stimulator treatments. The neuro-stimulator is programmed to provide a stimulation comprised of 0-10 HZ , impulse interval 1000 ms, monophasic impulse width 1 ms, ims/bipolar., changing polarity ( to avoid polarizing effects) , with an maximum amplitude of 3.2 V.

**Procedure:** Mapping is done of patient's unique trigeminal, Greater Occipital, Lesser Occipital, cranial and peripheral nerve anatomy with subsequent placement of neuro-stimulator generator and percutaneous electrode array implantation at verified nerve sites.

Medicare LCDs, Noridian in particular relate that " Peripheral Nerve Stimulation may be covered for relief of chronic intractable pain for patients with conditions known to be responsive to this form of therapy." "Severe neuropathic pain is typically well suited for successful responses to PNS".

Such LCDs relate the treatment of occipital, trigeminal, peripheral, intercostal and ilio-inguinal nerves as well as lower back and trunk syndromes.

*64555 Percutaneous implantation of neurostimulator electrode array; peripheral nerve*- is the descriptor both in CPT and that recognized by Medicare and most private payers today.

I would opine that this is the most appropriate CPT code for such service."

Former advisor to AMA CPT editorial panel

Matt Miller - Distributor/Principal

412-401-8565
matthewmiller1025@gmail.com

# Auricular Neurostimulation with BRIDGE device Prevents Post-Inflammatory Visceral and Somatic Hyperalgesia in Rats

**Adrian Miranda, M.D.**
Associate Professor of Pediatrics-Gastroenterology
Medical College of Wisconsin, Department of Pediatrics, Division of Pediatric Gastroenterology, Hepatology, and Nutrition. Milwaukee, WI

## Introduction

Patients with irritable bowel syndrome (IBS) suffer from chronic abdominal pain despite having no structural or anatomical lesions that can account for symptoms. Hyperalgesia is the hallmark of IBS and refers to an exaggerated pain response to a normally noxious stimulus. Visceral and somatic hyperalgesis can occur in humans and animals following inflammation in the colon. In humans, up to 14% of patients can develop chronic IBS following common gastrointestinal infections [(1)]. The annual direct cost of IBS in adults has been estimated at US $1.35 billion, since extensive testing is often performed and only few treatment options exist [(2)]. In animals, inflammation of the colon with Trinitrobenzenesulfonic acid (TNBS) results in visceral and somatic hyperalgesia. This has been extensively used as an animal model for IBS [(3-4)]. Since most pharmacological agents being used or promoted to treat IBS are often no better or have minimal gain over placebo, most patients are seeking complementary or alternative treatments [(5-7)]. Recent clinical evidence from our group suggests that auricular electrical stimulation with the BRIDGE device (Innovative Health Solutions, Versailles, IN, USA) can have antinociceptive properties. BRIDGE is a non-invasive, drug free alternative that may improve symptoms of acute or chronic pain by influencing pain pathways centrally (RVM, Amygdala, hypothalamus) through stimulation of external auricular branches of cranial nerves (V, VII, IX, and X). We aimed to examine the role of auricular stimulation with the BRIDGE device on the development of visceral and somatic hyperalgesia following colitis in rats.

**<u>Methods</u>:** In two groups of male Sprague-Dawley rats, a pair of electrodes was implanted in the external abdominal musculature of each animal to record EMG. EMG measures contraction of abdominal wall muscles in response to colon distension and is a well-established method of assessing visceral sensitivity [(8)]. Five days post implantation of the electrodes, colonic inflammation was induced by a single application of trinitrobenzenesulfonic acid (50%TNBS in EtOH, 0.5ml) in the colon. In one group (n=8), the BRIDGE device was applied in the external ear on the first day of TNBS administration and continued for 4 hours per day over 5 days. The control group (n=6) had an inactive device that was also placed on the first day of TNBS and continued for 4 hours a day for 5 days. Seven days after the initial placement of the BRIDGE device or control device, a visceromotor response (VMR) to graded colorectal distension (CRD;10-80mmHg, 30s, 180s inter-stimulus intervals) was recorded in both groups to assess changes in visceral sensitivity. The paw withdrawal response (PWR) was also assessed in both groups by applying Von Frey filaments of various bending forces (100–400 mN) to the plantar surface of the hind paws. Progressive, increasing forces were applied until the hind paw was withdrawn. The lowest bending force required to stimulate a PWR was

recorded as the mechanical withdrawal threshold. Experimenters were blinded to all groups and conditions.

**Results:** Control animals with the inactive device showed a much higher VMR at CRD pressures >30mmHg compared to those with BRIDGE (0.63±0.08 and 0.77±0.06 vs. 0.34±0.03 and 0.37±0.06, respectively). Thus, stimulation with the BRIDGE significantly prevented the development of visceral hyperalgesia compared to inactive devices (p<0.05) (Figure 1A). Similarly, rats with BRIDGE stimulation required much higher forces to induce a paw withdrawal (749± 196mN) compared to the control group (181±45mN) (p<0.05), suggesting that auricular stimulation prevented the development of somatic hyperalgesia following TNBS, (Figure 1B).




**Figure 1:** (A) Summary data of mean VMR to graded CRD (10–60 mmHg) in rats one week after induction of colitis with TNBS. Animals that received auricular stimulation with the BRIDGE device did not show an increase in response to distension pressures ≥30 mm Hg, representing the prevention of visceral hyperalgesia compared to control. (B) Bar graphs represent the bending force of von Frey filaments required to induce PWR. Similarly, animals with auricular stimulation with the BRIDGE device had a significantly higher threshold for pain compared to control (*p < 0.05).

**Conclusion**: Auricular neurostimulation with the BRIDE device significantly prevents the development of post-inflammatory visceral and somatic hypersensitivity associated with TNBS colitis. This effect is likely a centrally mediated process, but further studies are underway to investigate potential pathways.

**References**

1. Schwille-Kiuntke J, Frick JS, Zanger P, Enck P. Post-infectious irritable bowel syndrome--a review of the literature. Z Gastroenterol. 2011;49:997-1003.

2. Canavan C, West J, Card T. Review article: the economic impact of the irritable bowel syndrome. Aliment Pharmacol Ther. 2014;40:1023-34.

3. Zhou Q, Price DD, Caudle RM, Verne GN. Visceral and somatic hypersensitivity in TNBS-induced colitis in rats. Dig Dis Sci. 2008;53:429-35.

4. Miranda A, Nordstrom E, Mannem A, Smith C, Banerjee B, Sengupta JN. The role of transient receptor potential vanilloid 1 in mechanical and chemical visceral hyperalgesia following experimental colitis. Neuroscience. 2007 21;148:1021-32.

5. Miranda A, Saps M. The use of non-narcotic pain medication in pediatric gastroenterology. Paediatr Drugs. 2014;16:293-307.

6. Chey WD, Maneerattaporn M, Saad R. Pharmacologic and complementary and alternative medicine therapies for irritable bowel syndrome. Gut Liver. 2011;5:253–66.

7. van Tilburg MA, Palsson OS, Levy RL, Feld AD, Turner MJ, Drossman DA, Whitehead WE. Complementary and alternative medicine use and cost in functional bowel disorders: a six month prospective study in a large HMO. BMC Complement Altern Med. 2008;8:46–53.

8. Ness TJ, Gebhart GF. Colorectal distension as a noxious visceral stimulus: physiologic and pharmacologic characterization of pseudaffective reflexes in the rat. Brain Res. 1988;450:153-69.

# Auricular Neurostimulation with Bridge Device Alters the Response Characteristics of Amygdala Neurons in Rats

**Adrian Miranda, M.D.**
Associate Professor of Pediatrics-Gastroenterology
Medical College of Wisconsin, Department of Pediatrics, Division of Pediatric Gastroenterology, Hepatology, and Nutrition. Milwaukee, WI

Introduction

Data from our laboratory suggests that in animals, auricular stimulation with the BRIDGE device (Innovative Health Solutions, Versailles, IN, USA) prevents the development of visceral and somatic hyperalgesia. Recent clinical evidence from our group and others suggests that an alteration in the amygdala connectivity is common in patients with chronic pain [(1-5)]. Anecdotal evidence also suggests that this device can attenuate clinical symptoms of opioid withdrawal. A common central link between a state of chronic pain and opioid dependence appears to be the amygdala, since it has major projections to the hypothalamus and brainstem. The amygdala is involved in the emotional component of pain processing and activation of this area has also been associated with the negative emotional state of withdrawal to opioids and drug craving [(6)]. Thus, we aimed to investigate whether external auricular stimulation with the BRIDGE device could influence processing in the amygdala. Electrophysiological recordings from single cells in the rat amygdala were performed to examine the response characteristics of these neurons before and after stimulation with the BRIDGE device. We hypothesized that acute auricular stimulation would alter the response characteristics of amygdala neurons.

**Methods:**

Electrophysiological recordings

A group of 5 rats underwent extracellular single-unit recordings from neurons in the central nucleus of the amygdala (CeA). Animals were anesthetized with Urethane (induction, 1.5g/kg, i.p.; maintenance, 0.05mg/kg intravenously bolus to maintain plane of anesthesia). Physiological parameters such respiratory rate, heart rate and core body temperature (kept at 37°C) were continuously monitored. The animal was mounted in a stereotaxic frame and a small unilateral craniotomy was made to allow for the insertion of the recording electrode.

Single-unit recordings from neurons were made with glass-insulated carbon filament electrodes (4-6MΩ). The following stereotaxic coordinates were used: 2.2 to 3.1 caudal to bregma, 3.8 to 4.2 lateral to midline, depth 6.5 to 8.0 (Paxinos and Watson) (Figure 1). The action potentials were amplified through a low-noise AC differential amplifier (model 3000; AM Systems) and continuously monitored and displayed on an oscilloscope. A dual window discriminator (modelDDIS-1; BAK Electronics) was used to discriminate the action potentials and to convert the signal to a rectangular TTL pulse. The frequency of TTL pulses was counted on-line by using the Spike 2/CED 1401 data acquisition system (Cambridge Electronic Design). Action potentials and blood pressure were recorded on-line. After the experiments, data were analyzed using the Wave-Mark

analysis method of the Spike 4 software (Cambridge Electronic Design) to distinguish individual action potentials.

<u>EP Experiment Protocol</u>
In each animal, background and evoked activity of only one neuron was recorded form the right amygdala. An individual neuron was identified by its background activity and responses to brief search stimuli, which included compression of deep tissue (left paw) with a consistent force using Von Frey filaments. In each experiment, one amygdala neuron that responded to paw compression was selected and recorded. The background activity in the absence of any intentional stimulation was recorded for 5 min. Following the baseline recording, a brief (30 s) compression of the paw was applied twice with the same Von Frey filament (190 mN) 5 min apart. After two compressions were recorded, the BRIDGE device was connected to the ear on the ipsilateral side and left undisturbed for 15 minutes. The baseline firing of the neuron and response to compression of the paw was again recorded.

**Figure 1**




Adapted from Paxinos and Watson (2005)

## **<u>Data Analysis</u>**
Statistical analysis was performed using SigmaStat (V2.03, SPSS Inc, Chicago, IL). Baseline firing and response of the neurons to paw pinch was measured as action potential counts over 30 sec compression of the paw and were analyzed using one-way repeated measures ANOVA.

## **<u>Results</u>:**
Extracellular recordings from amygdala neurons were made in 5 rats. A total of 5 neurons that responded to noxious stimuli (compression) of the hind paw were recorded. All neurons were classified as excitatory with cutaneous receptive fields mainly in the trunk and plantar surface of the paw.




**Figure 2:** Example of a typical response of an amydala neuron before and after auricular stimulation. In both panels, the top trace shows the response represented as a frequency histogram (1 s bin width), the middle trace is the neuron action potential and the bottom trace is the paw pinch duration.

Prior to auricular stimulation, the mean spontaneous firing of the neurons was 1.15±0.36 imp/sec with an excitatory response to 3.05± 0.46 after paw pinch (190mN). There was a 52% decrease in the spontaneous firing of the neurons after just 15 minutes of auricular stimulation with BRIDGE (0.56 ±0.21 imp/sec). Similarly, the response to compression of the paw was decreased by approximately 66% after auricular stimulation (1.04±0.29imp/sec) ($p<0.05$). Figure 2 shows and example of one neuron recorded before and after stimulation with the BRIDGE device. Figure 3 shows the cumulative data for all 5 neurons.




**Figure 3:** The mean response of amygdala neurons (imp/sec) before and after auricular stimulation with BRIDGE device. The spontaneous firing of each neuron was recorded as baseline firing prior to somatic stimulation (paw pinch). Both the spontaneous firing and response of the neurons to paw pinch were significantly decreased after 15min of auricular stimulation with the BRIDGE (*$p<0.05$).

**Conclusion**

Neurostimulation with the BRIDGE device significantly decreases the baseline firing of amygdala neurons and attenuates the response to somatic stimulation after just 15 minutes. This attenuation could theoretically account for the modulation of pain responses in both humans and animals as well as improvement in the negative emotional state associated with drug withdrawal. Further studies are underway to examine whether the effect is limited to the supraspinal areas or if spinal neurons are also influenced.

**References**

1. Icenhour A, Langhorst J, Benson S, Schlamann M, Hampel S, Engler H, Forsting M, Elsenbruch S. Neural circuitry of abdominal pain-related fear learning and reinstatement in irritable bowel syndrome. Neurogastroenterol Motil. 2015;27:114-27.

2. Felice VD, Gibney SM, Gosselin RD, Dinan TG, O'Mahony SM, Cryan JF. Differential activation of the prefrontal cortex and amygdala following psychological stress and colorectal distension in the maternally separated rat. Neuroscience. 2014 ;267:252-62.

3. Myers B, Greenwood-Van Meerveld B. Divergent effects of amygdala glucocorticoid and mineralocorticoid receptors in the regulation of visceral and somatic pain. Am J Physiol Gastrointest Liver Physiol. 2010;298:G295-303.

4. Hong JY, Naliboff B, Labus JS, Gupta A, Kilpatrick LA, Ashe-McNalley C, Stains J, Heendeniya N, Smith SR, Tillisch K, Mayer EA. Altered brain responses in subjects with irritable bowel syndrome during cued and uncued pain expectation. Neurogastroenterol Motil. 2016;28:127-38.

5. Liu X, Silverman A, Kern M, Ward BD, Li SJ, Shaker R, Sood MR. Excessive coupling of the salience network with intrinsic neurocognitive brain networks during rectal distension in adolescents with irritable bowel syndrome: a preliminary report. Neurogastroenterol Motil. 2016;28:43-53.

6. Koob GF, Volkow ND. Neurocircuitry of addiction. Neuropsychopharmacology. 2010;35:217-38.

**A Novel Approach for the Treatment of Refractory Functional Gastrointestinal Disorders in Children: A Randomized, Controlled Trial of Neurostimulation**

K Kovacic, G Chelimsky, M Sood, T Chelimsky, B Li, K Hainsworth, P Simpson, A Miranda
Medical College of Wisconsin, Milwaukee, Wisconsin, USA

**Background:** Pharmacological treatments are often inadequate for patients with functional gastrointestinal disorders (FGIDs) and psychological therapies are not always readily available. Newer, alternative therapies are needed in this population. IBstim (Innovative Heath Solutions, IN, USA), an FDA-approved device, delivers percutaneous electrical stimulation (3.2V) with alternating frequencies to branches of cranial nerves (V, VII, IX, and X) through the external ear. Preliminary studies in animals suggest that it alters neuronal activity in central nociceptive structures. This study aimed to evaluate the efficacy of IBStim in children with FGIDs who failed pharmacological therapy. We report an interim analysis of this ongoing trial.

**Methods:** In this prospective, double-blind, randomized controlled trial, we enrolled 52 out of 100 intended subjects ages 11-18 y/o with FGIDs from an outpatient GI clinic. The IBstim device, which delivers stimulation on/off for 2 hour intervals, was applied to the external ear weekly for 5 days x 4 weeks. The control group had an inactive "sham" device. Patients were randomized by a computer-generated scheme. A Likert 0-10 scale assessed daily nausea and pain ratings. Baseline and weekly assessments included: 1) Pain-Frequency-Severity-Duration (PFSD) scale, 2) Nausea Profile with 3 subscales (Somatic, GI and Emotional distress) and 3) a 14-point validated Symptom Response Scale (SRS) (-7 = "A very great deal worse"; 7 = "A very great deal better"). A 1-point change on the SRS is considered clinically significant.

**Results:** 42/52 subjects (90% female) completed the trial. 92% had failed drug therapy with ≥ 1 neurally active agent. Median age was higher in the sham group: [*Mdn (range)* 16.6 (12.2-18.7) vs. 15.4 (10.8-18.4) years] (p=0.025). After 4 weeks, the group with IBstim treatment had a significant reduction in the worst pain intensity scores compared to sham (*Mdn*): 8.0 to 5.0 vs 7.0 to 7.0 (p<0.05). Similarly, those with the active device had improvement in overall symptoms compared to sham based on the SRS: [*Mdn (range)*: 3.0 (-3 to 6) vs 1.0 (-4 to 6)] (p=0.032). On this scale, 86% in the treatment vs. 57% in the sham group showed a minimally important improvement with a change score ≥1 (p=0.08). Nausea Profile scores (total and all subscales) decreased significantly over time in both groups with a trend toward greater

improvement in treatment vs. sham group for the Somatic distress ($p=0.064$) and Emotional distress ($p=0.09$) subscales.

**Conclusion:** Our interim analyses show that percutaneous neurostimulation with IBstim offers a novel treatment approach for children and adolescents with refractory FGIDs. Further data on daily pain and nausea scores, physical functioning and health-related quality of life will be examined at the end of the trial.

# Auricular Neurostimulation with Bridge Device Modifies the Activity of Lumbar Spinal Neurons in Rats

**Adrian Miranda, M.D.**
Associate Professor of Pediatrics-Gastroenterology
Medical College of Wisconsin, Department of Pediatrics, Division of Pediatric Gastroenterology, Hepatology, and Nutrition. Milwaukee, WI

## Introduction

Our previously studies suggest that auricular stimulation in animals with the BRIDGE device (Innovative Health Solutions, Versailles, IN, USA) prevents the development of visceral and somatic hyperalgesia and modulates amygdala neurons. It has been proposed that a shift in the balance between pain inhibiting and facilitating outflows from the brainstem to the spinal cord, known as the conditioned pain modulation (CPM) system, plays an role in the pathophysiology of chronic pain disorders. This system involves descending modulation of spinal neurons by the periaqueductal gray (PAG) and the rostroventral medulla (RVM). Since the amygdala has major projections to these brainstem areas, we hypothesized that acute auricular stimulation would also alter the response characteristics of lumbar spinal cord neurons.

## Methods:

### Surgical Preparation

Rats were anesthetized with an initial dose of Urethane (induction, 1.5g/kg, i.p) and maintained by bolus dosing through the right femoral vein (0.05mg/kg). To monitor blood pressure, the left carotid artery was also cannulated. Following tracheal intubations, the rats were paralyzed with an initial dose of gallamine triethiodide (10 mg•kg-1 i.v., Flaxedil) and mechanically ventilated with room air (~60 strokes•min-1). Subsequent doses of gallamine triethiodide (5 mg•kg-1•h-1) were given as needed to maintain paralysis. The body temperature was kept within physiological range (36–37°C) with an overhead lamp. The rats were placed in a stereotaxic head holder and the thoraco-lumbar (T13-L2) spinal cord was exposed by laminectomy. After removal of the dura membrane, a 1-2cm saline-soaked gelatin sponge (Gelfoam, Pharmacia Upjohn Company, MI USA) was used to cover the exposed spinal cord segment. The skin was reflected laterally to make a pool for agar solution that was allowed to cool to 38ºC prior to pouring. The agar was allowed to harden and the dorsal surface of the spinal cord was exposed by removing a cubical slice of agar with a scalpel blade. The exposed surface of the spinal cord was covered with warm mineral oil (37°C).

### Spinal Neuron Recordings

Two rats underwent extracellular single-unit recordings from the lumbar (L1-L2) spinal segments using a glass-insulated, carbon filament electrodes. The placement of the electrode was 0.1-0.5mm lateral from the spinal midline and 0.6-1.8mm ventral from the dorsal surface. The action potentials were amplified through a low-noise AC differential amplifier (model 3000; A-M Systems) and continuously monitored and displayed on an oscilloscope. A dual window discriminator (model DDIS-1; BAK Electronics) was used

to discriminate the action potentials and to convert it to rectangular TTL pulse. The frequency of TTL pulses was counted online by using the Spike2/CED 1401 data acquisition system (Cambridge Electronic Design). Action potentials and blood pressure were recorded online. Post experiments, data were analyzed using the Wave-Mark analysis method of the Spike 4 software (Cambridge Electronic Design) to distinguish individual action potentials.

The spontaneous neuronal activity was recorded for each neuron followed by recording of responses to noxious pinch of the paw using Von Frey filament (190 N) for 10 seconds. Once the baseline response was obtained, the BRIDGE device was attached to the contralateral ear. After 15 minutes of stimulation, the baseline firing and response to paw pinch was again recorded.

**<u>Results</u>:**

One neuron from each animal (n=2) that responded to noxious stimuli (compression) of the hind paw were recorded. All neurons were classified as excitatory and had cutaneous receptive fields mainly in the ipsilateral rump area. Figure 1 shows and example of one spinal neuron recorded before and after stimulation with the BRIDGE device.




**Figure 1:** Example of a typical response of a lumbar spinal neuron before (A) and after auricular stimulation (B). In both panels, the top trace shows the response represented as a frequency histogram (1 s bin width), the middle trace is the neuron action potential.

Following stimulation with the BRIDGE there appeared to be a decrease in the spontaneous baseline firing of the neurons (4.6± 0.21 imp/sec) compared to pre-stimulation (9.5±0.43 imp/sec). Similarly, firing of the neurons in response to pinching of the paw was much lower after auricular stimulation (7.7 ± 0.24 imp/sec) compared to the pre-stimulation response (15.8± 1.43imp/sec). Figure 2 shows the cumulative data for both neurons.




**Figure 2**: The mean response of lumbar spinal neurons (imp/sec) before and after auricular stimulation with BRIDGE device. The spontaneous firing of each neuron was recorded as baseline firing prior to somatic stimulation (paw pinch). Both the spontaneous firing and response of the neurons to paw pinch were decreased after 15min of auricular stimulation with the BRIDGE.

**Conclusion**

Neurostimulation with the BRIDGE device decreases the spontaneous firing and response to somatic stimulation of lumbar spinal neurons. This suggests that auricular stimulation with the BRIDGE influences the descending modulatory effect on spinal neurons. This inhibitory effect on spinal neurons could account for the anti-nociceptive effects seen in previous pre-clinical and clinical studies.

# Exhibit 7

[redacted]

---------- Forwarded message ----------
From: **Bobby Smith** <bobby@ihcsnation.com>
Date: Mon, Aug 17, 2015 at 11:08 AM
Subject: Introduction to NSS/ Please confirm receipt
To: "rt.bhambhani@gmail.com" <rt.bhambhani@gmail.com>

Dr Bhambhani, My company has the exclusive rights to a recently FDA and VA approved device for acute and chronic pain. I live in Maryland and am selecting key practices now. We have launched with prominent Physicians and larger surgery groups throughout the U.S. I have attached the Slideshow above along with a short Science Video https://vimeo.com/user17291718/review/108118730/56e5ec2571. They feature the technology along with the extraordinary reimbursement for this treatment. Select practices can participate in our Full Service Program outlined on the attached PowerPoint
>
> Our expert billing team will provide:
>
> * All pre certifications required (not required for Medicare patients)
>

> * All follow up requests from insurance providers
>
> * Provide bi- weekly A&R reports
>
> * 90 Day billing terms
>
>
> This device is:
>
> * FDA and VA approved
>
> * Utilized by leading Physicians and Surgery Centers
>
> * Featured in the Key Evolutions in the Device Arena at the Highly acclaimed Beckers ASC Ortho, Spine& Pain Conference
>
> * Featured at Pain Week in Las Vegas, the Nation's largest Pain Conference
> ASC's utilize this cutting edge technology for:
>
> * Post surgical pain control
>
> * Acute and Chronic pain
> Our expert training staff will provide:
> Easy to follow training videos for the placement of the devices
> A full day of training upon request for the initial scheduled patients
> Patient educational handouts
>
> Please review the attached slide show to fully understand the impact that this technology can have on your patients and your practice.
>
> Robert A Smith
> Innovative Health Care Solutions Inc.
> VP of Sales and Marketing
> C 410-977-8777
> F 410-561-4772
>

# Exhibit 8

[redacted]

---------- Forwarded message ----------
From: **Kristen Brannon** <kristen@ihcsnation.com>
Date: Tue, Sep 8, 2015 at 9:53 AM
Subject: NSS Billing Information
To: "rt.bhambhani@gmail.com" <rt.bhambhani@gmail.com>
Cc: Bobby Smith <bobby@ihcsnation.com>

It was a pleasure speaking with you on Friday. See attached the NSS Billing information we discussed on Friday. Please review and I will be glad to answer any questions during our 10am call this morning.

Kristen Brannon

Innovative Healthcare Solutions

Director Of Operations

502-561-0963 Office

502-303-0919 Cell

1-800-884-9650 efax

# FSP Billing and Precertification Overview

**Prior Authorization Protocols**

1. IHCS will initiate all prior authorizations (PA) for the NSS Device.

2. For each patient referred by your office, we need documents in order to facilitate the authorization and billing of the device. Please fax this information to: 800-884-9650.

   A. Please fill out the NSS Device Pre-Certification form.
   B. Our office needs a copy of the patient's insurance card(s), front and back, in order to verify coverage and eligibility.
   C. Patient demographics: we need the demographics for billing.
   D. Office Note: for each patient, we need the provider's note ordering the NSS device.

3. Work Comp: if a patient is covered by work comp, IHCS will contact the adjuster and verify the claim and coverage. The adjuster must authorize each device the physician orders for treatment. In order to increase the likelihood of coverage for work comp patients, we must have all required information and the Office Note in order to call the adjuster. If the adjuster requires additional information we will contact your office to obtain this documentation. The documentation requested is required within 72hr of request.

4. Once the PA has been initiated, we will provide a status update within 72hrs. As soon as we determine eligibility and coverage we will contact your office with the PA information.

5. Should IHCS receive either a denial or a request for additional information, IHCS will work with your office to provide the information needed for the insurance company to reach a decision or aid in an appeal of a denial of service. The request we most often have is for additional information, up to and including a letter from the physician's office to answer their questions regarding patient treatment and medical necessity. We ask that you answer our requests for information within seventy two (72) hours.

6. Should you have any questions or concerns about any prior authorization for your patient please send an email to priorauth@ihcsnation.com. We will respond within 24hrs.

**Billing Protocols**

IHCS provides personalized attention to all clients. As a client, you will receive constant communication from our team. In order to build a successful partnership, we require that our clients be compliant with all requests within Seventy two (72) hours. When a team member is working to obtain authorization to treat your patient, we come to a halt when we are asked for

information that we do not possess. It is imperative that we receive all requests for information as these are needed by the insurance company in order to render a decision. Please review the following billing protocols.

1. New Client Information sheet: this form is submitted to IHCS by the sales team.

2. NSS Encounter Forms: Please forward all NSS encounter forms at the end of each business day. We bill for services as soon as we have the information in order to expedite payment to your office.

3. Procedure Note: your office note for the procedure is needed for our software and for billing. All documents we receive from your office are uploaded into our software system.

4. We will submit claims for service within twenty-four hours of receiving your encounter form.

5. Work Comp: in order to submit a claim to work comp, IHCS must have the encounter form and the office note. Work comp insurance companies will not consider a claim without documentation.

6. Explanation of Benefits: IHCS requires clients to email EOBs within twenty-four hours for the billing of the NSS device. We update records daily and for our reports to be accurate we need EOBs to enter payment information.

7. Client Billing: in order to track revenue and payments, some offices may bill for the NSS device in their billing software. It is IMPERATIVE that, as a client for whom we are billing, all such claims are placed in a HOLD status so the claims are not generated. While participating in the FSP our clients are precluded from billing for the NSS devices. This will result in duplicate billing.

**Reporting**

Accounts Receivable Report, Bi-Weekly: IHCS will send an accounts receivable report bi-weekly. This report will help clients keep track of their progress.

Accounts Receivable Report, End of Month: IHCS will send a monthly A/R summary by the 3rd of every month, after the month-end calculations have been completed.

**Neurostimulator Precertification Form**

**Office 502-561-0963**

**Efax 1-800-884-9650**

**Patient Name:**________________________________ **File #:**__________ **Date:**________________ ▢Initial ▢ Revised

***Diagnoses Codes:*** 1__________ 2__________ 3__________ 4__________ 5__________ 6__________ 7__________

***Onset Date of Primary DX***: ______________________

***Failure of Conservative Treatment***: _____Yes _____No Notes:_____________________________________________

***Modalities, Type & Duration, if any***: _________________________________________________________________

***Is further surgical intervention warranted:*** ____Yes ____No Notes:_________________________________________

***Complicating Factors:***

▢Diabetes ▢Aneurisms ▢Anti-Coagulation Tx ▢Psoriasis/Auricular ▢Recent Heart Attack
▢Blood Pressure ▢Spinal Stenosis ▢Under15 yrs/age ▢Skin Allergies ▢Pregnant
▢Overweight ▢Bell's Palsy ▢Renal Insufficiencies ▢Implanted Electrical Devices
▢Severe Obesity ▢Other Heart________________________ ▢Other________________________

***ADL Deficits:***

▢Standing_______ ▢Walking_______ ▢Dressing_______ ▢Lifting________
▢Housework______ ▢Bathing________ ▢Sitting________ ▢Other______________________________

Notes:_______________________________________________________________________________________________

***Treatment Goals – Short Term*** (aeb=as evidenced by)***:***

▢Decrease Pain/Inflammation by ____% w/I ____ visits ▢Decrease % of time in pain by ____% w/i _____visits
▢Increase ROM to _______________area by _____% w/i _____visits _______________area by _____% w/i _____visits
▢Increase Sleep by:_____________________________________________________________________________
▢Reduce Narcotics by:___________________________________________________________________________
▢Improve ADLs aeb______________________________________________________________________________
▢Other_______________________________________________________________________________________

***Long Term Treatment Goals*** (aeb=as evidenced by):

▢100% or _____% pain reduction of affected area(s) ▢Restore 100% or _____% of normal ROM of the affected area(s)
▢Restore 100% or _____% of following ADLs: ▢sleep ▢lift ▢sit ▢stand ▢walk ▢work ▢household chores
▢Other_______________________________________________________________________________________

**Contraindications to Neurostimulator:** ▢No Known Contraindications ▢Contraindications as follow:
___Epilepsy or Hx of Seizures ___Pacemaker/Irregular Heart Rhythm ___Recent Transplant ___Orthostatic Hypotension

***Type of Care:*** ▢Acute Pain Management ▢Chronic Pain Management ▢Post-Operative ▢Other____________________

***Frequency of Care:***

▢Every 5th day for ___ x's ▢1x/week for ___weeks ▢1x in 2 weeks ▢1x in 3 weeks ▢PRN

Initial estimate # staged neurostimulator procedures_________ Re-evaluation Date:_____________

_______________________________________________ ______________ ______________

Ordering Provider Date Revision Date

**Please include along with this form patient demographic and a copy of the health insurance card (front and back)**

# Practice Info Here

Phone: Fax:

**PATIENT NAME:**

**DATE**:

**PREPROCEDURE DIAGNOSIS:**
**POSTPROCEURE DIAGNOSIS:** Same

**COMPLICATIONS:** None

**PROCEDURES:**
1. Percutaneous implantation of neurostimulator electrodes-peripheral nerves

**INDICATIONS:** *Insert any chronic/acute pain*

**Procedure Performed:** Analysis of neurostimulator device operation and neurostimulator device placement to the peripheral nerves. Three electrodes and one ground were implanted in the following nerve sites: auricular branches of the occipital, trigeminal, vagal and greater auricular nerves. (This is the second of six weekly staged procedures. Each procedure will be performed during the global period.)

**Procedure Detail:** After consent was obtained, the *(left/right)* mastoid process and ear was cleaned and prepped in the usual fashion using alcohol swabs. The NSS procedure kit was opened. Neurostimulator generator was then activated, and attached to the sterile needle electrode arrays. The specific auricular nerve bundles were identified via transillumination and marked with a surgical pen. The neurostimulator generator was then fixed to the mastoid process. *Three* electrodes were then percutaneously implanted at the previously listed nerve sites. The NSS generator, electrodes, and wires were then properly taped and protected in the usual fashion using Tagaderm sterile dressing. *No complications* were experienced and the patient was released.

.

**POSTPROCEDURE**

**I.** **RECOVERY:** Uneventful.
**II.** **RESPONSE:** Indeterminate. Follow up appointment in 1 week
**III.** **DISPOSITION:** The patient tolerated the procedure well without any complications or side effects. Heart rate and blood pressure were stable prior to, during and after the procedure. The patient was monitored for 30 minutes after the procedure. Pain diary provided. Patient to follow up in one week.

**Insert Doctor's Signature Here**

Name:
Date:

# Exhibit 9

[redacted]

---------- Forwarded message ----------
From: **Bobby Smith** <bobby@ihcsnation.com>
Date: Wed, Sep 9, 2015 at 9:04 PM
Subject: Fwd: Research
To: Ritu Bhambhani <rt.bhambhani@gmail.com>
Cc: Brian Carrico <Brian@i-h-s.com>

Ritu, Attached are a few of the current and ongoing studies for the NSS device. I will send you under separate cover an additional email with a few training videos. I have cc'd Brian Carrico one of the owners and pioneers of this technology. I have informed him as to the tremendous opportunities within your practice. He is going to forward you some additional studies as well.

Sincerely,

Robert A Smith

Innovative Health Care Solutions Inc.

VP of Sales and Marketing

C 410-977-8777

F 410-561-4772

[redacted]

---------- Forwarded message ----------
From: **Bobby Smith** <bobby@ihcsnation.com>
Date: Wed, Sep 9, 2015 at 9:07 PM
Subject: Training/ patient selection
To: Ritu Bhambhani <rt.bhambhani@gmail.com>

The following short videos will familiarize you with the placement and process of the NSS device; our trainer will be on site to walk you through it:

EAD Training Video: https://vimeo.com/user17291718/review/110270072/b986ff4479
Dorsal Video: https://vimeo.com/user17291718/review/125929652/e29b5bd30e

The following are a partial list of applications for the device. I look forward to working with you to integrate this exciting new technology into your practice.

•Chronic Pain
•Back Pain
•Cancer Pain

•Arthritis & Joint Pain
•Neuropathies
•Craniofacial Pain
•Patients with opioid contraindications, such as addictions or allergies
•Acute Pain
•Migraines
•Wound Care
•Vascular Insufficiency
•Fibromyalgia
•Post Surgical Pain Management

Robert Smith
Innovative Health Care Solutions, LLC.
VP of Sales and Marketing
P 410-977-8777
F 410-561-4772

# Exhibit 10

**Acclivity Medical**

456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

| BILL TO | SHIP TO | |
|---|---|---|
| Dr. Ritu Bhambhani<br>Box Hill Surgery Center<br>603 Revolution St.<br>#102<br>Havr DeGrace, MD 21078 | Dr. Ritu Bhambhani<br>Box Hill Surgery Center<br>100 Walter Ward Blvd.<br>Suite 300<br>Abingdon, MD 21009 | INVOICE # 1356<br>DATE 09/14/2015<br>DUE DATE 12/13/2015<br>TERMS Net 90 from invoice date |

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 09/14/2015 | UPS 2 Day | 1Z45W87Y024202 9020 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | 900.00 | 18,000.00 |

BALANCE DUE **$18,000.00**

**Acclivity Medical**

456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

| BILL TO | SHIP TO | |
|---|---|---|
| Dr. Ritu Bhambhani<br>Box Hill Surgery Center<br>603 Revolution St.<br>#102<br>Havr DeGrace, MD 21078 | Dr. Ritu Bhambhani<br>Box Hill Surgery Center<br>100 Walter Ward Blvd.<br>Suite 300<br>Abingdon, MD 21009 | INVOICE # 1377<br>DATE 10/06/2015<br>DUE DATE 01/04/2016<br>TERMS Net 90 from invoice date |

| SHIP DATE | SHIP VIA | TRACKING NO. | CUSTOMER P.O. # |
|---|---|---|---|
| 10/06/2015 | UPS Ground | 1Z45W87Y034142 4932 | Fax |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | 900.00 | 18,000.00 |

BALANCE DUE **$18,000.00**

**Acclivity Medical**

456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

| BILL TO | SHIP TO | |
|---|---|---|
| Dr. Ritu Bhambhani<br>Box Hill Surgery Center<br>603 Revolution St.<br>#102<br>Havr DeGrace, MD 21078 | Dr. Ritu Bhambhani<br>Box Hill Surgery Center<br>100 Walter Ward Blvd.<br>Suite 300<br>Abingdon, MD 21009 | INVOICE # 1387<br>DATE 10/19/2015<br>DUE DATE 10/19/2015<br>TERMS Already Paid |

| SHIP DATE | SHIP VIA | TRACKING NO. | CUSTOMER P.O. # |
|---|---|---|---|
| 10/19/2015 | UPS Overnight | 1Z45W87Y014278 1361 | Kristina Vellines |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | 600.00 | 12,000.00 |

| | |
|---|---|
| SUBTOTAL | 12,000.00 |
| SHIPPING | 86.43 |
| TOTAL | 12,086.43 |
| PAYMENT | 12,086.43 |
| BALANCE DUE | $0.00 |

**Acclivity Medical**

456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

BILL TO
Dr. Ritu Bhambhani
Box Hill Surgery Center
603 Revolution St.
#102
Havr DeGrace, MD 21078

SHIP TO
Dr. Ritu Bhambhani
Box Hill Surgery Center
100 Walter Ward Blvd.
Suite 300
Abingdon, MD 21009

INVOICE # 1394
DATE 10/26/2015
DUE DATE 10/26/2015
TERMS Already Paid

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 10/28/2015 | UPS Ground | 1Z45W87Y034113 0526 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD** NeuroStim System-EAD | 20 | 600.00 | 12,000.00 |

PAYMENT 12,000.00
BALANCE DUE $0.00

**Acclivity Medical**

456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

BILL TO
Dr. Ritu Bhambhani
Box Hill Surgery Center
603 Revolution St.
#102
Havr DeGrace, MD 21078

SHIP TO
Dr. Ritu Bhambhani
Box Hill Surgery Center
100 Walter Ward Blvd.
Suite 300
Abingdon, MD 21009

INVOICE # 1403
DATE 11/05/2015
DUE DATE 11/05/2015
TERMS Pay in advance

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 11/05/2015 | UPS Ground | 1Z45W87Y034040 3699 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD** NeuroStim System-EAD | 20 | 600.00 | 12,000.00 |

PAYMENT 12,000.00
BALANCE DUE **$0.00**

**Acclivity Medical**

456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

AcclivityMedical

# INVOICE

BILL TO
Dr. Ritu Bhambhani
Box Hill Surgery Center
603 Revolution St.
#102
Havr DeGrace, MD 21078

SHIP TO
Dr. Ritu Bhambhani
Box Hill Surgery Center
100 Walter Ward Blvd.
Suite 300
Abingdon, MD 21009

INVOICE # 1410
DATE 11/18/2015
DUE DATE 11/18/2015
TERMS Pay in advance

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 11/17/2015 | UPS Ground | 1Z45W87Y034092 2584 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD** NeuroStim System-EAD | 20 | 600.00 | 12,000.00 |

| | |
|---|---|
| PAYMENT | 12,000.00 |
| BALANCE DUE | $0.00 |

**Acclivity Medical**

456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

| BILL TO | SHIP TO | |
|---|---|---|
| Dr. Ritu Bhambhani<br>Box Hill Surgery Center<br>603 Revolution St.<br>#102<br>Havr DeGrace, MD 21078 | Dr. Ritu Bhambhani<br>Box Hill Surgery Center<br>100 Walter Ward Blvd.<br>Suite 300<br>Abingdon, MD 21009 | INVOICE # 1417<br>DATE 11/24/2015<br>DUE DATE 11/24/2015<br>TERMS Pay in advance |

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 11/27/2015 | UPS Ground | 1Z440X740337796<br>429 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | 600.00 | 12,000.00 |

| | |
|---|---|
| PAYMENT | 12,000.00 |
| BALANCE DUE | $0.00 |

**Acclivity Medical**

456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

BILL TO
Dr. Ritu Bhambhani
Box Hill Surgery Center
603 Revolution St.
#102
Havr DeGrace, MD 21078

SHIP TO
Dr. Ritu Bhambhani
Box Hill Surgery Center
100 Walter Ward Blvd.
Suite 300
Abingdon, MD 21009

INVOICE # 1427
DATE 12/07/2015
DUE DATE 12/07/2015
TERMS Pay in advance

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 12/08/2015 | UPS Ground | 1Z45W87Y034166 7180 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | 600.00 | 12,000.00 |

| | |
|---|---|
| PAYMENT | 12,000.00 |
| BALANCE DUE | $0.00 |

**Acclivity Medical**

456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

BILL TO
Dr. Ritu Bhambhani
Box Hill Surgery Center
603 Revolution St.
#102
Havr DeGrace, MD 21078

SHIP TO
Dr. Ritu Bhambhani
Box Hill Surgery Center
100 Walter Ward Blvd.
Suite 300
Abingdon, MD 21009

INVOICE # 1442
DATE 12/29/2015
DUE DATE 12/29/2015
TERMS Pay in advance

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 12/30/2015 | UPS Ground | 1Z45W87Y034143 9962 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | 600.00 | 12,000.00 |

PAYMENT 12,000.00
BALANCE DUE $0.00

**Acclivity Medical**

456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

**BILL TO**
Dr. Ritu Bhambhani
Box Hill Surgery Center
603 Revolution St.
#102
Havr DeGrace, MD 21078

**SHIP TO**
Dr. Ritu Bhambhani
Box Hill Surgery Center
100 Walter Ward Blvd.
Suite 300
Abingdon, MD 21009

**INVOICE #** 1465
**DATE** 02/05/2016
**DUE DATE** 02/05/2016
**TERMS** Pay in advance

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 02/05/2016 | UPS Ground | 1Z45W87Y0341549183 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | 600.00 | 12,000.00 |

| | |
|---|---|
| SUBTOTAL | 12,000.00 |
| SHIPPING | 24.95 |
| TOTAL | 12,024.95 |
| PAYMENT | 12,024.95 |
| BALANCE DUE | **$0.00** |

**Acclivity Medical**
456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

**BILL TO**
Dr. Ritu Bhambhani
Box Hill Surgery Center
603 Revolution St.
#102
Havr DeGrace, MD 21078

**SHIP TO**
Dr. Ritu Bhambhani
Box Hill Surgery Center
100 Walter Ward Blvd.
Suite 300
Abingdon, MD 21009

**INVOICE #** 1475
**DATE** 02/18/2016
**DUE DATE** 02/18/2016
**TERMS** Pay in advance

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 02/18/2016 | Fedex Ground | 775681565660 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | 600.00 | 12,000.00 |

| | |
|---|---|
| SUBTOTAL | 12,000.00 |
| SHIPPING | 24.95 |
| TOTAL | 12,024.95 |
| PAYMENT | 12,024.95 |
| BALANCE DUE | **$0.00** |

**Acclivity Medical**
456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

**BILL TO**
Dr. Ritu Bhambhani
Box Hill Surgery Center
603 Revolution St.
#102
Havr DeGrace, MD 21078

**SHIP TO**
Dr. Ritu Bhambhani
Box Hill Surgery Center
100 Walter Ward Blvd.
Suite 300
Abingdon, MD 21009

**INVOICE #** 1489
**DATE** 03/09/2016
**DUE DATE** 03/09/2016
**TERMS** Pay in advance

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 03/09/2016 | Fedex Ground | 775835424506 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | 600.00 | 12,000.00 |

| | |
|---|---|
| SUBTOTAL | 12,000.00 |
| SHIPPING | 24.95 |
| TOTAL | 12,024.95 |
| PAYMENT | 12,024.95 |
| BALANCE DUE | **$0.00** |

**Acclivity Medical**
456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

**BILL TO**
Dr. Ritu Bhambhani
Box Hill Surgery Center
603 Revolution St.
#102
Havr DeGrace, MD 21078

**SHIP TO**
Dr. Ritu Bhambhani
Box Hill Surgery Center
100 Walter Ward Blvd.
Suite 300
Abingdon, MD 21009

**INVOICE #** 1500
**DATE** 03/28/2016
**DUE DATE** 03/28/2016
**TERMS** Pay in advance

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 03/29/2016 | UPS Ground | 1Z45W87Y0342916793 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1014 - NSS/EAD 411 Array**<br>NeuroStim System- EAD 411 Array | 20 | 600.00 | 12,000.00 |

| | |
|---|---|
| SUBTOTAL | 12,000.00 |
| SHIPPING | 24.95 |
| TOTAL | 12,024.95 |
| PAYMENT | 12,024.95 |
| BALANCE DUE | **$0.00** |

**Acclivity Medical**
456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

| BILL TO | SHIP TO | | |
|---|---|---|---|
| Dr. Ritu Bhambhani | Dr. Ritu Bhambhani | **INVOICE #** | 1513 |
| Box Hill Surgery Center | Box Hill Surgery Center | **DATE** | 04/11/2016 |
| 603 Revolution St. | 100 Walter Ward Blvd. | **DUE DATE** | 04/11/2016 |
| #102 | Suite 300 | **TERMS** | Pay in advance |
| Havr DeGrace, MD 21078 | Abingdon, MD 21009 | | |

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 04/11/2016 | UPS Ground | 1Z45W87Y0340387832 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1014 - NSS/EAD 411 Array**<br>NeuroStim System- EAD 411 Array | 60 | 600.00 | 36,000.00 |

| | |
|---|---|
| SUBTOTAL | 36,000.00 |
| SHIPPING | 35.00 |
| TOTAL | 36,035.00 |
| PAYMENT | 36,035.00 |
| BALANCE DUE | **$0.00** |

**Acclivity Medical**
456 Glengarry Way.
Covington, KY 41011
(513)415-9977
orders@acclivitymedical.com
www.acclivitymedical.com

# INVOICE

| BILL TO | SHIP TO | |
|---|---|---|
| Dr. Ritu Bhambhani | Dr. Ritu Bhambhani | **INVOICE #** 1546 |
| Box Hill Surgery Center | Box Hill Surgery Center | **DATE** 06/22/2016 |
| 603 Revolution St. | 100 Walter Ward Blvd. | **DUE DATE** 06/22/2016 |
| #102 | Suite 300 | **TERMS** Pay in advance |
| Havr DeGrace, MD 21078 | Abingdon, MD 21009 | |

| SHIP DATE | SHIP VIA | TRACKING NO. |
|---|---|---|
| 06/22/2016 | UPS Ground | 1Z45W87Y0342057668 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **01-1014 - NSS/EAD 411 Array**<br>NeuroStim System- EAD 411 Array | 80 | 600.00 | 48,000.00 |

| | |
|---|---|
| SUBTOTAL | 48,000.00 |
| SHIPPING | 35.00 |
| TOTAL | 48,035.00 |
| PAYMENT | 48,035.00 |
| BALANCE DUE | **$0.00** |

# Exhibit 11

[redacted]

---------- Forwarded message ----------
From: **Kristen Brannon** <kristen@ihcsnation.com>
Date: Mon, Sep 28, 2015 at 4:12 PM
Subject: I have clarification
To: Ritu Bhambhani <rt.bhambhani@gmail.com>

It's no longer necessary to add modifier 58 to procedure code 64555 in an ASC. However continue to document that its related to a staged procedure. Rebill both denials without modifier.

Kristen Brannon

Innovative Healthcare Solutions

VP Of Operations

502-561-0963 Office

502-303-0919 Cell

1-800-884-9650 efax

[redacted]

---------- Forwarded message ----------
From: **Kristen Brannon** <kristen@ihcsnation.com>
Date: Tue, Sep 29, 2015 at 3:34 PM
Subject: Billing in an ASC
To: Ritu Bhambhani <rt.bhambhani@gmail.com>
Cc: Bobby Smith <bobby@ihcsnation.com>

Medicare is no longer requiring that you pin a modifier with the code 64555. Bill all claims with no modifier except when you are billing your professional fee. You can rebill the claims that were denied because when a claim is rejected it's as if it has never been billed. Also, when a claim is rejected with Medicare you cannot correct over the phone only denied claims can be corrected over the phone this claim was rejected..

Kristen Brannon

Innovative Healthcare Solutions

VP Of Operations

502-561-0963 Office

502-303-0919 Cell

1-800-884-9650 efax

# Exhibit 12

[redacted]

---------- Forwarded message ----------
From: **Kristen Brannon** <kristen@ihcsnation.com>
Date: Tue, Dec 8, 2015 at 3:55 PM
Subject: RE:
To: Ritu Bhambhani <rt.bhambhani@gmail.com>

64555 & L8680 X 3

---

**From:** Ritu Bhambhani [mailto:rt.bhambhani@gmail.com]
**Sent:** Tuesday, December 08, 2015 3:47 PM
**To:** Kristen Brannon
**Subject:**

Good Afternoon,

I'm trying to follow up on Tammy Long's authorization for the PNS. What codes are used for workers compensation.

Thank you,

Kristina

**

100 Walter Ward Boulevard
Suite 300
Abingdon, MD 21009

Office: (410) 569-3333
Fax: (877) 595-7180

Note: *This email and its attachments may contain privileged and confidential information and/or protected health information (PHI) intended solely for the use of _______________ and the recipient(s) named above. If you are not the recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any review, dissemination, distribution, printing or copying of this email message and/or any attachments is strictly prohibited. If you have received this transmission in error, please notify the sender immediately at Ph: 1-410-569-3333 and permanently delete this email and any attachments.*

# Exhibit 13

[redacted]

---------- Forwarded message ----------
From: **Brian Carrico** <Brian@i-h-s.com>
Date: Thu, Sep 1, 2016 at 1:50 PM
Subject: NSS Devices
To: rt.bhambhani@gmail.com
Cc: Bobby Smith <bobby@ihcsnation.com>

Hi Dr Bhambhani

I hope this finds you well. I have been told of the CMS request for documents. IHS has not and does not get involved in billing and coding in any way but I do have an attorney I can refer you to who specializes in dealing with these situations.

Bobby also let me know you have devices that you want to return. I have good and bad news. The bad news is that we have a strict policy related to the FDA which does not allow us to return devices. The good news is that you see a lot of commercial patients which require a pre auth which protects you. I am guessing you, like countless other physicians, have not done these because it requires significant time to do pre authorize, etc. IHS has been referring physicians like yourself to Alliance Med in Scottsdale, AZ for a while and they do a

tremendous job of pre authorizing and billing for the NSS which will allow you to have 0 headaches, help patients, be very profitable, and be protected.

I would strongly urge you to let me connect you with them so you can continue to help people in a more controlled and protected environment.

I look forward to hearing back from you today.

Thank You

Brian Carrico
VP of Sales
Innovative Health Solutions
317-409-7617
Brian@I-H-S.com
www.I-H-S.com

# Exhibit 14

**Ginny Goldbach**

---

| | |
|---|---|
| **From:** | Matt Miller <matthewmiller1025@gmail.com> |
| **Sent:** | Tuesday, September 22, 2015 10:24 AM |
| **To:** | Ginny Goldbach |
| **Subject:** | Re: NSS Pre-Cert sample |
| **Attachments:** | NSS - ASC Billing Overview.docx |

Guidelines that also could be helpful to understand NSS for post-op pain:

On Sep 22, 2015, at 10:05 AM, Matt Miller <matthewmiller1025@gmail.com> wrote:

> Sample of pre-cert letter used in the past. Bottom paragraph would need to be changed to reflect diagnosis and treatment.
>
> <precert v.2therapeutic ASC.doc>
>
> Matt Miller - Distributor/Principal
>
> <PastedGraphic-7.tiff>
>
> 412-401-8565
> matthewmiller1025@gmail.com
>
> On Sep 22, 2015, at 9:48 AM, Matt Miller <matthewmiller1025@gmail.com> wrote:
>
> > Some EOB'S for NSS use. Some seem to have code modifiers or placement sites added as well. Hope this helps.
> >
> > <unknown.jpeg>
> > <unknown.jpeg>
> > <unknown.jpeg>
> > <unknown.jpeg>
> > <unknown.jpeg>
> >
> > Matt Miller - Distributor/Principal

<PastedGraphic-7.tiff>
412-401-8565
matthewmiller1025@gmail.com

On Sep 22, 2015, at 9:02 AM, Matt Miller <matthewmiller1025@gmail.com> wrote:

<EAD Brochure.pdf>
<NSS Protocols Rev-001.pdf>
<NSS - Science and Overview.docx>

Brochure, Protocols and Science/Overview of how NSS works.

Aligning PENS codes and accessing peripheral nerve pathways.

Ginny, please contact me with any questions or to review.

MM

Matt Miller - Distributor/Principal

<PastedGraphic-7.tiff>

412-401-8565
matthewmiller1025@gmail.com

On Sep 22, 2015, at 8:56 AM, Sudhir Rao <srao@PAINANDSPINESPECIALISTS.COM> wrote:

Matt,

Please email Ginny the brochure Info for NSS so she can review and look into Highmark policy. Thx

Sudhir

Sent from my iPhone

ASC BILLING POST OP PAIN MANAGEMENT

1) Cannot be used for every case. There are no guidelines, however, if used for 70% or more cases, the patients insurance will consider it routine care, which is not separately reimbursable. The physician must determine which patients will benefit the most from NSS as pain management device and utilize accordingly.

2) The question to ask is which patients/types of cases have the most post operative pain?

3) Be aware of the patients' financial responsibility. If "in-network' the patients deductible will obviously be less. "Out-of-network" patients' responsibility will be greater. Like other treatments, the provider (ASC or Physician) must show an effort to collect the deductible/co-pay regardless of whether provider is in or out of network.

4) The device can be placed pre-operatively, outside of OR suite. A precedent has been set by Medicare that a device can be placed pre-op to address post-operative pain. If placed intra-operatively there will *always* be a multiple-procedure discount taken. If applied after surgery it is important to place in PACU or holding area, not in the surgical suite. (All Payors). Even when placed in PACU some payers will *sometimes* take a multiple procedure discount (usually 25%).

   Additional Suggestions:

   Documentation may be requested by payors. It is important that physician have supporting info that shows why the device is being used. One good additional support for medical necessity is if the patient has a documented history of substance abuse or allergies to narcotics that require an alternate treatment for post-op pain management.

   The ASC will receive the bulk of the reimbursement (device reimbursement is rolled into the procedure reimbursement). However, physician can also bill for 64555 with a modifier "PC" which pays just under $200 in most cases.

All jurisdictions will pay 80% of allowable under Medicare guidelines; patient or their supplement responsible for the remaining 20%.

# Exhibit 15

# NSS - NeuroStim System / Military Field Stimulator

The NSS/MFS is a physician applied, ambulatory, neurological device which consists of a battery powered externally affixed generator, 4 wire leads attached to 3 electrode/ needle arrays and one single point needle. The arrays are designed to produce a field effect similar to surgically implanted peripheral neurostimulators. The modulation of the device ranges from 1~10Hz during pulsations.
The electrode/needle arrays are implanted according to the individual's arterial and cranial nerve anatomy. The exact location of the implantation is determined by both knowledge of auricular neuro- anatomy and visualization of the neurovascular bundles by a patent pending transillumination technique (Christopher R. Brown DDS, MPS). The electrode / needle array must be percutaneously implanted to within .5-1mm of the neurovascular bundles to allow for proper energy transfer according to Coulomb's and Ohm's laws. The implantation locations are therefore determined by a properly trained physician based strictly on neurovascular anatomy and will vary from person to person.
Once the arrays are implanted the patient is observed for clinical signs, which includes auricular vasodilation, warming of the tissue, lack of site implantation pain, bleeding, and symptom reduction similar to observation guidelines for surgically implanted peripheral neuro-stimulators. **The generator is designed to turn on and off every two hours and have a total run time of 120 hrs. The NSS is a disposable, single use device.** (see Table A for comparisons)

**Clinical Application of the NSS Neurostimulator for the treatment of Acute and Chronic Pain**
The NSS peripheral nerve field stimulator is the only ambulatory, physician applied, minimally invasive application of electrical neural stimulation implanted directly into the neurovascular bundles of the external ear verified by transillumination. A generator located behind the affected ear, produces electrical stimulation impulses, which are transferred via an electrode/ needle array to branches of cranial and/or occipital nerves and sympathetic fibers of the arterial branches. The NSS neurostimulator allows for continuous, intermittent (2 hrs. on and 2 hrs. off) neurovascular stimulation for 120 hours while allowing the patient to remain ambulatory during the treatment of both acute and chronic pain**.**
Electrode implantation into the skin of the ear allows for direct access to branches of Cranial Nerves V, VII, IX, X as well as branches of the occipital nerves.**(16)** Direct access to the arterial branches of the head and neck are accessible **(17)** and reduction of sympathetic stimulation results in an increase of vascular flow rate, reduction of vascular resistance, and

increase of perfusion **(18,19 )** The arterial branches of the superficial temporal artery ( STA ) and the posterior auricular artery ( PAA ) form a rich interconnecting complex network the terminal branches of which anastomose through out the ear.
(Table B)
Since the external auricle is rich with branches of cranial nerves V,VII, IX, and X , branches of the lesser and greater occipital nerves, the upper cervical plexus and arterial branches (STA, PAA ) that directly lead into the head and neck, NSS neurostimulator provides direct stimulation to these entities and may directly affect the anatomical areas through which they traverse. **(20, 21)** Sensory innervation found in the external auditory meatus can reflect or refer pain from the ear, upper and lower digestive tracts, TMJ's, teeth, salivary glands, and / or the thyroid gland. **(22)** The trigeminal nerve also accompanies the superficial temporal artery and vein which directly feeds into the TMJ's. **(23)** There is not an anatomical area which is solely one type of cranial nerve or arterial branches at any given location in an area of the external ear. **(24)** Innervation of the external ear is diverse and may vary from individual to individual. **(25)** Each "zone "of the external ear is innervated by two different cranial branches of the lesser and greater occipital nerves and upper cervical plexus, and arterial branches which lead to the head and neck. There is no part of the ear however which contains three different cranial nerve branches. **(26)**
Many of the pathways intersect and interact in the trigeminal complex. Anti-nociceptive activity in the trigeminal complex involves inhibitory control of afferent nociception, serotonin fluctuation and concurrent vagal stimulation. The trigeminal complex is an essential component in the development of central sensitization and peripheral sensitization probably through sympatho-afferent coupling, a key to sympathetic pain maintenance **(27)** The mandibular division of Cranial nerve V (trigeminal) is also implicated with mediation of migraine headaches. Direct implantation into branches of the trigeminal nerves can be found in the lobe, inner concha and anterior to the tragus of the ear.
Branches of the vagal nerve are found in almost all aspects of the external ear. There are some regions with a greater concentration than others but all are easily accessed with the leads of the NSS neurostimulator.
The mechanism of induced analgesia is speculated to be as a result of neuro-modulation (inhibition of small C fibers) **(28)** and an increase of endogenous morphine - like substances within the central nervous system (CNS) **(29)** The NSS neurostimulator achieves a rapid onset of analgesia and is a safe, additive, non-addictive, non-pharmaceutical approach to pain management in a clinical setting.
The NSS neurostimulator may also alleviate other symptoms commonly associated with CSS (central sensitization syndrome) which involves

"hyper-excitability" of the CNS resulting in headaches, body pain, confusion, sleep disturbances, and chronic fatigue **(30)**. Direct access by the NSS neurostimulator into the spinal cord via the lesser and greater occipital nerves, cranial nerves, and sympathetic reduction along with endogenous endorphin production, may account for the reduction of these symptoms. Electro-analgesia is thought also to be mediated by three types of CNS opioid receptor sites: mu, sigma, and kappa **(31)** producing a more regionalized analgesia effect indicated by the use of the NSS neurostimulator.

The decrease in the use of oral analgesics including opioids has been noted as well with the NSS neurostimulator. All symptom reduction and behavioral changes noted in the APS Bulletin and University of Birmingham review **(32, 33)** correlate well with those found with the NSS peripheral neurostimulator.

Other percutaneous electrical neural stimulation methods stimulate in only 15, 30-45 minute applications applied twice per week over the course of several weeks. An increase in analgesia was noted by the longer duration of various applications **(34)** All noted percutaneous electrical neural stimulation techniques are designed to follow dermatomes **(35)** while the NSS neurostimulator directly implants into the cranial nerves, blood vessels, and the soft tissue surrounding them. Auricular neurovascular bundles/ arterial branches are initially visualized by transillumination utilizing an Auricular Transilluminator (IHS, Versailles, IN) via a specific technique.

Utilization of both techniques is essential to help verify the most optimal electrode implantation into the underlying neurovascular bundles. The positive results achieved by the stimulation is dependent on the precise placement of the electrode into the neurovascular bundles. The precise neurovascular application, electrode arrays, and clinical technique, including transillumination clearly separates the use of the NSS. Placing the patent pending electrode array directly into the neurovascular bundles is a technical advancement of previously published methodology, experimental approach, and rationale.

The NSS neurostimulation system allows for direct, physician applied, ambulatory, continual treatment. The use of electrical stimulation has reduced the need for analgesic drugs such as NSAIDS, and central acting Opioids. **(36)**This may also help alleviate the dependencies, addictions, and other common complications found with opioid use such as immunosuppression, constipation, and hyperalgesia. **(37, 38, 39, 40)**

Electrical neural stimulation such as the NSS neurostimulator can be considered as a useful, non-pharmaceutical adjunct or replacement for opioid and non-opioid analgesics and should be considered as a viable non narcotic treatment option for chronic pain with sleep disturbance co-

morbidity. **(41)**
The APS bulletin (vol 9, Number 2, March/April 1999 White, MD PhD, Phillips, et al) compared findings from a group of publications **(42)** as well as did The University of Birmingham, Alabama. **(43)** and collectively noted the following results consistently with peripheral neural stimulation

**Summary:**

The use of percutaneous electrical neural stimulation is a non-narcotic alternative to acute and chronic pain. The NSS neurostimulator, is the only physician applied ambulatory, continuous, home based therapy, which is designed to be directly implanted into auricular neural vascular bundles ascertained by neurovascular anatomy verified by auricular transillumination. Preliminary data indicates the use of the NSS neurostimulator also substantially reduces the need for analgesics including NSAID's and central acting opioids potentially reducing the co-morbidities of unwanted significant side effects often associated with analgesic pain control.

The use of percutaneous electrical neural stimulation has been shown as a viable alternative to escalating opioid and non-opioid dosages even in the management of cancer pain. **(44, 45, 46, 47)**

The NSS peripheral nerve field is an easily applied, cost effective, safe, non pharmaceutical neurological based treatment alternative which is anticipated to reduce ancillary health care costs associated with acute and chronic pain, improve sleep, and reduce opioid use. Because of the length of application of the NSS neurostimulator both actively (two hours) and duration (five days), a longer residual effect is noted as a result of potential neuroplastic changes and endogenous endorphin production indicated beyond that of other peripheral electrical neural stimulation techniques.

The use of the NSS nerve field stimulator as an adjunct with other means of treatment such as oral medications, injectables, surgical procedures, physical and manipulative therapy, exercise, and nutrition, will integrate well into the established medical model. Use in out- patient and hospital post-operative situations holds great promise for reduced healing time, pain control, and reduction of opioid consumption.

# Exhibit 16

NSS
The Neuro-Stim System

Now Featuring:

EAD
ELECTRO AURICULAR DEVICE




IHS™
Innovative Health Solutions


**www.I-H-S.com**

**info@i-h-s.com**

**(812) 609-4183**


NSS
The Neuro-Stim System

***Restrictions of NSS use include:***

- ***Implantable electrical devices including cardiac pace makers and brain shunts***
- ***History of seizures***
- ***Bleeding disorders***
- ***Chronic low blood pressure***
- ***Medications design to stimulate the sympathetic nervous system***
- ***Psoriasis Vulgaris***
- ***Localized skin infections***

IHS™
Innovative Health Solutions

NSS
The Neuro-Stim System

"The Non Narcotic Alternative For Acute and Chronic Pain"



The NSS™ (Neuro-Stim System™) is a family of products, methods, training and service conveniently packaged to provide care to a target population of acute and chronic pain patients.



The EAD™ (Electro Auricular Device™) is an auricular peripheral nerve field stimulator appliance contained in the NSS kit. This device is designed to provide you, the clinician, with another tool in your toolbox to address the many problems you face in your day-to-day practice. The EAD™ is an FDA cleared device. Specific instructions and information concerning this device can be found in the IFU (Indications for Use) contained inside the packaging of every EAD™ device.

Clinical and anecdotal evidence in the application of this device, and previously distributed IHS devices, have been overwhelmingly positive! IHS is dedicated to working with the Henry Jackson Foundation and the DVCIPM (Department of Veterans Complementary and Integrative Pain Medicine) sponsoring studies. One such present study, is entitled; Double-Blind, Randomized, Sham Controlled Study on the Effects of Neuro-Stim System on Pain, Sleep and Opioid Use in Wounded Soldiers.

IHS is also involved with several university-based studies and is dedicated to providing solid scientific evidence to fully verify clinical and anecdotal data. IHS is a proud sponsor of the Wounded Warriors Project.



***EAD™ Device (Actual Size)***

The NSS™ allows clinicians the option of considering a non-narcotic alternative for patients. Each IHS representative is carefully trained and must pass a certification exam including written, visual, and hands-on training. Each clinician providing the NSS™ must also successfully complete an IHS certification program.

# Exhibit 17

## Ginny Goldbach

**From:** Matt Miller <matthewmiller1025@gmail.com>
**Sent:** Tuesday, September 22, 2015 10:09 AM
**To:** Ginny Goldbach
**Subject:** Fwd: NSS EOB's
**Attachments:** 2015 Medicare ASC.pdf; UHC 7-2014.pdf

Let me know if this is better.

Begin forwarded message:

**From:** Ryan Kuhlman <ryankuhlman@acclivitymedical.com>
**Subject: EOB's**
**Date:** September 20, 2015 at 3:24:14 PM EDT
**To:** Matthew Miller <matthewmiller1025@gmail.com>

See attached.

Ryan Kuhlman
Acclivity Medical
"Offering non-narcotic solutions for pain management"
Phone: 513-415-9977
Fax: 513-672-2422
www.acclivitymedical.com

# *Explanation of Benefits*

MEDICARE PART B
532 RIVERSIDE AVE.
JACKSONVILLE, FL 32231

[redacted]
NAPLES, FL 341093884

Check/EFT #: 895024426
Check Date: 02/05/2015
Check Amt: 6415.37
NPI Provider#: [redacted]

Patient: [redacted]
HIN: [redacted]
Patient Control Number: [redacted]
ICN#: [redacted]
Status: Primary

| Dates of Service | Units | CPT4/Mods | Billed | CoIns | Allwd | Deduct | Paid |
|---|---|---|---|---|---|---|---|
| 01/19/2015-01/19/2015 | 1.00 | 64555 SG GA | 6840.14 | 719.64 | 3598.19 | 0 | 2820.98 |
| 01/19/2015-01/19/2015 | 1 | G8907 | 0.00 | 0 | 0 | 0 | 0 |
| 01/19/2015-01/19/2015 | 1 | G8918 | 0.00 | 0 | 0 | 0 | 0 |
| *Totals:* | | | *6840.14* | *719.64* | *3598.19* | *0* | *2820.98* |

Claim Level Adjudication Codes: MA01;
Remark Codes: N620
Reason Codes: CO45-3241.95; CO253-57.57; PR2-719.64

HIPAAX12 Code List Summary:
CO253 - On-The-Fly ERA
CO45 - Charges exceed your contracted/ legis...
PR2 - Coinsurance Amount

Other

ELECTRONIC REMITTANCE ADVICE

[illegible]/2014

Banner Health

LSI
86100
AH

TAXID:
NPI:

CHECK #:
CHECK AMT:

NAME:
ACCOUNT #:
ICN #:
SVC DATE:
INSRD ID:
CLM STATUS:
REMARK:
NETWORK ID:
REND PROV:
TOB:

TOTAL CHARGE:
TOTAL PAYMENT:
TOTAL CONTRACTUAL:
TOTAL DEDUCTIBLE AMT:
TOTAL COINSURANCE AMT:
TOTAL CO-PAYMENT AMT:
ADJ AMT:
ADJ CODE:
INTEREST:

| S | FROM | THRU | PROC | MD | REV | UNI | CHARGE AMT | ALLOWED | PAYMENT | ADJ AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| CLAIM TOTALS | | | 64555-LT | | | 1 | [illegible] | $0.00 | [illegible] | [illegible] |



RAO000029

LS80
86100
AG

Return Service Requested

4636 0.3820 FP 0.460 3-DIGIT 752

30

For Customer Service Contact Us At:
Phoenix Metro Area - (480)684-7070
All Other Areas - (800)827-2464

Date Paid:
Check # Issued:
Check Amount:

Internal Use Only:

Patient ID#: Claim Reference #: Provider Name/ #:
Patient Name: Patient Acct#: Net-Prod-Carr-Plan:

| Date(s) Service | Procedure/Service | Srvc. Code | Billed Amount | Adjust. | Allowed Amount | Copay | Deduct. | Co-Ins. | Net Payments |
|---|---|---|---|---|---|---|---|---|---|
| 04/30/14 | MED/SURGICAL SUPP | 0274 L8680 | 5,514.00 | 3,087.84 | 2,426.16 | 0.00 | 0.00 | 0.00 | 2,426.16 |
| 04/30/14 | AMBULATORY SURGI | 04333-79LT | 4,828.00 | 2,703.68 | 2,124.32 | 0.00 | 0.00 | 0.00 | 2,124.32 |
| | Claim Sub Totals | | 10,342.00 | 5,791.52 | 4,550.48 | 0.00 | 0.00 | 0.00 | 4,550.48 |

**Payment Summary**

| Billed Amount | Adjust. | Allowed Amount | Copay | Deduct. | Co-Ins. | Total Net Payment |
|---|---|---|---|---|---|---|
| 10,342.00 | 5,791.52 | 4,550.48 | 0.00 | 0.00 | 0.00 | 4,550.48 |

| Adjustment Code: | Adjustment Description/Comments: |
|---|---|
| %MP012 | Repriced thru MultiPlan using MultiPlan Network. |
| %OOPMX | The Out of Pocket Maximum for this plan year has been reached. |
| *** | In compliance with HIPAA EDI requirements, Banner BPA/BPO has the ability to receive claims electronically the X12 transmission standard. Please be advised that Banner's policy is not to pay for set up or transaction fees clearinghouses or other third party EDI providers. If you wish to send your claims electronically, please contact customer service center at 480 827-7070 or 800 827-2464. |



RAO000030

CHCP - Cigna for Health Care Professionals

Cigna – Professional

CSI 96466/TPA

# Claim Details

Claim/Reference Number:

Claim Status: Paid

**Claim Information**

Claim/Reference Number:

Patient Name:

Provider Generated Patient Account Number:

Service Providers:

Date Received:

Date Processed:

HIPAA Status:

**Payment Information**

Patient Responsibility: $0.[illegible]

Claim Amount Paid: $1,[illegible]

**Payment Details**

Checks that indicate a paid amount greater than the paid amount above [illegible] details above indicate a bulk payment made to the provider that includes payments [illegible]

| Payee's Name | Payee's Address | Check Amount | Remittance Tracking Number | Check Status | Check Issued | Check Cleared |
|---|---|---|---|---|---|---|
| | | $1,348.79 | | Paid | 02/20/2014 | 02/26/2014 |

**Procedures**

| Procedure Code | Date of Service | Amount Charged | Allowed Amount | Amount Not Covered | Deductible/Copay Applied | Covered Balance | Plan Coinsurance Paid | Patient Coinsurance | Pa[illegible] Re[illegible] |
|---|---|---|---|---|---|---|---|---|---|
| 64[illegible] | 01/18/2014 | $3,065.40 | $1,348.79 | $1,716.62 | $0.00 | $1,348.79 | 100%= $1,348.79 | 0%= $0.00 | $[illegible] |
| Totals | | $3,065.40 | $1,348.79 | $1,716.62 | $0.00 | $1,348.79 | $1,348.79 | $0.00 | $[illegible] |

**Explanation of Remark Codes**

1101 - $1,716.62 HEALTH CARE PROFESSIONAL: DO NOT BILL THE PATIENT FOR THE [illegible] DISCOUNT THROUGH [illegible] PLEASE CALL 888-2[illegible] INFORMATION

This information reflects our data when the claim was processed. It may not reflect the final patient coinsurance due to other pending claims processing activities.

**Remittance Reports**

Instructions: Reports that are more than 100 pages must be viewed in segments by selecting an option from the page range dropdown.

| Remittance Tracking Number | Tax Identification Number | Payment Date | Deposit Amount | Product Type | Patient Last Name | Patient First Name | Patient Date of Birth | Report Ty[illegible] |
|---|---|---|---|---|---|---|---|---|
| | | | | | – | – | – | Remittance Report |

Cigna.

©2014 Cigna. All rights reserved.



RAO000031

ELECTRONIC REMITTANCE ADVICE

Florida B
Facili-

[illegible]/02/2014

FLORIDA BLUE
4800 DEERWOOD CAMPUS PARKWAY JACKSONVILLE, FL [illegible]

TOTAL CHARGE:
TOTAL PAYMENT:
TOTAL CONTRACTUAL:
TOTAL DEDUCTIBLE AMT:
TOTAL COINSURANCE AMT:
TOTAL CO-PAYMENT AMT:
ADJ AMT:
ADJ CODE:
INTEREST:

CLM STATUS: 1
REMARK:
NETWORK ID:
RNED PROV:
TOB: 131

| S | FROM | THRU | PROC | MD | REV | UNT | CHARGE AMT | ALLOWED | PAYMENT | ADJ AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2014-04-08 | | L8680 | | 0274 | 1 | $5,514.00 | $5,514.00 | $0.00 | $5,514.00 |
| 2 | 2014-04-08 | | [illegible] | LT | 0490 | 1 | $4,828.00 | $4,828.00 | $1,447.46 | $268.14 |
| | | | | | | | | | | $911.48 |
| CLAIM TOTALS | | | | | | | $10,342.00 | $10,342.00 | $1,447.46 | $8,894.52 |

ACCT [illegible]



RAO000032

MEDICARE PART B
MEDICARE REMITTANCE NOTICE --

| Rend Prov | Date | P | | | Mods | Billed | Allowed | Deduct | Coins | StatGroup | RC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Acnt | | ICN | | | ASG: Y | |
| | 12/11/13 | 24 | 1 | 64555 LT | | 3,065.40 | 152.94 | 0.00 | 30.59 | CO-150 | 2,91 |
| | | | | | | | | | | CO-253 | |

PT RESP 30.59 CLAIM TOTALS 3,065.40 152.94 0.00 30.59 2,91
ADJ TO TOTALS: PREV PD INTEREST 0.00 LATE FILING CHARGE 0.00 NET
CLAIM INFORMATION FORWARDED TO: BCBS OF MISSISSIPPI
ESTIMATED AMOUNT DUE: PAYMENT VARIANCE: -- PYMT VAR IND: Cla

| Rend Prov | Serv Date | PT | | | | Bi | Allowed | | Coins | StatGroup | RC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | L | | | | | | I | | | ASG: Y | |
| | 12/26/13 | 24 | 1 | 64555 59LT | | 3,065.40 | 148.80 | 0.00 | 29.76 | CO-172 | 2,91 |
| | | | | | | | | | | CO-253 | |

PT RESP 29.76 CLAIM TOTALS 3,065.40 148.80 0.00 29.76 2,91
ADJ TO TOTALS: PREV PD INTEREST 0.00 LATE FILING CHARGE 0.00 NET
CLAIM INFORMATION FORWARDED TO: REGENCE BLUESHIELD OF UTAH
ESTIMATED AMOUNT DUE: PAYMENT VARIANCE: -- PYMT VAR IND: Cla

| Rend Prov | Serv Date | POS | | | Mods | Billed | Allowed | Deduct | Coins | StatGroup | RC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name: | | 1 | | | Acnt: | | ICN: | | | ASG: Y | |
| 1417125844 | 09/27/13 | 24 | 1 | 64555 59LT | | 3,065.40 | 74.40 | 0.00 | 14.88 | CO-59 | 2,99 |
| | | | | | | | | | | CO-253 | |

PT RESP 14.88 CLAIM TOTALS 3,065.40 74.40 0.00 14.88 2,99
ADJ TO TOTALS: PREV PD INTEREST 0.00 LATE FILING CHARGE 0.00 NET
CLAIM INFORMATION FORWARDED TO: UNITEDHEALTH GROUP
ESTIMATED AMOUNT DUE: PAYMENT VARIANCE: -- PYMT VAR IND: Cla

| Rend Prov | Serv Date | POS | NOS | Proc | Mods | Billed | Allowed | Deduct | Coins | StatGroup | RC |
|---|---|---|---|---|---|---|---|---|---|---|---|

ADJ TO TOTALS: PREV PD LATE FILING CHARGE 0.00 NET
PYMT VAR IND: Cla

| Rend Prov | Serv Date | POS | NOS | Proc | Mods | Billed | Allowed | Deduct | Coins | StatGroup | RC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name: | | 1 | | | | nt: | IC | | | ASG: Y | |
| | | 24 | 1 | 64555 LT | | 3,065.40 | 152.94 | 0.00 | 30.59 | CO-150 | 2,9 |
| | | | | | | | | | | CO-253 | |

PT RESP 30.59 CLAIM TOTALS 3,065.40 152.94 0.00 30.59 2,9
ADJ TO TOTALS: PREV PD INTEREST 0.00 LATE FILING CHARGE 0.00 NET
CLAIM INFORMATION FORWARDED TO:
ESTIMATED AMOUNT DUE: PAYMENT VARIANCE: PYMT VAR IND: Cla

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 2014-06-05 | | 64555 | 79 LT | 0490 | 1 | $3,536.83 | $3,536.83 | $3,536.83 | |
| CLAIM TOTALS | | | | | | | $10,342.00 | $4,550.48 | $4,145.02 | $6,196 |

| S | FROM | THRU | PROC | MD | REV | UNT | CHARGE AMT | ALLOWED | PAYMENT | ADJ AM |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2014-06-05 | | L8680 | | 0274 | 1 | $5,514.00 | $1,013.65 | $608.19 | $5,79<br>$-1,29<br>$40 |
| 2 | 2014-06-06 | | L8680 | | 0274 | 1 | $1,291.17 | $0.00 | $0.00 | $1,29 |

| S | FROM | THRU | PROC | MD | REV | UNT | CHARGE AMT | ALLOWED | PAYMENT | ADJ AM |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2014-06-09 | | L8680 | | 0274 | 1 | $5,514.00 | $5,171.00 | $5,171.00 | $-4,82<br>$5,17 |
| 2 | 2014-06-09 | | L8680 | | 0274 | 1 | $4,828.00 | $0.00 | $0.00 | $4,82 |
| CLAIM TOTALS | | | | | | | $10,342.00 | $5,171.00 | $5,171.00 | $5,17 |

| S | FROM | THRU | PROC | MD | REV | UNT | CHARGE AMT | ALLOWED | PAYMENT | ADJ AM |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2014-06-26 | | L8680 | | 0274 | 1 | $5,514.00 | $2,607.21 | $1,825.05 | $5,71<br>$-2,8<br>$7 |
| 2 | 2014-06-26 | | L8680 | | 0274 | 1 | $2,884.73 | $0.00 | $0.00 | $2,8 |
| 3 | 2014-06-26 | | 64555 | 79 LT | 0490 | 1 | $1,943.27 | $1,943.27 | $1,943.27 | |
| CLAIM TOTALS | | | | | | | $10,342.00 | $4,550.48 | $3,768.32 | $6,5 |

TOB: 431

Prof

UHC

ELECTRONIC REMITTANCE ADVICE

08/04/2016

UNITED HEALTHCARE INSURANCE COMPANY
9900 BREN ROAD, MINNETONKA, MN 55343-0000

NAME:
ACCOUNT #:
ICN #:
SVC DATE:
INSRD ID:
CLM STATUS:
REMARK: [illegible]
NETWORK ID:
REND PROV:
TOB:

TOTAL CHARGE:
TOTAL PAYMENT:
TOTAL CONTRACTUAL:
TOTAL DEDUCTIBLE AMT:
TOTAL COINSURANCE AMT:
TOTAL CO-PAYMENT AMT:
ADJ AMT:
ADJ CODE:
INTEREST:

| # | FROM | THRU | PROC | MD | REV | UNT | CHARGE AMT | ALLOWED | PAYMENT | ADJ AMOUNT | GRP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2016-06-13 | | 64555 | 79 LT | | 1 | $3,219.05 | $1,416.36 | $1,416.38 | $1,802.64 | CO |
| CLAIM TOTALS | | | | | | | $3,219.00 | $1,416.36 | $1,416.38 | $1,802.64 | |

| # | FROM | THRU | PROC | MD | REV | UNT | CHARGE AMT | ALLOWED | PAYMENT | ADJ AMOUNT | GRP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2016-07-19 | | 64555 | 79 LT | | 1 | $3,219.00 | $1,416.36 | $868.21 | $1,802.64 | CO |
| | | | | | | | | | | $219.05 | PR |
| | | | | | | | | | | $548.20 | PR |
| CLAIM TOTALS | | | | | | | $3,219.00 | $1,416.36 | $868.21 | $2,570.79 | |

NAME:
ACCOUNT #:
ICN #:
SVC DATE:
INSRD ID:
CLM STATUS:
REMARK:
NETWORK ID:
REND PROV:
TOB:

TOTAL CHARGE:
TOTAL PAYMENT:
TOTAL CONTRACTUAL:
TOTAL DEDUCTIBLE AMT:
TOTAL COINSURANCE AMT:
TOTAL CO-PAYMENT AMT:
ADJ AMT:
ADJ CODE:
INTEREST:

| # | FROM | THRU | PROC | MD | REV | UNT | CHARGE AMT | ALLOWED | PAYMENT | ADJ AMOUNT | GRP |
|---|---|---|---|---|---|---|---|---|---|---|---|

1

UHC L

CLAIM TOTALS

NAME:
ACCOUNT #:
CCN #:
SVC DATE:
INSRD ID:
CLM STATUS: 1
REMARK: CRPTC:
NETWORK ID:
REND PROV:
TOB:

TOTAL CHARGE:
TOTAL PAYMENT:
TOTAL CONTRACTUAL:
TOTAL DEDUCTIBLE AMT:
TOTAL COINSURANCE AMT:
TOTAL CO-PAYMENT AMT:
ADJ AMT:
ADJ CODE:
INTEREST:

| # | FROM | THRU | PROC | MD | REV | UNT | CHARGE AMT | ALLOWED | PAYMENT | ADJ AMOUNT | GRP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2014-05-27 | | 14955 | 79 LT | | 1 | $3,219.00 | $1,416.36 | $1,416.36 | $1,802.64 | CO |
| CLAIM TOTALS | | | | | | | $3,219.00 | $1,416.36 | $1,416.36 | $1,802.64 | |

ELECTRONIC REMITTANCE ADVICE

08/04/2014

UNITED HEALTHCARE INSURANCE COMPANY
9900 BREN ROAD MINNETONKA, MN, 55343-9664
CHECK #:
CHECK AMT:

TAXID:
NPI:

NAME:
ACCOUNT #:
CCN #:
SVC DATE:
INSRD ID:
CLM STATUS:
REMARK: CRPTCRP
NETWORK ID:
REND PROV:
TOB: 24

TOTAL CHARGE:
TOTAL PAYMENT:
TOTAL CONTRACTUAL:
TOTAL DEDUCTIBLE AMT:
TOTAL COINSURANCE AMT:
TOTAL CO-PAYMENT AMT:
ADJ AMT:
ADJ CODE:
INTEREST:

| # | FROM | THRU | PROC | MD | REV | UNT | CHARGE AMT | ALLOWED | PAYMENT | ADJ AMOUNT | GRP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2014-06-19 | | 64885 | 75 LT | | 1 | $3,219.00 | $1,416.36 | $991.45 | $1,802.64 | CO |
| | | | | | | | | | | $424.91 | PR |
| CLAIM TOTALS | | | | | | | $3,219.00 | $1,416.36 | $991.45 | $2,227.55 | |

| # | FROM | THRU | PROC | MD | REV | UNT | CHARGE AMT | ALLOWED | PAYMENT | ADJ AMOUNT | GRP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2013-12-20 | | 14955 | 59 LT | | 1 | $3,065.40 | $1,348.78 | $1,348.78 | $1,716.62 | C |

# Exhibit 18

**Type: All transactions · Status: All statuses · Name: Acclivity Medicaft · Date: All**

| Date | Type | No. | Payee | Category | Memo | Total |
|---|---|---|---|---|---|---|
| 12/11/2015 | Expense | | Acclivity Medicaft | Due From SimCare ASC LLC | IN *ACCLIVITY MEDICAFT. WRIGHT 345IAIYXZ35 5134159977 | 5,000.00 |
| 01/14/2016 | Expense | | Acclivity Medicaft | Due From SimCare ASC LLC | IN *ACCLIVITY MEDICAFT. WRIGHT 014IA0DH375 5134159977 | 5,024.25 |
| 02/25/2016 | Expense | | Acclivity Medicaft | Due From SimCare ASC LLC | IN *ACCLIVITY MEDICAFT. WRIGHT 056IAIZ1XCE 5134159977 | 5,024.25 |
| 04/08/2016 | Expense | | Acclivity Medicaft | Due From SimCare ASC LLC | IN *ACCLIVITY MEDICAFT. WRIGHT 099IAIZ9JWF 5134159977 | 5,024.25 |
| | | | | | | 20,072.75 |

# Simcare ASC LLC
## Transaction Report
### January 2015 - December 2017

| Date | Transaction Type | Adj | Name | Memo/Description | Account | Split | Amount |
|---|---|---|---|---|---|---|---|
| 05/27/2016 | Expense | No | Acclivity Medical | equipment??? | 2010 Credit cards payable:American Express 91002 | 5790 Supplies - medical | 5,024.25 |
| 07/14/2016 | Expense | No | Acclivity Medical | | 2010 Credit cards payable:American Express 91002 | 5790 Supplies - medical | 5,024.25 |
| 08/05/2016 | Expense | No | Acclivity Medical | | 2010 Credit cards payable:American Express 91002 | 5790 Supplies - medical | 5,024.25 |
| 09/21/2016 | Expense | No | Acclivity Medical | | 2010 Credit cards payable:American Express 91002 | 5790 Supplies - medical | 5,024.25 |
| 10/20/2016 | Expense | No | Acclivity Medical | | 2010 Credit cards payable:American Express 91002 | 5790 Supplies - medical | 5,024.25 |
| | | | | | | | 25,121.25 |

# Exhibit 19

## Chronological List of Transactions Evidencing Mail Fraud

### Dr. Bhambhani

| Date | From | Billed to | Shipped To | Invoice No. | Item | Qty. (Units) | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| 09/14/2015 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. #102 Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 100 Walter Ward Blvd. Suite 300 Abingdon, MD 21009 | 1356 | **01-1010-NSS-EAD** NeuroStim System-EAD | 20 | $900.00 | $18,000.00 |
| 10/06/2015 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. #102 Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 100 Walter Ward Blvd. Suite 300 Abingdon, MD 21009 | 1377 | **01-1010-NSS-EAD** NeuroStim System-EAD | 20 | $900.00 | $18,000.00 |
| 10/19/2015 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. #102 Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 100 Walter Ward Blvd. Suite 300 Abingdon, MD 21009 | 1387 | **01-1010-NSS-EAD** NeuroStim System-EAD | 20 | $600 | $12,086.43 (includes shipping) |
| 10/26/2015 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. #102 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 100 Walter Ward Blvd. | 1394 | **01-1010-NSS-EAD** NeuroStim System-EAD | 20 | $600 | $12,000.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Havr DeGrace, MD 21078 | Suite 300 Abingdon, MD 21009 | | | | | |
| 11/05/2015 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. #102 Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 100 Walter Ward Blvd. Suite 300 Abingdon, MD 21009 | 1403 | **01-1010-NSS-EAD** NeuroStim System-EAD | 20 | $600 | $12,000.00 |
| 11/18/2015 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. #102 Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 100 Walter Ward Blvd. Suite 300 Abingdon, MD 21009 | 1410 | **01-1010-NSS-EAD** NeuroStim System-EAD | 20 | $600 | $12,000.00 |
| 11/24/2015 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. #102 Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 100 Walter Ward Blvd. Suite 300 Abingdon, MD 21009 | 1417 | **01-1010-NSS-EAD** NeuroStim System-EAD | 20 | $600 | $12,000.00 |
| 12/07/2015 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. | **Dr. Ritu Bhambhani** Box Hill Surgery Center | 1427 | **01-1010-NSS-EAD** | 20 | $600 | $12,000.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | #102<br>Havr DeGrace, MD 21078 | 100 Walter Ward Blvd.<br>Suite 300<br>Abingdon, MD 21009 | | NeuroStim System-EAD | | | | |
| 12/29/2015 | **Acclivity Medical**<br>456 Glengarry Way.<br>Covington, KY 41011 | **Dr. Ritu Bhambhani**<br>Box Hill Surgery Center<br>603 Revolution St.<br>#102<br>Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani**<br>Box Hill Surgery Center<br>100 Walter Ward Blvd.<br>Suite 300<br>Abingdon, MD 21009 | 1442 | **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | $600 | $12,000.00 |
| 02/05/2016 | **Acclivity Medical**<br>456 Glengarry Way.<br>Covington, KY 41011 | **Dr. Ritu Bhambhani**<br>Box Hill Surgery Center<br>603 Revolution St.<br>#102<br>Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani**<br>Box Hill Surgery Center<br>100 Walter Ward Blvd.<br>Suite 300<br>Abingdon, MD 21009 | 1465 | **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | $600 | $12,024.95 (includes Shipping) |
| 02/18/2016 | **Acclivity Medical**<br>456 Glengarry Way.<br>Covington, KY 41011 | **Dr. Ritu Bhambhani**<br>Box Hill Surgery Center<br>603 Revolution St.<br>#102<br>Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani**<br>Box Hill Surgery Center<br>100 Walter Ward Blvd.<br>Suite 300<br>Abingdon, MD 21009 | 1475 | **01-1010-NSS-EAD**<br>NeuroStim System-EAD | 20 | $600 | $12,024.95 (includes Shipping) |
| 03/09/2016 | **Acclivity Medical**<br>456 Glengarry Way.<br>Covington, KY 41011 | **Dr. Ritu Bhambhani**<br>Box Hill Surgery Center<br>603 Revolution St.<br>#102 | **Dr. Ritu Bhambhani**<br>Box Hill Surgery Center<br>100 Walter Ward Blvd. | 1489 | **01-1010-NSS-EAD**<br>NeuroStim | 20 | $600 | $12,024.95 (includes |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Havr DeGrace, MD 21078 | Suite 300 Abingdon, MD 21009 | | System-EAD | | | Shipping) |
| 03/28/2016 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. #102 Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 100 Walter Ward Blvd. Suite 300 Abingdon, MD 21009 | 1500 | **01-1014-NSS/EAD 411 Array** NeuroStim System-EAD 411 Array | 20 | $600 | $12,024.95 (includes Shipping) |
| 04/11/2016 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. #102 Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 100 Walter Ward Blvd. Suite 300 Abingdon, MD 21009 | 1513 | **01-1014-NSS/EAD 411 Array** NeuroStim System-EAD 411 Array | 60 | $600 | $36,035.00 (includes Shipping) |
| 06/22/2016 | **Acclivity Medical** 456 Glengarry Way. Covington, KY 41011 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 603 Revolution St. #102 Havr DeGrace, MD 21078 | **Dr. Ritu Bhambhani** Box Hill Surgery Center 100 Walter Ward Blvd. Suite 300 Abingdon, MD 21009 | 1546 | **01-1014-NSS/EAD 411 Array** NeuroStim System-EAD 411 Array | 80 | $600 | $48,035.00 (includes Shipping) |

# Exhibit 20

## <u>Chronological List of Communications Evidencing Wire Fraud</u>

### Dr. Bhambhani

| Date | Type of Communication | From whom | To whom | Description |
|---|---|---|---|---|
| 08/17/2015 | Email w/ attachment, Video, <u>Exhibit 7</u>. | Smith, Vice President of Sales and Marketing for IHCS | Dr. Bhambhani | Introduction to the NSS device; attachment IHCS Power Point Slide Show; NSS Educational Video |
| 09/08/2015 | Email, w/ multiple attachments, <u>Exhibit 8</u>. | Brannon, Vice President of Operations for IHCS | Dr. Bhambhani | Providing certain NSS "billing information." referred to the NSS service by the CPT descriptor only, and again contained no reference to electro acupuncture. |
| 09/09/2015 | Multiple Emails, <u>Exhibit 9</u>. | Smith, Vice President of Sales and Marketing for IHCS | Dr. Bhambhani | Solicitations included links to training videos and an extensive list of applications for the device. |
| 09/28/2015 | Email, <u>Exhibit 11</u>. | Brannon, Vice President of Operations for IHCS | Dr. Bhambhani | Providing additional coding instruction |
| 09/29/2015 | Email, <u>Exhibit 11</u>. | Brannon, Vice President of Operations for IHCS | Dr. Bhambhani | Providing additional coding instruction |
| 12/08/2015 | Email, <u>Exhibit 12</u>. | Brannon, Vice President of Operations for IHCS | Dr. Bhambhani | Confirmed the propriety of the same code sequence set forth on the IHCS Physician Power Point Slide Show |
| 09/01/2016 | Email, <u>Exhibit 13</u>. | Carrico, HIS President | Dr. Bhambhani | Lied to Dr. Bhambhani that IHS is not involved in billing and coding Recommended a third-party billing services that would "do a tremendous job of pre-authorizing and billing for the NSS which will allow you to have 0 headaches, help patients, be very profitable, and be protected." |

**Chronological List of Communications Evidencing Wire Fraud**

**Dr. Rao**

| Date | Type of Communication | From whom | To whom | Description |
|---|---|---|---|---|
| 09/15/2015 | Email w/ Attachment, Video, Exhibit 14 | Miller, Distributor/Principal of Acclivity | Dr. Rao | Providing coding and reimbursement advice consistent with the slideshow provided to Dr. Bhambhani by IHCS. |
| 09/22/2015 | Email, with several attachments, FAQ Sheet for Clinicians prepared by IHS (Exhibit 3), "NSS – Science and Overview" (Exhibit 15), and "EAD Brochure" (Exhibit 16) | Miller, Distributor/Principal of Acclivity | Ginny Goldbach, Chief Financial Officer for Radiance Surgery Center | Two of these three attachments were prepared by IHS and branded accordingly. And more importantly, not even one of these documents identified that the NSS was FDA-cleared as an electroacupuncture device. Indeed, consistent with Mr. Carrico's explicit instructions to all IHS's Sales Agents, the word "acupuncture" did not appear even once in these materials. |
| 09/22/2015 | Email, attached with several "exemplar" Explanation of Benefits ("EOB") statements, Exhibit 17. | Miller, Distributor/Principal of Acclivity; email originally sent to Miller by Kuhlman | Ginny Goldbach, Chief Financial Officer for Radiance Surgery Center | Detailed payments to other medical providers from a variety of insurance companies and other third-party payers, including Medicare, for bills submitted under the codes promoted by Defendants as part of the NSS coding Scheme, including CPT 64555. Miller explicitly identified these in email correspondence to Goldbach as being EOBs "for NSS use," and pointed to not only the reporting of CPT 64555, but code modifiers and placement sites to be used with the code. |

| | | | | |
|---|---|---|---|---|
| 09/22/2015 | Telephone call | Joy Long, Member of DragonSlayer Strategies; introduced to Ginny Goldbach by Miller | Ginny Goldbach, Chief Financial Officer for Radiance Surgery Center | Regarding coding for the NSS Device |
| 09/22/2015 | Email, with several attachments, including a coding memorandum and “template” procedure notes and letters of medical necessity, Exhibit 4. | Joy Long, Member of DragonSlayer Strategies | Ginny Goldbach, Chief Financial Officer for Radiance Surgery Center | Characterizing the NSS as a neurostimulator, reportable under CPT 64555, and “clearly delineated from acupuncture” or electro-acupuncture.” *See* Exhibit 4. |
| 07/14/2016 | Email, Exhibit 17. | Miller, Distributor/Principal of Acclivity; copying on the email Kimberly Coleman | Dr. Rao and Ginny Goldbach, Chief Financial Officer for Radiance Surgery Center | Miller is responding to concerns related to various coding-related issues. Miller also arranges phone call to take place on 07/14/2016 to discuss NSS, coding, and patient identification/candidacy. |
| 07/19/2016 | Telephone | Kimberly Coleman; Miller | Dr. Rao and Ginny Goldbach | Teleconference takes place regarding the use of the NSS in an ASC setting |