# Leardi Decl. Exhibit 3



1032 Peninsula Drive Central City, PA 15926
**Phone**: (814) 754-1550 **Fax**: (814) 754-1553
**On the Web**: http://www.codingexperts.com

March 15, 2021

**To**:   Buttaci Leardi & Werner LLC                    <u>VIA E-Mail and US Mail</u>
**Attn**:  John W. Leardi, Esq.
        Elizabeth A. Rice, Esq.
        212 Carnegie Center, Suite 202
        Princeton, NJ 08540

**To**:   Colella Zefutie LLC
**Attn**:  Ugo Colella, Esq.
        John J. Zefutie, Jr.
        1300 I Street NW, Suite 400E
        Washington, D.C. 20005

**RE**:   <u>*Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*</u>, Case No. 19-cv-355 (RDB)(D. Md.)

Dear Mr. Leardi, Ms. Rice, Mr. Collella, and Mr. Zefute:

As requested, I have analyzed the information provided to me in this matter which are detailed at Appendix A of this report to include inspection of an actual NeuroStim System ("NSS") device, electrodes and manufacturer instructions, as well as relevant standards as cited herein. Analysis was conducted in accordance with audit process standards published by the Department of Health and Human Services ("HHS"), Office of Inspector General ("OIG"), Office of Audit Services ("OAS")[1], which are commonly used in the industry.

**<u>SUMMARY OF EXPERTISE</u>**

I have substantial experience in the analysis of coding particularly with respect to physical medicine services. I have developed educational curricula on behalf of AAPC (formerly the American Academy of Professional Coders) as well as authored specialty certification examinations that address physical medicine services, ambulatory surgical and urologic services and have additionally authored substantial portions of the curricula for the AAPC certified professional compliance officer, medical auditor physical medicine, and ambulatory surgical specialty certifications. I have additionally performed expert analysis of physical medicine and out-patient surgical services in a variety of administrative, civil and criminal proceedings on behalf of providers, insurance carriers, and the government. I am a nationally recognized expert in the field of forensic CPT, HCPCS and ICD coding and compliance. My complete Curriculum Vitae and history of testimony is attached at Appendix B of this report.

---

[1]   HHS, OIG, OAS, *The Audit Process*, (2nd ed. January, 2005)

Leardi – *Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*
Page 2 of 20

## RULE 26 DISCLOSURES

My compensation in this matter is based solely on the amount of time spent evaluating the materials provided and resources cited, and in development of the opinions expressed in this report and its appendices.  Neither the entitlement to nor the amount of my compensation is predicated on the substance of the opinion or conclusions reached.  The hourly fee charged in this case is $375.00 per hour for analysis and preparation of this expert report and $425 per hour for live deposition or hearing testimony.  Additional fees for costs (e.g. copying, postage, travel,) are also included in my total fee.  A complete history of testimony given is included with my curriculum vitae, which is attached at Appendix B of this report.

## SUMMARY OF FINDINGS

1. The FDA cleared use of the NeuroStim System ("NSS") device is properly coded using CPT 97813.

2. The off-label use of the NSS device as an electric neurostimulator is correctly coded using CPT 97014 or HCPCS G0283.

3. The coding guidance provided to IHS clients by IHS or its surrogates was misleading and designed to result in inappropriate and/or inflated payments.

4. IHS and its surrogates reasonably knew that their representations regarding the device, the CPT codes it recommended for use and coverage of either the device or treatment with the NSS device were false.

5. The recommendation by IHS and its surrogates that the placement of the NSS device could or should be performed in an ASC was designed to demonstrate increased reimbursement potential to sell more devices to its unsuspecting clients.

## STANDARD OF REVIEW

### I.    GENERAL STANDARDS FOR CODE SELECTION

In 1996, Congress passed the Health Insurance Portability and Accountability Act (HIPAA). As a part of that law, Congress added a section to the existing Social Security Act (SSA) entitled Administrative Simplification. The underlying purpose of this legislation was to increase utility of electronic data interchange (EDI) through standardization of electronic transactions. To accomplish this, the codes used to report services were to be standardized. Four years later, on Aug. 17, 2000, the Department of Health and Human Services (HHS) published regulations (*see* 45 CFR §§160, 162) detailing the transaction and code set standards mandated under the HIPAA statute (*see* 65 FR 50312-01). The effective date of the rule was Oct. 16, 2000 and the compliance date was Oct. 16, 2002.

The regulations require all "covered entities," as that term is defined in the regulations, and which includes all health plans and practically all providers, to use ICD-10-CM (including the official guidelines for use), as maintained and distributed by HHS, for the reporting of diseases, injuries, impairments, other health problems and their manifestations, and causes of injury disease, impairment, or other health problems (45 CFR §162.1002(a)(1)). The regulations further require that a combination of HCPCS Level II, as maintained and distributed by HHS, and CPT®, maintained and distributed by the American Medical Association (AMA), be used to report physician services and other health care services (45 CFR §162.1002(a)(5)).

HHS expressly included the guidelines for use of ICD-10 in the code set, but did not include the CPT® Editorial Panel guidance published in the CPT® coding manual, or the guidelines for use published in HCPCS Level II, as being included in the code set for reporting physician services and supplies. This omission was not accidental, as is evident in the official comments published in the Federal Register with the final rule. 65 FR 50312-01 (Aug. 17, 2000). The significance of the exclusion of code utilization guidance from the code set cannot be understated.  The exclusion of any rules on how the codes are utilized permits local carriers or, in the case of a statutory reimbursement scheme, legislators, to define how the standard codes will be used beyond the plain meaning obtained from the code description itself.  The result of this authorization is that there are no universally accepted rules pertaining to code selection or usage.  Therefore, auditors must identify, on a case-by-case basis, either the contractually mandated code utilization standard or, as is the case here, the statutory, regulatory and/or sub-regulatory rules for the benefit program being billed as a means of identifying binding code utilization criteria.

## II.     STANDARDS FOR CODE SELECTION FOR MEDICARE CLAIMS

The Social Security Act provides a detailed statutory scheme defining the coverage and reimbursement for all manner of health services, including physician services and supplies provided on an outpatient basis.  Because the Medicare program is administered by local Medicare Administrative Contractors ("MACs") consistent with requirements of the Social Security Act, it's implementing regulations published by the Department of Health and Human Services and the guidance published by the Centers for Medicare and Medicaid Services ("CMS"), which is included in sub-regulatory guidance known as the Medicare Internet Only Manuals, it is appropriate that these resources be applied when determining whether a  code selection is consistent with Medicare program requirements.

### A.  CMS CODE SELECTION GUIDANCE

While there are no statutory or regulatory instructions that address specific code selection methodologies that are appropriate for Medicare claims, sub-regulatory guidance issues by CMS does provide guidance to Medicare contractors relative to the process for determining if a CPT or HCPCS code is appropriate for the service or supply provided.  For determining the correct "Medicare code" we turn to the Medicare Program Integrity Manual ("MPIM"), which provides guidance for resolving coding related issues as follows.

Case 1:19-cv-00355-LKG   Document 132-5   Filed 02/25/22   Page 5 of 22
Leardi – *Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*
Page 4 of 20

> The MACs, CERT, SMRC, Recovery Auditors, and ZPICs shall determine that an item/service is correctly coded when it meets **all the coding guidelines listed in the Current Procedural Terminology-4 (CPT-4)**, Coding Clinic for ICD, Coding Clinic for HCPCS, and any coding requirements listed in CMS manuals or MAC articles.

MPIM, IOM Pub 100-08, Chapter 3, Section 3.6.2.4 (emphasis added).

Based on the MPIM provision above, correct coding for Medicare is coding that follows the coding guidelines found in the CPT Coding Manual, which are developed by the CPT Editorial Panel and published by the American Medicare Association ("AMA").  CPT guidance for code selection is addressed below.

### B. CPT EDITORIAL PANEL GUIDANCE

The CPT Editorial Panel guidance for code selection that is published in the CPT coding manual provides a number of fundamental instructions regarding the proper assignment of a CPT code to a service.  The Introductory Section of the CPT Coding Manual includes a section entitled "Instructions for the Use of the CPT Codebook", which contains the following guidance: "*Select the name of the procedure or service that accurately identifies the service performed. **Do not select a CPT code that merely approximates the service provided**. If no such specific code exists, then report the service using the appropriate unlisted procedure or service code.*"

The CPT Coding Manual is organized into sections and subsections based on the type of service.  Surgical procedures include CPT codes 10021-69990 and are subdivided into subsections based on the organ system that is the target of the surgical procedure.  CPT 61000-64999 apply generally to "Surgical Procedures on the Nervous System."  This subclassification is further subclassified under "Surgical Procedures on the Extracranial Nerves, Peripheral Nerves, and Autonomic Nervous System" (CPT 64400-64999) and even further sub-classified as "Neurostimulator Procedures on the Peripheral Nerves" (CPT 64550-64595).  While CPT 64999 is appropriate for any procedure classifiable as a surgical procedure to the Nervous System, it is still reportable only where a surgical procedure not defined by a code in the range of CPT 61000-64911 is performed.

### NEUROSTIMULATOR PROCEDURES ON THE PERIPHERAL NERVES

According to the section guidance published in the CPT Coding Manual relative to these codes, the term "surgical" is given its common meaning. The CPT Guidelines for surgical procedures and the work included with surgical procedures defined within this section of the CPT Coding Manual as follows:

> The services provided by the physician to any patient by their very nature are variable. The CPT codes that represent a readily identifiable **surgical** procedure thereby include, on a procedure-by-procedure basis, a variety of services. In defining the specific services "included" in a given CPT **surgical** code, the following services are always included in addition to the **operation** per se:
> - *Local infiltration, metacarpal/metatarsal/digital block or topical anesthesia*

- *Subsequent to the decision for surgery, one related Evaluation and Management (E/M) encounter on the date immediately prior to or on the date of procedure (including history and physical)*
- *Immediate postoperative care, including dictating operative notes, talking with the family and other physicians*
- *Writing orders*
- *Evaluating the patient in the **postanesthesia recovery area***
- *Typical postoperative follow-up care*

Based on the above, the work involved in the performance of services classified as surgical procedures anticipate pre-surgical E/M work, **anesthesia, and post-operative recovery and care**.

Surgical procedures applicable to the nervous system (CPT 61000-64999) and more specifically, the surgical procedures on the Extracranial Nerves, Peripheral Nerves, and Autonomic Nervous System (CPT 64400-64999) are generally classified in the Medicare Physicians Fee Schedule Database ("MPFSDB") as minor surgical procedures with a post-operative period of ten (10) days (surgical classification "010").  By contrast, therapeutic services defined in the AMA CPT Coding Manual are found within the Medicine section of CPT entitled "Physical Medicine and Rehabilitation". Therapeutic services are classified in the MPFSDB as non-surgical services (surgical classification "XXX") and therefore have no surgical post-operative period.  This suggests that services described in the section of CPT entitled "Surgical Procedures on the Extracranial Nerves, Peripheral Nerves, and Autonomic Nervous System - 64400-64999" and, more specifically, the services described in the sub-section applicable to "Neurostimulator Procedures on the Peripheral Nerves" are invasive surgical procedures that involve more work and post-surgical risk than is involved with simple application of small acupuncture needles that are applied through the skin for providing percutaneous electrical stimulation, which are non-surgical services given that these treatment procedures require no post service care.

Beyond the "surgical" nature of these services, we additionally note that the CPT Editorial Panel section guidance applicable to "Neurostimulator Procedures on the Peripheral Nerves" provides an express definition of an "electrode array."  Specifically, an electrode array is defined as "a catheter or other device with more than one contact." The CPT Editorial Panel further explains in its guidance that *"[t]he function of each contact may be capable of being adjusted during programming services. Test stimulation to confirm correct target site placement of the electrode array(s) and/or to confirm the functional status of the system is inherent to placement, and is not separately reported as electronic analysis or programming of the neurostimulator system. Electronic analysis (95970) at the time of implantation is not separately reported.*"

Based on the above, we can conclude that the service described by CPT 64555 involves an invasive surgical procedure for placement of a catheter or other device that constitutes an "electrode array," which must have more than one contact and that each contact can be adjusted as to its location to confirm proper placement. Additionally, there is an apparent programming element to the service

Leardi – *Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*
Page 6 of 20

to confirm proper placement of each electrode in the array that is not separately reportable given its inclusion in the work described by the service.

### PHYSICAL MEDICINE AND REHABILITATION

Therapeutic treatment services are found within the Medicine section of the CPT coding manual under the sub-section entitled "Physical Medicine and Rehabilitation." The codes in this section of CPT are further subdivided into a variety of sub-sections, which include those therapeutic services classified as either "modalities" or "procedures." These terms are defined in CPT as follows:

> ***Modalities***
> *Any physical agent applied to produce therapeutic changes to biologic tissue; includes but not limited to thermal, acoustic, light, mechanical, or electric energy.*
>
> > ***Supervised (97010-97028)***
> > *The application of a modality that **does not require** direct (one-on-one) patient contact by the provider.*
>
> > ***Constant Attendance (97032-97039)***
> > *The application of a modality **that requires** direct (one-on-one) patient contact by the provider.*

Current Procedural Terminology Manual, 4th ed. 2013-2021 (emphasis added)

As indicated in the definition above, where the therapeutic change to biologic tissue is caused by a "physical agent" such as electric energy, the service is classified as a modality. It is also notable that the "application of a modality to one or more areas," which is consistent in the code description for all modalities, does not limit the application to surface application and, relative to electrical stimulation, could involve either transcutaneous or percutaneous application of the physical agent. In contrast, therapeutic procedures are defined in CPT as follows:

> ***Therapeutic Procedures (97110-97546)***
> *A manner of effecting change through the **application of clinical skills** and/or services that attempt to improve function. **Physician or therapist required to have direct (one-on-one) patient contact**.*

*Id.*

Therefore, as a general matter, where a service is provided to cause biologic change to tissues for therapeutic benefit, proper code selection relies on a determination of whether the therapeutic change is primarily produced as a result of application of a physical agent such as thermal, acoustic, light, mechanical or electrical energy, or whether such therapeutic change is instead dependent primarily on the application of clinical skill during the delivery of the therapeutic service. Once the modality/procedure distinction is resolved, then the level of contact necessary to provide the service must be analyzed.

Leardi – *Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*
Page 7 of 20

For a modality, where only supervision is required, we look to CPT codes 97010-97028 to define the modality. Where no such code accurately describes the physical agent used, CPT 97039 is the appropriate code.  Where a modality requires the constant attendance of the physician or therapist, we look to CPT codes 97032-97036 to define the modality based on the physical agent used. Where no such code accurately describes the physical agent used, CPT 97039 is again the appropriate code.

### *Acupuncture*
The Medicine section of CPT also provides an express sub-section of codes for Acupuncture services (CPT 97810, 97811, 97813 and 97814), which were added in 2005.  These codes are described as follows:

> *97810   Acupuncture, one or more needles, without electrical stimulation; initial 15 minutes of personal one-on-one contact with the patient*
>
> *97811 Acupuncture, one or more needles, without electrical stimulation; each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure)*
> *97813 Acupuncture, one or more needles, with electrical stimulation; initial 15 minutes of personal one-on-one contact with the patient*
>
> *97814 Acupuncture, one or more needles, with electrical stimulation; each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure)*

### C.  SECONDARY SOURCE MATERIAL
While not binding, secondary source material is often helpful to coders when attempting to code a service properly. Obviously, correct coding depends on a proper understanding of the work involved in the service defined by a CPT code.  As such, commonly used encoder software such as Optum 360 EncoderPro.com Professional and AAPC Codify, provide a "lay description" for each CPT code so that coders may better understand the work involved in the service.  The following lay description is provided in the Optum 360 product:

> *The physician places an **electrode array percutaneously** (through the skin) through an **introducer needle** into the tissue to be stimulated. Electrodes placed over sensory nerves decrease pain sensation in the distribution of the nerve. Electrodes placed over motor nerves stimulate paralyzed muscles to prevent atrophy. In 64553, the electrodes are placed over the motor or sensory points of cranial nerves. In 64555, the electrodes are placed over peripheral motor or sensory nerves, excluding sacral nerves.*
> *Report 64561 when stimulators are placed near sacral nerves (via transforaminal approach) that may require imaging guidance.* (Emphasis added).

Leardi – *Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*
Page 8 of 20

The AAPC Codify product provides the following lay description:

> *A neurostimulator includes electrodes which are **inserted under the skin** and induced by a generator to stimulate the nerve tissue. Use of this stimulator involves implantation of electrodes around a selected peripheral nerve.*
>
> ***Clinical Responsibility***
> *The stimulating electrode is connected by an insulated lead to a receiver unit **which is implanted under the skin at a depth not greater than 1/2 inch**. Stimulation is induced by a generator connected to an antenna unit which is attached to the skin surface over the receiver unit. **Implantation of electrodes requires surgery and usually necessitates an operating room**. Report 64555 if the targeted area is peripheral nerve.*
>
> ***Terminology***
> *The term **percutaneous** pertains to any medical procedure where access to inner organs or other tissue is done via **needle–puncture** of the skin, rather than by using an "open" approach where inner organs or tissue are exposed. (Emphasis added).*

As these materials make clear, the work involved in performance of the service described by CPT 64555 is commonly understood to involve a surgical service that usually requires performance in an operating room (hence the ten (10) day global surgical period classification) where an electrode array is placed percutaneously through an introducer needle, sometimes called a cannula, under the skin so as to contact the targeted peripheral nerve or nerves.  A pad containing multiple electro acupuncture needles is not an "electrode array" and application of that pad so that the needles puncture the skin is not considered a percutaneous implantation given that the pad remains on top of the skin rather than underneath it.

## DISCUSSION

### CORRECT CODING OF NSS

Based on the binding coding standards above, it is clear, given that the NSS device is an electro-auricular device ("EAD") classified by the FDA as an "electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states." [2] The NSS devices is to be used only by licensed acupuncturists and therefore as an acupuncture device, the placement of the device, assuming that placement involves at least 8 minutes of time, is correctly coded using CPT 97813.  Relative to the issue of billable time for this code, we note that acupuncture is a service within the series of codes described in CPT as "Physical Medicine and Rehabilitation" and while in most cases, the time associated with the various time-based modalities, procedures and other services is dependent on treatment time, this is not the case with the acupuncture codes. CPT Editorial Panel guidance is clear that relative to acupuncture, either with or without electrical stimulation, only the time spent inserting, manipulating or reinserting the needles is billable time.  As such, the time

---

[2]   FDA 510(k) K140530, which determined that the EAD was "substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices marketed in interstate Commerce…" The predicate devices were the P-Stim and the E-Pulse devices.

involved in the actual provision of the electrical acupuncture service, which according to the IHS protocols, is usually five (5) days, is irrelevant.  Based on the assumption that placement involves 8 minutes of actual physical contact by the physician, then CPT 97813 would be reportable for this service.  CPT 97814, which represents each additional 15 minutes of time spent in the insertion, manipulation or reinsertion of the needles would be reportable in a single unit in addition to CPT 97813 only where the total time spent in the insertion, manipulation or reinsertion of the needles involved 23 minutes or more.  Similarly, a second unit of CPT 97814 would be reportable in addition to CPT 97813 only where the total time spent in the insertion, manipulation or reinsertion of the needles involved 38 minutes or more.

Notwithstanding the above, it is understood that there are opinions in secondary source materials that suggest a different conclusion. Specifically, a subscription newsletter published by the American Medical Association ("AMA") CPT Information and Education Services Division ("CPTEIS"), which was formerly the CPT Information Services Division ("CPTIS") concluded that the placement of the NSS device should be reported using CPT 64999.  This conclusion is erroneous for the reasons that follow.

1. CPTIS undertook the task of publishing information regarding changes to neurostimulator implantation codes, which were effective on January 1, 2012 in the 2012 edition of AMA CPT Changes.  CPTIS explained that the CPT Editorial Panel changed the description of these codes, changing the word "electrodes" to "electrode array".  In describing the basis for the change, CPTIS indicated that the change was necessary to portray the intended use of neurostimulator implantation codes such as CPT 64555 as follows:

> _Rationale_
> _Changes have been made to the neurostimulation codes throughout the CPT codebook to provide language that is the same for these procedures as well as to more clearly portray the intended use for these procedures. This includes revision to the guidelines following the neurostimulator heading, which has been revised to provide a definition for the term "electrode array" identifying that an array includes more than a single contact **capable of being adjusted**. This change accommodates the addition of the term "array" to codes 64553, 64555, 64561, 64565, 64575, 64580, 64581, and 64585, which have been revised to reflect the more appropriate term "electrode array."_

AMA CPTIS, CPT Changes (2012) (emphasis added)

Consistent with this clarification, which merely replicates the binding definition of "electrode array" found in the CPT coding manual, CPTIS indicates that an "electrode array" must have multiple contacts and must be capable of being adjusted during programming.  Because the NSS device is not a neurostimulator and does not involve surgical "implantation" of an "electrode array" and does not involve any programming, none of the neurologic surgical codes provided in CPT correctly describe the placement of or treatment with an NSS device.

Case 1:19-cv-00355-LKG   Document 132-5   Filed 02/25/22   Page 11 of 22
Leardi – *Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*
Page 10 of 20

2.   In addition to the CPT Changes guidance above, a review of the CPT Assistant Newsletter reveals content that directly addresses the coding of NSS[3] although we must note that the articles contained in the CPT Assistant, which is a subscription publication, are written by unnamed authors employed in the CPTIS division of the AMA.  The qualifications of the authors cannot be verified and, in many cases, as is the case here, the basis for the conclusion expressed is not disclosed.  At the time this particular edition was published, there was no editorial review of the opinions published by the CPT Editorial Panel and even if such review had occurred, coders must be cautious relative to relying on the conclusions published given that CPT IS includes the following disclaimer in its printed newsletter publication.

*"CPT® Assistant is designed to provide accurate, up-to-date coding information.  We continue to make every reasonable effort to ensure the accuracy of the material presented.  However, this newsletter does not replace the CPT codebook; it only serves as a guide."*

Based on the above disclaimer, not only does CPT IS disclaim the accuracy of the opinions they publish, but specifically directs that any variance between the opinions published and the result reached through application of the CPT Editorial Panel guidance contained in the CPT code book must be resolved in favor of the conclusion commanded by the guidance published by the CPT Editorial Panel in the official CPT code book.  For that reason, a CPT IS opinion on proper code selection cannot be considered a particularly persuasive secondary coding resource except where the opinion mirrors the result obtained by application of the official CPT Editorial Panel guidance, which is not the case here.  Additionally, and importantly, the CPT Assistant Newsletter is not publicly available.  It is available only to subscribers for a substantial fee and for that reason, few providers subscribe to this resource and are unaware of what may be contained in the various editions of this newsletter.  With these issues in mind, we note the following opinion relative to the coding for placement of the Neuro-Stim System Electro-Auricular device for pain management.

*Question:* *What is the appropriate CPT code to report the placement of the Neuro-Stim System™ Electro-Auricular Device™ for pain management?*

*Answer:* *The Neuro-Stim System™ Electro-Auricular Device™ is a* ***small implant****, which is similar to the size of a hearing aid, that rests behind the ear and generates a low, continual frequency and pulse in an effort to help decrease chronic pain in the neck and/or back. Therefore, it is* ***not appropriate to report codes for nerve stimulators that are implanted directly into the body****, such as code 64555, Percutaneous implantation of neurostimulator electrode array; peripheral nerve (excludes sacral nerve). The correct code to report for the placement of a Neuro-Stim System™ Electro-Auricular Device™ is code 64999, Unlisted procedure, nervous system. When reporting an unlisted procedure code, it is necessary to submit supporting documentation (eg, procedure report) along with the claim to provide an adequate description of the nature, extent and need for the procedure, as well as the time, effort, and equipment necessary to provide the service.*[3]

---

3    CPT Assistant Newsletter, *Frequently Asked Questions: Surgery: Nervous System*, Vol. 26, Issue 2 (Feb. 2016)

Leardi – *Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*
Page 11 of 20

While the CPT Assistant article does confirm that CPT 64555 is not an appropriate code for reporting placement of the *Neuro-Stim System™ Electro-Auricular Device™,* it does so for the wrong reason as indicated by two logical errors evident in the published response.  First, CPTIS concludes erroneously that the device is a "small implant."  This is not the case as CPTIS confirms later in its opinion when it states that the device "rests behind the ear."  Second, CPTIS erroneously relies on the device name as indicating that it is, in fact, a nerve stimulator.  This is not the case given that the device is classified by the FDA, based on representations made by the manufacturer, as an "electro acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states."  Third, CPTIS erroneously concludes that CPT 64555 represents the implantation of the stimulator despite correctly reciting the description of CPT 64555, which involves implantation of an "electrode array" rather than the neurostimulator (generator) itself, which CPT expressly states that, where performed, is coded separately.

In short, the CPTIS came to the wrong conclusion as to the appropriate coding of placement of and/or treatment with the NSS device for the following reasons:

1.  The questioner did not disclose and CPTIS did not endeavor to discover that the *Neuro-Stim System™ Electro-Auricular Device™* was classified as an electro-acupuncture device by the FDA and therefore was not a neurostimulator at all.

2.  While CPT IS apparently recognized that the placement of the NSS was not a surgical procedure, it nonetheless concluded, without explanation, that an unlisted nervous system surgical procedure code was appropriate.  In reaching this conclusion, CPTIS failed to apply CPT Editorial Panel guidance pertaining to the selection of unlisted procedure or service codes as follows:

> **Instructions for Use of the CPT Codebook**
> *Select the name of the procedure or service that accurately identifies the service performed. Do not select a CPT code that merely approximates the service provided. If no such specific code exists, then report the service using the appropriate unlisted procedure or service code.*

Relative to use of unlisted procedure or service codes, the CPT Editorial Panel Instructs as follows:

> **Unlisted Procedure or Service**
> *It is recognized that there may be services or procedures performed by physicians or other qualified health care professionals **that are not found** in the CPT code set. Therefore, a number of specific code numbers have been designated for reporting unlisted procedures. When an unlisted procedure number is used, the service or procedure should be described (see specific section guidelines). Each of these unlisted procedural code numbers (with the appropriate accompanying topical entry) relates to a specific section of the book and is presented in the guidelines of that section.*

Case 1:19-cv-00355-LKG   Document 132-5   Filed 02/25/22   Page 13 of 22
Leardi – *Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*
Page 12 of 20

Based on this guidance, prior to recommending use of an unlisted procedure from the surgical section of CPT applicable to the nervous system, CPTIS should have followed the CPT Editorial Panel guidance and ascertained what the NSS system was (an electro acupuncture device), what type of treatment it provided (acupuncture with electrical stimulation) and what placement of the NSS system (as a service) physically involved (placing the generator behind the ear, taping on the electrode pads with pre-positioned needles). As it did not do so as required, it rendered an opinion based on an incomplete understanding of the service and did not follow CPT Editorial Panel guidance when concluding that an unlisted code was appropriate. Given the inconsistency between the CPTIS conclusion and the conclusion commanded by the CPT Editorial Panel guidance, based on the CPT Assistant Newsletter disclaimer, we cannot therefore consider this secondary source opinion as accurate or persuasive, let alone binding, on the issue of how placement of an NSS device should be coded. Therefore, the above CPT Assistant Newsletter opinion must be discarded in favor of the conclusion commanded by the binding guidance of the CPT Editorial Panel that is published in the CPT code book. As noted above, correct coding of the electro acupuncture treatment using the NSS device is CPT 97813 and potentially, where needle placement, manipulation or re-insertion involved sufficient time, one or more units of CPT 97814.

### CORRECT CODING OF NSS TREATMENT BASED ON MARKETED OFF-LABEL USE

Notwithstanding the implications of marketing the device in a manner contrary to its FDA pre-market clearance, even where we assume that the marketing statements by IHS and/or its surrogates [4] were true and that the NSS was being used to provide electrical stimulation of peripheral nerves rather than the acupuncture with electrical stimulation service that was represented in the pre-market clearance application to the FDA, this does not change the fact that CPT 64555 and 64999 are inappropriate codes for the resultant service. Taking acupuncture out of the equation does not make the device a "neurostimulator," does not make placement of the device a surgical service, and does not change the fact that the service does not involve percutaneous implantation of an "electrode array." Instead, by ignoring the fact that the device provides an "acupuncture" service, we must conclude that the service is a therapeutic modality that does not require constant attendance. As such, the correct CPT code would be CPT 97014, which is described as follows:

97014 – Application of a modality to 1 or more areas; electrical stimulation (unattended)

As noted above, the description for CPT 97014 does not impose any restrictions to the method of application. Additionally, it is not a time-based service. As such, whether electrical energy was provided transcutaneously or percutaneously is irrelevant and the duration of the service in the office under the supervision of the physician is also equally irrelevant.

---

[4]     It is notable that in all the marketing materials or documents published by IHS or its surrogates, the true FDA classification of the device is never mentioned. In fact, the word acupuncture is never used. As an example, IHS contrary to its FDA 510(k) pre-market clearance, merely represents the device as a "generator [that is] FDA cleared for targeting acute and chronic pain" (Doc. 48, p. 86) omitting its classification as an electro-acupuncture device that is only to be used by qualified acupuncturists. IHS marketing agent IHCS goes further by making the statement that NSS is an "FDA approved peripheral nerve stimulator" (Doc. 48, p. 52) and the "first and only FDA approved electro-auricular peripheral nerve stimulator." (Doc. 48, p. 61).

Finally, while CPT 97014 is the appropriate CPT code for the off-label use of the NSS marketed by IHS and its surrogates, this code is not appropriate for claims where Medicare coding rules are applicable.  CMS has classified CPT 97014 in the MPFSDB using the status code of "I," which means it is invalid for claims submitted to the Medicare program.  Instead, providers are instructed to report HCPCS code G0283 for electrical stimulation for non-wound care, which is described as follows:

> G0283 – Electrical stimulation (unattended), to one or more areas for indication(s) other than wound care, as part of a therapy plan of care

As a result, for claims to Medicare or payers who rely on Medicare coding rules, the correct code for reporting NSS used off-label as providing electrical stimulation to peripheral nerves is G0283. For commercial payers not relying on CMS coding rules, the off-label use of the NSS would be correctly coded using CPT 97014.

## FINDINGS

1. **The FDA cleared use of the NeuroStim System ("NSS") device is properly coded using CPT 97813.**

   CPT 64555 and CPT 64999 are neither an accurate nor reasonable code choice when reporting the electrical acupuncture services and/or the off-label electrical stimulation services provided with the NSS device.  The correct code for the acupuncture service performed using the NSS device is CPT 97813 for the initial 15 minutes of personal one-on-one contact associated with needle placement, manipulation or re-insertion.  Where necessary and performed, CPT 97814 for each additional 15 minutes of personal one-on-one contact associated with needle placement manipulation or re-insertion is also reportable although it does not appear that application of the electrodes would likely involve more than the 23 minutes of time necessary for reporting the add-on code (CPT 97814).

2. **The off-label use of the NSS device as an electric neurostimulator is correctly coded using CPT 97014 or HCPCS G0283**

   In cases where the NSS device was used to provide electrical stimulation treatment that would not be clinically classifiable as acupuncture, the correct code would either be CPT 97014 or its HCPCS counterpart for Medicare claims, HCPCS G0283, which are described as follows.

   a) CPT 97014 is a supervised modality code that is described as "[a]pplication of a modality to one or more areas, electrical stimulation (unattended).  There is notably no distinction in CPT relative to electrical stimulation for transcutaneous or percutaneous stimulation.

   b) HCPCS G0283, the Medicare counterpart to CPT 97014 is described as "[e]lectrical stimulation (unattended), to one or more areas for indication(s) other than wound care, as part of a therapy plan of care."

3. **The coding guidance provided to IHS clients by IHS or its surrogates was misleading and designed to result in inappropriate and/or inflated payments**.

Guidance provided by Innovative Healthcare Solutions ("IHS") and their surrogates appears designed to not only mislead the provider regarding the nature of the NSS device and the service it provides, but is also designed to cause healthcare providers, who reasonably relied on the accuracy of the information IHS provided,  to further mislead payers into making payments they otherwise would not make and/or making payments in higher amounts than would otherwise be due based on the inaccurate descriptions of the device and service that IHS provided to its clients.  Had the providers understood the true nature of the service provided, they would have identified the erroneous nature of the coding advice they received and certainly would not have purchased a single use device for as much as $900 when it provided a reimbursement potential of less than $40.00.  Additionally, had the payer understood the true nature of the service provided, it is likely that either service would not have been covered (some payers do not cover acupuncture), or where covered, would have paid substantially less than the amounts claimed under the CPT codes recommended by IHS.  Specifically;

a) Contrary to the Food and Drug Administration ("FDA") pre-market clearance document referenced by IHS (K140530), which designates the NSS as an Electro-Acupuncture Device ("EAD"), IHS and its surrogates ignored the acupuncture component of the marketing clearance and instead marketed the NSS as a neurostimulator for treatment of acute and chronic pain.

b) The FDA 510(k) summary submitted to the FDA by Navigant Consulting, Inc. on behalf of the manufacturer, Key Electronics, represents that the NSS is substantially equivalent to other electro-auricular acupuncture devices such as the "P-Stim" system and "E-Pulse" device.  It is apparent that the FDA 510(k) submission was approved on that basis. Regardless, the application describes the EAD as a battery-operated single use device that employs four (4) stainless steel wires that provide electrical impulses to three (3) needle "arrays" of four (4) needles each and one (1) "array" comprised of a single needle. Physical inspection of the electrode pad reveals small needles of approximately 1 mm in length that are capable of barely puncturing the skin.  Once the pad containing the small needles is placed on the skin such that the needles penetrate the skin to some degree, the generator and the pad containing the small needles remain in place for the duration of the treatment, which is, for many of the IHS designed protocols, described to be five (5) days.  According to the materials reviewed, the patient removes the device themselves after the treatment period, which is usually five (5) days.  There is no indication that either the pulse generator or the electrode "array" is surgically implanted percutaneously either via an incision or through a cannula as suggested by the CPT code recommended, the marketing presentation, or the various precertification, letter of medical necessity or documentation templates provided to physicians by IHS or its surrogates.  The fact that the patient removes the electrode pads themselves further supports the conclusion that placement is not a surgical procedure involving implantation. Otherwise, the patient would be incapable of performing the surgical procedure necessary to remove the electrode pad.

c) Neither providers nor payers were advised in the materials or information provided by IHS or its surrogates that the pre-market clearance received from the FDA designates the NSS as an "electrical acupuncture stimulator" that, according to its FDA indications for use, is cleared for "use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states." In fact, in none of the marketing materials or documentation provided, does IHS ever use the word "acupuncture" or advise potential purchasers that the FDA clearance received limits use of NSS to "qualified practitioners of acupuncture as determined by the states."

d) Precertification forms, letter of medical necessity templates and procedure note templates purposefully misrepresent the service as a means to justify inappropriate payment or inappropriately inflated payment amounts.

e) The device does not involve surgical implantation of a neurostimulator electrode array as alleged in the IHS marketing materials, example pre-certification form, example letter of medical necessity template or procedure note templates provided by IHS. Instead, it involves temporary percutaneous insertion of electrodes for performance of electrical acupuncture.

**4. IHS and its surrogates reasonably knew that their representations regarding the device, the CPT codes it recommended for use and coverage of either the device or treatment with the NSS device were false.**

Given the IHS experience with the P-Stim device, it certainly was aware of the coverage restrictions regarding electro-acupuncture devices. As a result, it appears to have recruited surrogates to develop an alternate method of coding so that it could justify its target cost for the device. So that it could justify charging $900 for a single use device, it developed a coding and reimbursement scheme that it reasonable should have known was inaccurate but would promote sales at the target sales price by showing a reasonable profit to its clients. Specifically,

a. IHS was, according to the complaint, an exclusive distributor of the "P-Stim" device prior to its development (via Key Electronics) of the NSS.

b. The NSS EAD, according to the FDA 510(k) application, was substantially equivalent to the P-Stim EAD. Specifically, both were EADs that were classified as miniaturized electrical acupuncture devices for use in the practice of acupuncture by licensed practitioners of acupuncture.

c. Unlike the recommendations it made either directly or through surrogates relative to P-Stim, which involved billing for the device itself under a HCPCS code for an implantable neuro stimulator or pulse generator, IHS and its surrogates made recommendations to providers to, in effect, obtain reimbursement for the NSS device by billing CPT code 64555,

which is code for a surgical procedure involving the "percutaneous implantation of [a] neurostimulator electrode array; peripheral nerve (excludes sacral nerve)." IHS knew that its device was not a neurostimulator, knew that it was not providing electrical energy through what CPT defines as an "electrode array," and further knew that the electrodes were not surgically implanted under the skin.

d. The CPT code recommended is not justifiable for the reasons described above. As discussed, the electrode "array," which is nothing more than a pad taped to the skin that includes four (4) small needles that transmit electrical current from the same lead wire, is not surgically implanted percutaneously. Instead, the pad, when taped to the skin, causes the needles to be temporarily inserted through the outer layer of the skin to provide the electrical acupuncture treatment. No surgical procedure is involved, and the "array" is not placed percutaneously through a cannula under the skin. Nor could it be since the device was designed for use by acupuncturists who are not generally qualified to perform surgical services. Second, the device is not a "neurostimulator." Neurostimulators are regulated by the FDA under the regulatory classification for "Neurological Therapeutic Devices" (*see* 21 C.F.R. §882.5890). The NSS EAD is designated as an Electro Acupuncture Stimulator that has an "unclassified" regulatory classification. Therefore, even if we were to conclude that the insertion of the needles constituted a surgical "implantation" of an electrode array, the device is classified as an electro acupuncture device not a neurostimulator. As such, even if we ignore the "implantation" requirement, the "array" cannot be considered an "neurostimulator electrode array" as is required by the code description for CPT 64555.

e. The CPT code recommended by IHS and its surrogates (CPT 64555), being classified as a minor surgical procedure with ten (10) follow-up days, also allowed NSS to credibly recommend that providers could perform this procedure in an ASC, thereby justifying additional reimbursement for the facility expenses of the ASC. When reporting the service in an office setting, the provider is paid the non-facility rate for the service, which is usually somewhat higher than the facility rate. The reason for this is that the Medicare Physician Fee Schedule is based on the relative value of a service, which is defined under what is known as the Medicare Resource Based Relative Value System ("RBRVS").

In 1992, Medicare significantly changed the way it paid for physicians' services. Instead of basing payments on charges, the federal government established a standardized physician payment schedule based on a what is known as the resource-based relative value scale (RBRVS). Under the RBRVS payment system, payments for services are determined by the resource costs needed to provide each specific service. The cost of providing any service is divided into three components: physician work, practice expense and professional liability insurance. Payments are calculated by multiplying the combined costs of a service by a conversion factor (a monetary amount that is determined by the Centers for Medicare and Medicaid Services). Payments are also adjusted for geographical differences in resource costs.

The physician work component accounts, on average, for 52 percent of the total relative value for each service. The initial physician work relative values were based on the results of a Harvard University study. The factors used to determine physician work include the time it takes to perform the service; the technical skill and physical effort; the required mental effort and judgment; and stress due to the potential risk to the patient. The physician work relative values are updated each year to account for changes in medical practice. Also, the legislation enacting the RBRVS requires the Centers for Medicare and Medicaid Services (CMS) to review the entire scale at least every five years.

The practice expense component of the RBRVS accounts for an average of 44 percent of the total relative value for each service. Practice expense relative values were based on a formula using average Medicare approved charges from 1991 (the year before the RBRVS was implemented) and the proportion of each specialty's revenues that is attributable to practice expenses. However, in January 1999, CMS began a transition to resource-based practice expense relative values, which accounted for these same expenses for each CPT code with a differential based on the site or place of service. In 2002, the resource-based practice expenses were fully transitioned and included a statistically derived practice expense component that included practices expenses such as the costs of physical building space, electricity, phones, cost of equipment necessary to perform a particular service, and costs of billing and collections for the service performed.

On January 1, 2000, CMS implemented the resource-based professional liability insurance (PLI) relative value units. The PLI component of the RBRVS accounts for an average of 4 percent of the total relative value for each service. With this implementation and final transition of the resource-based practice expense relative units on January 1, 2002, all components of the RBRVS are resource-based.

Annual updates to the physician work relative values are based on recommendations from a committee involving the American Medical Association (AMA) and national medical specialty societies. The AMA/Specialty Society RVS Update Committee (RUC) was formed in 1991 to make recommendations to CMS on the relative values to be assigned to new or revised codes in Current Procedural Terminology (CPT®). Nearly 8,000 procedure codes are defined in CPT, and the relative values in the RBRVS were originally developed to correspond to the procedure definitions in CPT and the costs associated with performance of each service defined in CPT.  Changes in CPT necessitate annual updates to the RBRVS for the new and revised codes.

Based on the above, it is evident that the relative value of the service, and therefore the reimbursement amount for a service, is based on three (3) cost factors.  Physician relative work, practice expense and malpractice expense.  When the physician performs a service in an ASC, he or she does not have the practice expense, the ASC does.  As a result, the

physician's fee is reduced and the ASC separately reports its facility expenses.  This, however, does not create a revenue neutral result.  A service performed in an office, paid at the higher non-facility rate, reimburses far less than the collective payment for the physician's service at the lower facility rate and the separately billed facility charges by the ASC.  This permits physicians, who have created their own ASCs, to gain substantially more profit by performing surgical procedures that could be performed in an office, in an ASC.  This is not to say that all surgical procedures can be performed in an office setting. In fact, surgical procedures classified as minor surgical procedures with ten (10) follow-up days (e.g. CPT 64555) often need to be performed in an ASC setting.

For this reason, IHS' misrepresentation of the nature of the service and the appropriate CPT code was apparently designed to not only justified the increased reimbursement that CPT 64555 offered, but also to support the potential of even more reimbursement where the service was performed in an ASC.

f.   CPT 64999, which was an alternate code recommended by IHS and/or its surrogates, is also inaccurate for the reasons expressed above.  CPT 64999 is described in CPT as an "unlisted procedure, nervous system."  As noted above, the CPT Instructions for Use indicate that an unlisted code should be reported only when there is not another code that exactly describes the service.  Given that the NSS is classified as an electrical acupuncture device, the electrical stimulation service provided would be reported using CPT 97813, which is described in CPT as "[a]cupuncture, 1 or more needles; with electrical stimulation, initial 15 minutes of personal one-on-one contact with the patient."   Even when used in the off-label fashion consistent with the marketing and instructions provided by IHS and its surrogates, the correct code for Medicare would be HCPCS G0283 or for non-Medicare based payers, CPT 97014.

g.   Because there is limited coverage for acupuncture or acupuncture with electrical stimulation, and where coverage exists, limited reimbursement, [5] IHS and its surrogates, promoted an improper billing scheme as a means of justifying generating the reimbursement necessary to convince physicians to purchase NSS devices, which cost, according to the complaint, $900.00 for each single use device.

---

[5]   Currently, the Medicare Physician Fee Schedule database indicates a total relative value of 1.21 for CPT 97813 and a reimbursement, depending on the locale, between $38.57 and $54.99.  HCPCS G0283 is carrier priced but generally reimburses even less.  By contrast, CPT 64555 presently reimburses (in a non-facility), depending on the locale, between $1,942.15 and $3,061.68.  *See* https://www.cms.gov/medicare/physician-fee-schedule/search? (accessed March 1, 2021).

Leardi – *Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*
Page 19 of 20

**5. The recommendation by IHS and its surrogates that the placement of the NSS device could or should be performed in an ASC was designed to demonstrate increased reimbursement potential to sell more devices to its unsuspecting clients.**

As noted above, the suggestion by IHS or its surrogates that the application of the NSS device could be performed in an ASC for additional reimbursement is especially incredulous. This became justifiable to its clients and payers only because of its inaccurate guidance that the service was correctly reportable using CPT 64555. A review of the instructions provided with the NSS device that were provided for review do not suggest that there could be a clinical justification for an acupuncturist providing any acupuncture treatment in an ASC let alone needing to apply an NSS device in an ambulatory surgical setting, which usually involves monitored anesthesia care. The same conclusion results even where we consider the marketed off-label use of the device. Instead, this seems to be another reckless recommendation designed to boost profits for physicians as a means of inducing them to purchase more devices.

**CONCLUSION**

IHS, based on its presumed experience with the predicate P-Stim device, certainly knew that it could not legitimately obtain reimbursement for the NSS device itself. Because of the collapse of the P-Stim market, which came about because CMS integrity contractors discovered the IHS recommended but erroneous coding of the P-Stim device and which led to 100% recoveries of the monies paid for its unfortunate clients, IHS and its surrogates were forced to not only come up with a new device, but develop a new coding scheme that would provide the reimbursement necessary to convince its unsuspecting physician clients that there was sufficient reimbursement to justify IHS' target sales price of $600.00-$900.00.

Despite knowing that its device was classified by the FDA as an electro acupuncture device designed for use by licensed acupuncturists, IHS and its surrogates, contrary to its permissible marketing clearance from the FDA, purposefully misrepresented what the device was. Specifically, it created the illusion that it was selling a neurostimulator that involved the placement of an implanted neurostimulator electrode array. It did so to create a plausible justification for its recommended coding as a surgical procedure, which thereby created the reimbursement potential necessary to justify the price IHS charged for the device. Given that CPT 64555 is classified as a minor surgical procedure with ten (10) follow up days, this created the ability, based on the representation that a surgical implantation was actually being performed, that the service was justifiably performed in an ASC setting adding increased profit potential such that paying $600.00 to $900.00 per device became a "no-brainer" to its unsuspecting clients. To further demonstrate the profit potential of its "new" device, IHS, through its published protocols, was generally recommending that treatment of most conditions would require the use of four (4) or more devices per patient. Presentation slides demonstrated the earning potential created by its protocols and were supported by exemplar carrier explanation of benefits documents designed to convince providers that their coding recommendations were legitimate.

Leardi – *Bhambhani, et al. v. Innovative Health Solutions, Inc. et al.*
Page 20 of 20

The knowing misrepresentation of the device classification was the predicate to justify to its unsuspecting clients that CPT 64555 was an appropriate code. Misrepresenting the service as involving a surgical implantation of an electrode array supported the representation that the service could be performed in an ASC thereby creating additional reimbursement potential.   The entire scheme was designed to demonstrate sufficient reimbursement to client physicians, which in turn would motivate them to not only implement the NSS treatment in their practices, but order a substantial number of NSS devices.  Ultimately, if IHS and its surrogates had told their clients the truth about what the device was (an electro-acupuncture device), it could not have plausibly justified its coding recommendations and its business model would have collapsed.

IHS, as a result of its reckless misrepresentations, exposed its clients to substantial financial harm.  Because the coding it and its surrogates recommended was not accurate, physicians, regardless of any appeals, will be forced to re-pay 100% of the monies paid by Medicare and other federal healthcare program contractors for these NSS services. With that in mind, it is important to understand that the monies those physicians received was not all profit.  They ultimately lose the amount they paid for the device, the value of their professional time and the administrative costs associated with the provision, billing, collection and repayment associated with the billing of these services.  They also endure the costs of obtaining professional and/or legal assistance with identifying and disclosing overpayments beyond what may have been identified by an integrity contractor.  Many practices who were induced by IHS' billing scheme are likely to be financially ruined as a result. Meanwhile, IHS and the surrogates it likely paid to promote their scheme, escape with the monies they received from the sales of these devices, which appears unfair and/or unjust.

Please advise if you require any additional clarification of the issues addressed above.

With Kind Regards,

Michael D.  Miscoe, JD, CPC, CASCC, CUC, CCPC, CPCO, CPMA, CEMA, AAPC Fellow

**Enclosures**
Appendix A – Reference List
Appendix B – Curriculum Vitae

APPENDIX A – INFORMATION AND MATERIALS REVIEWED

1. Second Amended Class Action Complaint, Civil Action No.: 19-cv-03555-RDB (D.Md)

2. PLFS0008512 – Patient Aftercare.pdf

3. PLFS00008352 – NSS Precertification Form FSP.pdf

4. PLFS0008353 - NSS Procedure Note Template.pdf

5. PLFS0008354 - Precertification and Billing Overview.pdf

6. PLFS0008511 - NSS Patient Progress Questionaire.pdf

7. PLFS0008821 - precert v.2therapeutic ASC.pdf

8. Final IHCS PHYSICIAN PP rev3 Slide Show.ppsx

9. LMN+for+NSS+Draft00005.docx

10. NSS Precertification Form FSP.pdf

11. Precertification and Billing Overview.pdf

12. DragonSlayer Strategies, Memo, December 24, 2014 (Provider+Update+Memo+-+NSS+12-24-201400001.docx.pdf)

13. Treatment+Procedure+Form+Draft00009.docx

14. Pre+Auth+Procedure+Description+Draft00007.docx

15. FDA+Stimulator+Comparison+Chart00004.docx

16. NSS Patient Progress Questionaire.docx

17. Michael J King DPM, FACFAS, FASPS, NSS+Comment+Letter+7+19+1600001.docx

18. CPTIS, CPT Assistant, Frequently Asked Questions, Vol. 26, Issue 2 (Feb. 2016)

19. CPTIS, CPT Assistant, Frequently Asked Questions, Vol. 28, Issue 8 (Aug. 2018)

20. CPTIS, CPT Assistant, Frequently Asked Questions, Vol. 28, Issue 10 (Oct. 2018)

21. Novitas Local Coverage Article, A55350 (Orig Eff. Date: 8/11/2016, Rev. Eff. Date 01/21/2020)

22. EAD Instructions.pdf

23. NSS EAD Device; PN 01-1014, SN 16-230015797, Lot EAD32114